**UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| KENNETH FIXLER, | ) | No. 19 B 36659 |
| | ) | |
| Debtor. | ) | |
| | ) | |
| _____ | ) | |
| | ) | |
| BCL-HOME REHAB LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 21 A 215 |
| | ) | |
| KENNETH FIXLER, | ) | |
| | ) | |
| Defendant. | ) | Judge Goldgar |

**MEMORANDUM OPINION**

Before the court for ruling is the motion of defendant Kenneth Fixler to dismiss the adversary complaint of plaintiff BCL-Home Rehab LLC. Home Rehab was a real estate venture. Fixler was a member of Home Rehab and controlled its operations. After his aggressive business plan allegedly ran Home Rehab into the ground, Fixler filed a chapter 7 bankruptcy case. In its complaint, Home Rehab alleges that Fixler owes the company debts for his share of the business losses and for money the company lent him, debts that are nondischargeable.

For the reasons below, Fixler's motion will be granted and the complaint dismissed. Home Rehab will be given leave to amend some but not all of its claims.

**1. Jurisdiction**

The court has subject matter jurisdiction under 28 U.S.C. § 1334(b) and the district court's Internal Operating Procedure 15(a). This is a core proceeding. 28 U.S.C. § 157(b)(2)(I).

## 2. Facts

On a Rule 12(b)(6) motion to dismiss, all well-pleaded factual allegations in the complaint are taken as true, and all reasonable inferences are drawn in the plaintiff's favor. *Jacquet v. Green Bay Area Catholic Educ., Inc.*, 996 F.3d 802, 807 (7th Cir. 2021).  Also fair game are exhibits to the complaint and facts that can be judicially noticed.  *Kuebler v. Vectren Corp.*, 13 F.4th 631, 636 (7th Cir. 2021).

These sources allege the following facts.

### a. Home Rehab and Fixler

Home Rehab is an Illinois limited liability company that bought foreclosed single-family homes, rehabbed them, and sold them for profit.  (Compl. ¶¶ 5, 13).  Barnett Capital Ltd. is Home Rehab's parent company.  (*Id.* ¶ 7).  Home Rehab funded its operations through loans from another Barnett Capital affiliate, BCL-Operations LLC.  (*Id.* ¶ 15).  Home Rehab then repaid the loans with revenue from property sales.  (*Id.*).

Joel Barnett is Barnett Capital's chairman and president and a member of Home Rehab.[1] (*Id.* ¶ 8).  Kenneth Fixler is a long-time member of the real estate industry (*id.* ¶¶ 10-11) and someone Barnett had known for decades (*id.* ¶ 9).  (Their wives are first cousins.  (*Id.* ¶ 9)).  In 2009, Fixler came to work for Home Rehab.  (*Id.* ¶ 13).  He bought properties and oversaw their reconstruction and resale.  (*Id.* ¶ 14).

The next year, Fixler became Home Rehab's president and assumed responsibility for its operations.  (*Id.* ¶ 16).  He was also given a 20% membership interest in the company.  (*Id.* ¶ 17). Rather than pay for his interest, Fixler personally guaranteed his portion of the loans Home

---

[1]     Home Rehab attaches to the complaint an operating agreement dated January 1, 2017. (Ex. 5).  The agreement lists the other members of Home Rehab as of that date.  Neither the operating agreement nor the complaint says who the members were before or after 2017.

Rehab obtained from Operations. (*Id.*). As a member, Fixler received a pro rata share of Home Rehab's profits and also guaranteed repayment of his pro rata share of any losses. (*Id.* ¶ 18). Fixler represented to Barnett and the other Home Rehab members that he had the means to take on the risk associated with his ownership interest. (*Id.* ¶ 19).

### b. Home Rehab's Entry into the Luxury Home Market

For the next four years, Home Rehab's operations went well. The company bought, rehabbed, and sold around 150 homes, generating roughly $5 million in profits for its members. (*Id.* ¶ 22).

In early 2014, Fixler had a strategic discussion with the other Home Rehab members in which he proposed to expand the business into the luxury home market. (*Id.* ¶¶ 23-24). Fixler's proposal assumed that Home Rehab could rehab and sell homes more quickly than it had. (*Id.* ¶ 25; Ex. 1). Fixler also intended to reduce costs by using in-house contractors instead of general contractors. (*Id.* ¶ 26). He prepared a business plan based on the new timelines and lower costs. (*Id.* ¶ 25; Ex. 1).

Given Fixler's past success and his new business plan, Barnett Capital agreed to have Operations lend Home Rehab more funds, procure third-party financing for Home Rehab, and hire an extensive in-house contracting staff. (*Id.* ¶ 27). Over the next year or so, Operations lent the funds and hired the staff. (*Id.* ¶ 32). Barnett Capital arranged the promised third-party financing. (*Id.*).

As Home Rehab's president, Fixler was the only Home Rehab member involved in daily business operations. (*Id.* ¶¶ 28, 30). He found the properties, staffed the company, oversaw the construction staff and subcontractors, and arranged and oversaw property sales. (*Id.*). He also maintained written status reports on Home Rehab's projects. (*Id.* ¶ 31). The reports reflected

the costs, timelines, and projected profits for each property in the company's portfolio.  (*Id.*; *e.g.*, Ex. 2).

Fixler periodically updated Home Rehab's other members on business operations and consulted them about strategy.  (Compl. ¶ 20).  Because of his personal involvement in the operation, Fixler knew more about company performance than the other members.  (*Id.* ¶ 31).

In early 2014, Home Rehab implemented the new business plan under the name "Barnett Homes" and began rapidly acquiring new properties.  (*Id.* ¶ 29).  In 2014 and early 2015 alone, Home Rehab spent more than $40 million to acquire seventy-four properties.  (*Id.* ¶ 33).  That sum was more than double the value of inventory the company had acquired during the previous five years.  (*Id.*).  Fixler planned to sell fifteen of the seventy-four homes for $2 million each. (*Id.* ¶ 34).  But he knew or should have known that the Chicago market would not support prices that high.  (*Id.*).

In the fall of 2015, the other Home Rehab members met with Fixler to discuss their concerns about the fifteen homes and the pace of acquisitions.  (*Id.* ¶ 35).  They also wanted to check on his business plan.  (*Id.*).  At the meeting, Fixler insisted that his plan was sound and the pace of acquisitions in line with achievable sales.  (*Id.* ¶ 36).  He expressed confidence that the properties acquired would produce the profits his plan contemplated.  (*Id.*).  Because Fixler, a part owner of the company and guarantor of its loan obligations, had "skin in the game," and because he was "family," the other members were reassured.  (*Id.* ¶ 37).  Based on Fixler's expressions of confidence and projections of profitability, Home Rehab continued to have access to the financial resources of Operations and the third-party lenders.  (*Id.* ¶ 38).

### c.  Home Rehab's Decline

Unfortunately, Fixler's confidence was misplaced.  Throughout 2015 and into 2016,

Fixler failed to keep Home Rehab on schedule. (*Id.* ¶¶ 39-40). By early 2016, Fixler knew (or

should have known) that the average holding time for the properties would be two years or more.

(*Id.* ¶ 40). Still, he continued to tell the other Home Rehab members and the outside lenders that

Home Rehab would turn a $12 million profit on homes sold through the end of 2016. (*Id.* ¶¶ 40,

42; *see* Ex. 3). During most of 2016, Fixler hid from the other members that he had improperly

managed the construction schedule and estimated carrying costs, and Home Rehab was

expecting losses that year. (Compl. ¶ 43).

In reliance, Home Rehab allowed Fixler "to remain at the helm" of its operations. (*Id.* ¶

92). Because he stayed in control, the company continued to incur debt and continued to suffer

financial losses from Fixler's "actions (or inaction) with respect to the construction of [Home

Rehab's] properties." (*Id.*).

In September 2016, Fixler finally admitted to the other members there would be no

promised profits. (*Id.* ¶ 44). He assured them, though, that he could arrange a "soft landing" for

Home Rehab. (*Id.* ¶ 45). He projected losses of $4 million, "a swing of over sixteen million

dollars" from his earlier estimate of a $12 million profit. (*Id.* ¶¶ 42, 45-46; Exs. 3-4).

The other Home Rehab members decided they had to cover the company's obligations to

Operations. (*Id.* ¶ 47). Collectively, they paid in more than $3.6 million to cover losses

sustained in 2015 and the first half of 2016. (*Id.* ¶ 48). Fixler paid his 20% share: $727,435.

(*Id.*).

Despite the capital infusion, though, the business continued to deteriorate. In March

2017, the members decided to contribute another $4 million to cover losses from home sales in

the last half of 2016. (*Id.* ¶ 50). Fixler paid his 20% share: $800,000. (*Id.* ¶ 51). But even that

did not help. During the rest of 2017, Fixler failed to complete and liquidate the company's

portfolio.  (*Id.* ¶ 55).  Home Rehab missed completion targets and continued to incur inflated carrying costs and losses.  (*Id.* ¶ 56).  Even so, Fixler continued to draw on loans from Operations and private lenders, increasing Home Rehab's obligations and the obligations of its members.  (*Id.* ¶ 58).

In early January 2018, Home Rehab's members contributed $8,664,806 to cover 2017 losses.  (*Id.* ¶ 60).  Fixler only paid $300,000 of his $1,732,961 share.  (*Id.* ¶ 61).  To come up with the rest, he asked Barnett for "short term help" until he could get money from his father.  (*Id.* ¶¶ 62, 65).  Counting on that prospect, Barnett and his wife agreed to help Fixler by co-signing a mortgage on his house.  (*Id.* ¶ 63).  Fixler used the $441,272.39 in mortgage proceeds to pay down his share of the losses.  (*Id.*).  From April 2018 to May 2019, Barnett also let Fixler draw $195,000 ($15,000 per month) from Home Rehab to pay his living expenses.  (*Id.* ¶ 65).

Still, Home Rehab's losses continued to mount.  (*Id.* ¶ 69).  By April 2019, the members had to make another capital contribution of $10 million to cover the losses.  (*Id.* ¶ 70).  This time Fixler did not pay his share, although he continued to say he was trying to get money from his family or from other sources and would never leave Barnett "holding the bag."  (*Id.* ¶¶ 71-72).

The next month, though, Fixler met with Barnett and told him he would not be paying anything toward his remaining debt.  (*Id.* ¶ 73).  Fixler quit the business, leaving Home Rehab to liquidate its portfolio at a total loss of nearly $31 million.  (*Id.* ¶¶ 73-74; Ex. 6).  Fixler's unpaid share of the losses comes to $3,920,836.93.  (*Id.* ¶ 74).  He also owes $195,000 for the living expenses Home Rehab advanced.  (*Id.* ¶¶ 65, 95-96).

### d.  Fixler's Hiring of Unqualified Family Members and Contractors

At some point in 2017, Fixler had Home Rehab hire his son as vice president and his

daughter-in-law as the company's real estate broker.  (*Id.* ¶¶ 52-53).  Fixler's son had no real estate or business experience.  (*Id.*).  Fixler's daughter-in-law had less than three years experience when she took charge of the Home Rehab portfolio.  (*Id.* ¶ 53).  Fixler provided them with jobs although he "likely already [knew] Home Rehab was going to incur substantial losses." (*Id.* ¶ 52).

Fixler also had the company hire unqualified contractors to work on projects.  (*Id.* ¶ 80). At least two home buyers sued Home Rehab over faulty construction.  (*Id.* ¶¶ 82-83).  Other buyers made warranty claims totaling $2.5 million, claims that Home Rehab paid.  (*Id.* ¶ 84). Home Rehab continues to receive warranty claims because of faulty construction.  (*Id.* ¶ 85).

### e.  The Bankruptcy Case and Adversary Proceeding

In late 2019, Fixler filed a petition under chapter 7 of the Bankruptcy Code.  Home Rehab then filed an adversary complaint against him alleging that his unpaid share of the business losses and the unreimbursed living expenses are nondischargeable debts.  The complaint has two counts.  Count I is a claim under section 523(a)(2)(A) of the Code, 11 U.S.C. § 523(a)(2)(A), that Fixler's debts are for money "obtained by false pretenses, a false representation, or actual fraud."  Count II is a claim under section 523(a)(4), 11 U.S.C. § 523(a)(4),  that the debts are for "defalcation by a fiduciary."

Fixler has moved to dismiss both counts under Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure, Fed. R. Civ. P. 9(b), 12(b)(6) (made applicable by Fed. R. Bankr. P. 7009, 7012(b), arguing that Count I fails to plead fraud with particularity, and neither count states a claim for relief.  Home Rehab opposes the motion.

### 3. Discussion

Fixler's motion will be granted.  His position is well taken:  Home Rehab's complaint fails to state claims under section 523(a)(2)(A) or section 523(a)(4).

### a.  Rule 12(b)(6) Standards

To survive a motion to dismiss, a complaint must clear two hurdles.  *E.E.O.C. v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007).  First, the complaint must describe the claim in enough detail to give the defendant notice of the allegations.  *Id.*; *see* Fed. R. Civ. P. 8(a) (made applicable by Fed. R. Bankr. P. 7008).  "[A] formulaic recitation of the elements of a cause of action will not do," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), nor will "naked assertions devoid of further factual enhancement," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotations omitted).  Some facts, in other words, must support each element of the claim.  *Iqbal*, 556 U.S. at 678-79; *McCauley v. City of Chicago*, 671 F.3d 611, 616-17 (7th Cir. 2011).

Second, the complaint "must plead facts sufficient to show that [the] claim has substantive plausibility."  *Johnson v. City of Shelby*, 574 U.S. 10, 12 (2014).  That means the allegations must raise the plaintiff's right to relief above the "speculative level."  *Twombly*, 550 U.S. at 555.  The plausibility standard "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Iqbal*, 556 U.S. at 678. "[T]he plausibility determination is a context-specific task that requires the . . . court to draw on its judicial experience and common sense."  *Bilek v. Federal Ins. Co.*, 8 F.4th 581, 586-87 (7th Cir. 2021) (internal quotation omitted).

And even if a complaint gives fair notice and the claim is plausible, "the facts must be legally sufficient in the sense that they invoke a cognizable legal theory."  *One-on-One Fitness*

*Personal Training Serv. v. Reyes (In re Reyes)*, Nos. 09 B 35198, 09 A 1277, 2010 WL 2757180, at *3 (Bankr. N.D. Ill. July 13, 2010). If no relief can be granted as a matter of law, the complaint must be dismissed. *Id.* (citing *Neitzke v. Williams*, 490 U.S. 319, 327 (1989)); *see also Hickey v. O'Bannon*, 287 F.3d 656, 657 (7th Cir. 2002) ("At a minimum, a complaint must state facts sufficient to state a claim as a matter of law").

### b.  Count I – Section 523(a)(2)(A)

Count I fails to state a claim under section 523(a)(2)(A). The portion of the claim about Home Rehab's business losses is something that section 523(a)(2)(A) on its face does not cover. The portion about the living expenses that Home Rehab advanced is at least a potentially cognizable section 523(a)(2)(A) claim, but Home Rehab has not adequately alleged fraudulent intent. As to Count I, Fixler's motion will be granted.

Section 523(a)(2)(A) excepts from discharge any debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by . . . false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." 11 U.S.C. § 523(a)(2)(A). The section describes three separate grounds for nondischargeability:  false pretenses, false representation, and actual fraud. *Groom v. Krook (In re Krook)*, 615 B.R. 479, 484 (Bankr. N.D. Ill. 2020); *First Am. Title Ins. Co. v. Speisman (In re Speisman)*, 495 B.R. 398, 402 (Bankr. N.D. Ill. 2013).

Section 523(a)(2), though, does not except from discharge every debt somehow connected with a fraud. *Reyes*, 2010 WL 2757180, at *3. It addresses a specific kind of debt with a specific relationship to fraud. *Id.* Section 523(a)(2) excepts from discharge debts for money (and so on) "'*to the extent obtained by*'" by the frauds described. *Id.* (quoting 11 U.S.C. § 523(a)(2)(A)) (emphasis in original); *see also Cohen v. De La Cruz*, 523 U.S. 213, 218-19

-9-

(1998); *Nunnery v. Rountree (In re Rountree)*, 478 F.3d 215, 219-20 (4th Cir. 2007); *Berger Schatz, LLP v. Livermore (In re Livermore)*, Nos. 12 B 30720, 12 A 1689, 2013 WL 1316549, at *6 (Bankr. N.D. Ill. Apr. 6, 2013); *Hellenic Enter. I, Inc. v. Vitogiannis (In re Vitogiannis)*, Nos. 08 B 4144, 08 A 315, 2009 WL 1372065, at *8 (Bankr N.D. Ill. May 15, 2009).  Only after it is first "established that specific money or property has been obtained by fraud" can a debtor's liability for "any debt" from the fraud become nondischargeable.  *Cohen*, 523 U.S. at 220-21.

The business loss claim in Count I does not allege a debt for money that Fixler obtained by fraud.  Home Rehab alleges that Fixler "grossly and fraudulently misrepresented the construction and sale timelines and overall profit projections."  (Compl. ¶ 91).  Relying on these misrepresentations, Home Rehab says, it allowed him to "remain at the helm," and so the company continued to incur debt and suffer losses.  (*Id.* ¶¶ 92-93).  Even if true, though, the "debt" Home Rehab asserts is for operational losses the company suffered, not money that Fixler "obtained."  Nowhere does Home Rehab allege that Fixler secured money for himself through his overly optimistic business projections or that the business losses somehow ended up in his pocket.  Because Home Rehab's business losses are not a debt for money, services, credit, or property obtained by fraud, *see Reyes*, 2010 WL 2757180, at *3, the business losses claim in Count I fails to state a claim under section 523(a)(2)(A) as a matter of law.

The claim about the living expenses Home Rehab advanced to Fixler fares slightly better.  The living expenses, at least, were monies Fixler "obtained."  The problem is that Home Rehab alleges it advanced those expenses because Fixler promised not to "walk away from his obligations" as a Home Rehab member and assured the company he would pay them back with help from his father.  (Resp. at 4).  Home Rehab alleges only promises.  To support a section 523(a)(2)(A) claim, a false representation must ordinarily relate to a "present or past fact."

*Handler v. Moore (In re Moore)*, 620 B.R. 617, 629 (Bankr. N.D. Ill. 2020); *Schiller DuCanto &
Fleck, LLP v. Potter (In re Potter)*, 616 B.R. 745, 752 (Bankr. N.D. Ill. 2020).  So a broken
promise – a promise to repay a loan, for example – usually will not support a section
523(a)(2)(A) claim.  *Rezin v. Barr (In re Barr)*, 194 B.R. 1009, 1017-18 ( Bankr. N.D. Ill. 1996).

True, a promise will support a claim if the debtor made the promise with no intention of
keeping it.  *Perlman v. Zell,* 185 F.3d 850, 853 (7th Cir.1999).  And here, Home Rehab alleges
that Fixler took the draws "knowing that he had no intention of repaying" them.  (Compl. ¶ 66).
But Home Rehab makes that allegation only on "information and belief."  (*Id.*).  Allegations on
information and belief seldom satisfy the "heightened pleading standard" for fraud claims under
Rule 9(b).  *United States ex rel. Mamalakis v. Anesthetix Mgmt. LLC*, 20 F.4th 295, 301 (7th Cir.
2021).  To plead fraud on information and belief, the facts that would otherwise support the
claim must be unavailable to the plaintiff, and he must "provide the grounds for his suspicions."
*Pirelli Armstrong Tire Corp. v. Walgreen Co.*, 631 F.3d 436, 443 (7th Cir. 2011) (internal
quotation omitted).  Home Rehab has not said the facts supporting its intent allegation are
unavailable, and it offers no grounds for its suspicions.  Without more, Count I fails to state a
claim under section 523(a)(2)(A) for the living expenses.

Because Count I fails to state a section 523(a)(2)(A) claim, Fixler's motion to dismiss
that count will be granted.  Home Rehab will be given leave to amend the living expenses claim.
*See Runnion ex rel. Runnion v. Girl Scouts of Greater Chi.*, 786 F.3d 510, 519 (7th Cir. 2015)
(noting that a plaintiff whose complaint has been dismissed should receive "at least one
opportunity to try to amend").  The claim about the business losses, though, is another matter.
Leave to amend even once can be denied when "any amendment would be futile."  *Bogie v.
Rosenberg*, 705 F.3d 603, 608 (7th Cir. 2013).  No amendment would salvage the business loss

claim because the claim is deficient as a matter of law.  The business loss claim will be dismissed with prejudice.

### c.  Count II – Section 523(a)(4)

Just as Count I fails to state a claim under section 523(a)(2)(A), Count II fails to state a claim under section 523(a)(4).  As to Count II, Fixler's motion to dismiss will also be granted.

Section 523(a)(4) excepts from discharge any debt for fraud or defalcation "while acting in a fiduciary capacity."  11 U.S.C. § 523(a)(4); *see Wachovia Sec., LLC v. Jahelka (In re Jahelka)*, 442 B.R. 663, 670 (Bankr. N.D. Ill. 2010).  To state a section 523(a)(4) claim, a creditor must allege (1) that the debtor acted as a fiduciary to the creditor when the debt was created, and (2) that the debt was caused by fraud or defalcation.  *Estate of Cora v. Jahrling (In re Jahrling)*, 816 F.3d 921, 925 (7th Cir. 2016); *Follett Higher Educ. Grp., Inc. v. Berman (In re Berman)*, 629 F.3d 761, 766 (7th Cir. 2011).

Whether a debtor is a "fiduciary" under section 523(a)(4) is a question of federal bankruptcy law, not substantive state or federal law.  *Berman*, 629 F.3d at 767.  "It bears emphasis," consequently, "that not all fiduciary relationships qualify under the Bankruptcy Code."  *In re Frain*, 230 F.3d 1014, 1017 (7th Cir. 2000).  The fiduciary exception to discharge is "'strict and narrow,'" *Berman*, 629 F.3d at 767 (quoting *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 333 (1934)), encompassing "only 'a subset' of fiduciary obligations" that substantive state and federal law recognize, *id.* at 768 (quoting *In re Woldman*, 92 F.3d 546, 547 (7th Cir. 1996)).

In this circuit, a fiduciary relationship that satisfies section 523(a)(4) arises in just two situations:  (1) when there is an express trust, and (2) when there is an implied fiduciary relationship.  *Id.* at 768-70; *In re Marchiando*, 13 F.3d 1111, 1116 (7th Cir. 1994).  To prove a

-12-

fiduciary relationship from an express trust, the creditor must show (1) a "clear intent to create a trust," and (2) the "hallmarks of a trust." *Berman*, 629 F.3d at 769. To prove an implied fiduciary relationship, the creditor must show the relationship involved a "special confidence." *Marchiando*, 13 F.3d at 1116. That confidence exists when the parties have an unequal relationship, one where there is "a difference in knowledge or power between fiduciary and principal" that gives "the former a position of ascendancy over the latter." *Id.*; *see also Berman*, 629 F.3d at 769; *Frain,* 230 F.3d at 1017.

Count II fails to state a claim under section 523(a)(4) because Home Rehab has not alleged facts suggesting plausibly that Fixler was Home Rehab's fiduciary. Home Rehab alleges that as its president Fixler had "responsibility for all its operations." (Compl. ¶ 16; *see also id.* ¶ 28 ("solely responsible for the business operations and success of Home Rehab")). Home Rehab alleges that he was the only member "involved in the day-to-day business operations" and had "sole control" over decisions about buying properties and the "design, implementation, and timeline" of projects. (*Id.* ¶ 30). And Home Rehab alleges that Fixler had "far more knowledge and understanding" than other members about of the company's performance. (*Id.* ¶ 31).

But that is all Home Rehab alleges. Nowhere does Home Rehab assert that its operating agreements entitled Fixler to "sole control" of company operations. In fact, he was only "a minority interest-holder" (*id.* at 1 (preliminary statement)) with no more than a 20% share of the business (*id.* ¶¶ 17-18). The operating agreement attached to the complaint – the agreement dated January 1, 2017 – gave management and control to the members generally, not just Fixler. (*Id.* Ex. 5 § 8.1). According to the agreement, "each Member" had the power to conduct all kinds of business on Home Rehab's behalf. (*Id.* Ex. 5 § 8.2(a)). Nothing in the complaint alleges that Fixler alone had access to information about Home Rehab's business, information

-13-

other members could not have had if they had wanted.[2]  The complaint alleges, not that Home

Rehab's structure put Fixler in sole control of company affairs, but that the other members let

him exercise that control.  Their *laissez-faire* attitude was what gave him greater knowledge of

the business.

That kind of "difference in knowledge or power" will not create a fiduciary relationship

under section 523(a)(4).  *Frain*, 230 F.3d at 1017.  By itself, a corporate officer or shareholder's

greater knowledge of daily business operations does not put him in a "position of ascendancy"

over other officers and shareholders – not, that is, if the information is available to the others, as

it appears to have been here.  *Id.*; *see also Berman*, 629 F.3d at 769-70; *Catrambone v. Adams*,

498 B.R. 839, 848 (N.D. Ill. 2013) (affirming finding of fiduciary duty where evidence showed

party "could not even access basic information about day-to-day business activities"); *Shrock v.*

*Meier (In re Meier)*, Nos. 14 B 10105, 14 A 403, 15 A 198, 2016 WL 5942309, at *14 (Bankr.

N.D. Ill. Oct. 11, 2016) (finding fiduciary where party "had sole control over financial

information" and "could rebuff . . . attempts to obtain [it]").

If there is no difference in knowledge in the relevant sense, there must at least be a

"concentration of power" that is "substantially one-sided."  *Frain*, 230 F.3d at 1017; *see also*

*Berman*, 629 F.3d at 770; *see, e.g., Bledsoe v. Bledsoe (In re Bledsoe)*, Nos. 09-80824, 09-8052,

2010 WL 2179721, at *6 (Bankr. C.D. Ill. June 1, 2010) (finding fiduciary duty where debtor

was corporation's sole shareholder and director, served as its CEO and CFO, and "exercised

exclusive control over [its] finances, its major decisions and . . . its distribution of profits").  But

---

[2]   Indeed, the complaint implies the opposite.  Home Rehab alleges that in mid-2015 "the
other members . . . became concerned about the pace of acquisitions that Fixler was driving" and
met with Fixler "to discuss these concerns and to check in on the business plan."  (*Id.* ¶ 35). For
the other members to become concerned, they had to have known what Home Rehab was up to,
and apparently they did not hesitate to ask Fixler about it.

-14-

Home Rehab has not alleged that kind of "concentration of power" either. The complaint identifies nothing like the shareholder agreement in *Frain* that was structured to give one shareholder-officer nearly exclusive decision-making power and so "considerable ascendancy" over the other two. *Frain*, 230 F.3d at 1018. As far as the complaint alleges, Fixler had ascendancy over the other Home Rehab members only because they left him to his own devices, not because the operating agreement empowered Fixler to shut them out.

Because Count II fails to allege a section 523(a)(4) claim, Count II will also be dismissed.[3] Home Rehab will have leave to amend. Unlike the business loss claim in Count I which is deficient as a matter of law, Count II lacks factual allegations from which a fiduciary relationship might be inferred. Home Rehab may yet be able to allege those facts. It has the right to try. *Runnion*, 786 F.3d at 519.

## 4. Conclusion

The motion of defendant Kenneth Fixler to dismiss Counts I and II of the adversary complaint of plaintiff BCL-Home Rehab LLC is granted. Counts I and II are dismissed. BCL

---

[3]    Given Home Rehab's failure to allege a fiduciary relationship, it is unnecessary to reach the harder question: whether Count II alleges a defalcation. "Defalcation" has traditionally been defined as "the misappropriation of funds held in trust for another in any fiduciary capacity," *Wians v. Wians (In re Wians)*, 523 B.R. 124, 130 (Bankr. N.D. Ill. 2014) (internal quotation omitted), or the "failure to account for money or property that has been entrusted to another," *Deady v. Hanson (In re Hanson)*, 432 B.R. 758, 775 (Bankr. N.D. Ill. 2010). If that is what "defalcation" means, the answer to the question is no. In *Bullock v. BankChampaign, N.A.*, 569 U.S. 267 (2013), though, the Court observed in dictum that defalcation "can encompass a breach of fiduciary obligation that involves neither conversion, nor taking and carrying away another's property, nor falsity." *Id.* at 275. The *Bullock* dictum appears to suggest that any breach of fiduciary duty will do as long as the debtor had the necessary mental state. Whether that is a fair reading of *Bullock* is a question for another day. *See Stoughton Lumber Co. v. Sveum*, 787 F.3d 1174, 1176 (7th Cir. 2015) (quoting the *Bullock* dictum but also declaring inconsistently that "'[d]efalcation' refers to the misappropriation of funds entrusted to one – a form of embezzlement").

Home-Rehab has leave to amend the living expenses claim in Count I as well as the claim in Count II.  The business loss claim in Count I is dismissed with prejudice.  A separate order will be entered consistent with this opinion.

Dated: July 22, 2022

_____
A. Benjamin Goldgar
United States Bankruptcy Judge