## UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| In Re: | ) | |
| | ) | |
| KENNETH FIXLER, | ) | |
| | ) | Chapter 7 |
| Debtor. | ) | |
| _____ | ) | Case No. 19-36659 |
| | ) | Honorable A. Benjamin Goldgar |
| BCL-HOME REHAB LLC, | ) | Lake County |
| | ) | |
| Plaintiff, | ) | Adversary Case No. 21-00215 |
| | ) | |
| v. | ) | |
| | ) | |
| KENNETH FIXLER, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

### AMENDED ADVERSARY COMPLAINT OBJECTING TO
### DISCHARGEABILITY OF DEBT OWED TO BCL-HOME REHAB LLC

BCL-HOME REHAB LLC ("**_Home Rehab_**" or "**_Plaintiff_**") by and through its attorneys, Levenfeld Pearlstein, LLC, files this Amended Adversary Complaint objecting to the dischargeability of debt owed to BCL pursuant to 11 U.S.C. §§523(a)(2)(A) and 523(a)(4). In support of its Adversary Complaint, BCL states as follows:

### PRELIMINARY STATEMENT

Debtor, Kenneth Fixler, was the President of Barnett Homes, the operating name for Home Rehab. Fixler is also a minority interest-holder in Home Rehab. As President, Fixler was entrusted with hundreds of millions of dollars to effectuate the business plan that he had proposed and sold to the other members of Home Rehab. But Fixler committed defalcation while acting as a fiduciary to those members and to Home Rehab by, among other things, carelessly overreaching in his acquisitions, staffing up Home Rehab as his personal fiefdom into which he hired his family,

failing to meet construction and sale timelines, carrying properties and staff for multiple years longer than planned and promised, and causing massive losses across the portfolio. Put simply, Fixler took advantage of trust built up over a long personal and family relationship to recklessly gamble with what he treated as "house money," all the while promising his partners that he was "at risk" with them, only to walk away when called upon to pay back his share of the massive losses that he personally caused.

## JURISDICTION AND VENUE

1.      This adversary proceeding is a civil proceeding arising under the Bankruptcy Code or arising in or related to a case under the Bankruptcy Code within the meaning of 28 U.S.C. § 1334(b).

2.      The court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334, and internal operating procedure 15(a) of the Federal District Court of the Northern District of Illinois.

3.      This is a core proceeding under 28 U.S.C. § 157.

4.      Venue of this adversary proceeding is proper in this Court under 28 U.S.C. § 1409 (a) and Rule 312 of the Bankruptcy Rules for the U.S. District Court and the U.S. Bankruptcy Court for the Northern District of Illinois.

## THE PARTIES

5.      Home Rehab is an Illinois limited liability company formed under the law of Illinois.  Home Rehab's principal place of business is in Northbrook, Illinois.

6.      Defendant, Kenneth Fixler, ("***Fixler***") maintains a residence in Riverwoods, Illinois and is a resident of the State of Illinois.

## ALLEGATIONS COMMON TO ALL COUNTS

### *Fixler's History and Relationship with BCL and the Barnett Family*

7.    Barnett Capital Ltd. ("***BCL***"), Home Rehab's affiliated parent company, is the real estate platform of the Barnett family office. BCL has been in business for over thirty (30) years and specializes in, among other things, providing capital to entrepreneurs and businesses that do not have access to conventional capital at scale to allow them to seize market opportunities quickly.

8.    Joel Barnett ("***Barnett***") is the Chairman and President of Barnett Capital.

9.    Barnett and Fixler have had a relationship for decades. In fact, they are family, as their wives are first cousins.

10.    Fixler has been in the real estate industry since the mid-1990's, when he first began working with Tucker Development, eventually holding the role of vice president of leasing and retail development.

11.    After leaving Tucker Development in the early 2000's, Fixler started his own company, Axis Properties, LLC ("***Axis***"), which was in the same industry of real estate development as Tucker Development, albeit on a smaller scale.

12.    During this time period, Fixler rented office space for Axis from BCL at BCL's headquarters in Northbrook, Illinois.

### *Fixler's Interest in and Responsibilities with Respect to Home Rehab*

13.    In or about 2009, Fixler started working for Home Rehab, which was then in the business of buying low-value foreclosed single-family homes, rehabbing them, and reselling them for a profit.

14.    Fixler was responsible for finding and acquiring the properties, overseeing the construction, and overseeing the sale of the properties.

15.     Like all BCL-related entities, Home Rehab was funded through loans from another BCL related entity – BCL-Operations LLC ("*Operations*"). Operations would loan the funds necessary for Home Rehab to acquire and rehab the homes and to pay overhead and other SG&A and capital costs, and Operations was repaid with revenue generated from the sale of those "flipped" homes at a profit.

16.     Ultimately, by 2010, Fixler acceded to the presidency of Home Rehab and assumed responsibility for all of its operations, and Fixler requested and was offered an ownership stake in Home Rehab. Due to his family relationship, Fixler was able to negotiate a 20% membership stake – the highest non-Barnett membership percentage.

17.     Fixler was not required to affirmatively pay for his 20% membership interest in Home Rehab. Rather, Fixler personally guaranteed his portion of the funds loaned to Home Rehab by Operations. Fixler himself did not "pay-in" his capital stake using personal funds initially or at any time as the business grew and required more capital.

18.     Thus, as a result of Fixler's 20% ownership interest in Home Rehab, in addition to his entitlement to a pro rata distribution of his share of any profits, he also guaranteed the repayment of his pro rata percentage of any losses that Operations might incur should Home Rehab fail to make sufficient profit on the home sales to satisfy the Operations operating loans or any third party loans that Operations may incur on Home Rehab's behalf.

19.     Fixler represented to Barnett and the other members of Home Rehab that he had sufficient personal and family means to take on the potential risk associated with such an ownership interest in Home Rehab.

20.     On or about October 19, 2012, the members of Home Rehab, which were at the time BCL-Business Holdings LLC and Fixler, executed an Amended and Restated Operating

Agreement (***"Operating Agreement"***), in which Fixler retained his 20% interest in Home Rehab. *See Affidavit of Elan Peretz*, attached as **Exhibit 1** at ¶ 4.

21.     Although the Operating Agreement provided for management by the members, it was Fixler, and only Fixler, that had the real and actual authority and control over Home Rehab. *Id.* at ¶ 7.

22.     Home Rehab operated under BCL's decentralized structure, which allowed it to operate under its own business line head – here, Fixler, who was the President – with periodic updates to and strategic consultation with Home Rehab's other members.  *Id.* at ¶ 8.

23.     As President, Fixler was responsible for running all of the business of Home Rehab – purchasing the properties, overseeing the staff and the construction, arranging for and overseeing the sale of the properties, and executing contracts on behalf of Home Rehab. *Id.* at ¶ 9.

24.     From 2009 through 2013, Operations invested approximately $15 million in Home Rehab, which in turn flipped and sold approximately 150 homes, generating profits for its members during that time period of approximately $5 million, of which Fixler was entitled to and was provided his 20% share of approximately $1 million in profit distributions.

***Plaintiff's Business Shifts to Luxury Home Market Under Direction of Fixler***

25.     During the first quarter of 2014, despite Home Rehab's profitability, Fixler expressed dissatisfaction with his total take-home from the profits and told the other members that he wanted to expand Home Rehab's business aggressively to increase profits both overall and to himself. *Id*. at ¶ 10.

26.     After the first quarter of 2014, Fixler, at a meeting with Home Rehab's other members, lead a strategic discussion revolving around moving Home Rehab into the luxury home market (with purchase prices in the mid-/high- six figures and sale prices over seven figures), in

which he would seek projects with gross margins of 13-18% and leveraged annualized returns to investment capital of 24%-35%. Fixler provided these figures to the other members of Home Rehab, and the other members, in turn, relied on those figures when modeling returns. *Id.*

27.     Fixler's business plan was based upon his premise that he could cause Home Rehab to complete the rehab of existing homes in a nine- to twelve-month timeframe and tear down and rebuild new homes in a twelve- to fifteen-month timeframe per home. *See* "Barnett Homes Sample Standard Timelines," prepared by Fixler, attached as **Exhibit 2**; and Ex. 1 at ¶ 11.

28.     It was also Fixler's plan to bring general contracting "in-house" to increase gross margins for Home Rehab by cutting out a general contractor, but also thereby greatly increasing his staff and overhead. Ex. 1 at ¶ 12.

29.     All of the foregoing "business plans" were presented by Fixler at the 2014 meeting, and were completely dictated by Fixler, who was fully entrusted to implement and execute on that plan by the other members of Home Rehab. Ex. 1 at ¶ 13.

30.     Specifically, given Fixler's representations regarding the business plan that he dictated, not to mention his family relationship and success with the low-end rehab projects, BCL agreed to (i) cause Operations to continue to make additional loans to Home Rehab to provide Home Rehab with the operating liquidity that Fixler would need to implement his business plan for Home Rehab to move out of low-end and into the luxury market, (ii) hire an extensive staff for Fixler's in-house contracting, and (iii) procure outside, third-party financing on the order of 70% loan-to-cost to allow Fixler to continue to grow and achieve his promised leveraged returns.

31.     As he had for the years prior, Fixler continued as President of Home Rehab, solely responsible for the business operations and success of Home Rehab – finding the opportunities,

finding the properties, staffing the company, overseeing the construction staff and subcontractors, and arranging for and overseeing the sale of the properties. *Id.* at ¶ 14.

32.     The other members of Home Rehab did not share any responsibility for finding the opportunities, finding the properties, staffing the company, overseeing the construction staff and subcontractors, or arranging for and overseeing the sale of the properties despite any powers or authority given to them in the Operating Agreement. *Id.*

### *Fixler Kicks Off Home Rehab's Buying Spree*

33.     Under Fixler's leadership and direction as President, starting after the first quarter of 2014, Home Rehab embarked on the new business plan focused on the luxury home market under the name of "Barnett Homes." Fixler caused Home Rehab to begin acquiring properties at a rapid clip.

34.     As the President of Barnett Homes, Fixler was the only member of Home Rehab who was involved in the day-to-day business operations. He remained in sole control of the decisions regarding what properties to buy, as well as the design, implementation, and timeline of the projects. And Fixler was solely responsible for visiting the properties and ensuring that the projects remained on track. *Id.* at ¶ 15.

35.     While the Operating Agreement may purport to grant authority to the members for the decisions set forth in paragraph 34 above, the reality of the business was that the sole authority for those decisions was vested with Fixler. *Id.*

36.     In his role as President of Barnett Homes, Fixler necessarily possessed far more knowledge and understanding of the "boots on the ground" performance of Barnett Homes than did the other members of Home Rehab, which was part of the reason why the decision to vest him with the authority for Home Rehab was made. As such, Fixler was also responsible for creating

and maintaining documents reflecting the current status of the portfolio of projects, including up-to-date projections as to cost and timeline for completion of construction, sale timing and price, and projected profits for each and every property. *See* spreadsheet of portfolio, dated March 23, 2015, created by Fixler and his staff, attached as **Exhibit 3**, to track all of this information; and Ex. 1 at ¶ 16.

37.     During the approximately 12 months starting around the end of the first quarter of 2014 and ending around the end of the first quarter of 2015, BCL caused Operations to fund operations and hire requested staff and employees, as promised. And BCL arranged for the promised third-party financing, first from Dwell Finance and later from Private Bank and Heartland Bank. This third-party financing required personal guarantees backed by Joel and Nancy Barnett and certain trust accounts of their children containing substantially all of the assets of the family.

38.     And during this 12-month period, using the funding and commitments provided by Operations and third-party lenders procured by BCL, Fixler purchased seventy-four (74) homes for over forty million dollars ($40 million). That sum represented more than two and one-half times (2.5x) the dollar value of inventory that Home Rehab had purchased in total in its prior five-year operating history.  *See* Exhibit 3.

39.     Of those homes, there were fifteen (15) properties that Fixler planned to sell for over two million dollars ($2 million) each, representing a grossly disproportionate share of the market for homes in that price range in the Chicagoland area at that time, a fact that Fixler knew or should have known.  See Exhibit 3.

40.     In or around the fall of 2015, the other members of Home Rehab became concerned about the pace of acquisitions that Fixler was driving, and a meeting was held to discuss these

concerns and to check in on the business plan. In particular, the matter of the numerous homes to be sold at price points in excess of $2 million was discussed. Ex. 1 at ¶ 17.

41.     At that meeting, Fixler was insistent that his business plan was good and that the pace of Home Rehab's acquisitions was in line with the sales that he as President of Barnett Homes could achieve. Fixler stated that he was confident that the acquired properties would have the ability to create the expected profits set forth in his business plan – going so far as pounding his fist on the table to make his point. *Id.* at ¶ 18.

42.     Because of the family relationship, and because Fixler also had "skin in the game" as a result of his 20% membership interest in and guarantee to Home Rehab, the other members were reassured that Fixler had all of their best interests in mind with respect to Home Rehab's business plan. *Id.* at ¶ 19.

43.     As a result of Fixler's reassurances regarding his ability to faithfully execute his business plan and his projections reflecting great profitability for Barnett Homes, Home Rehab was provided continued access to nearly unlimited resources from Operations, Private Bank, and Heartland Bank for Fixler to perform as promised.

### *Fixler Is Unable to Keep Home Rehab on Schedule and His Reckless Actions Cause Losses to Become Inevitable and Substantial*

44.     Throughout the course of 2015 and into 2016, even as he continued to acquire additional properties, Fixler was unable to keep Barnett Homes on schedule for properties already acquired and projects already underway.

45.     While his business plan and projections called for an eight- to fifteen-month timeline from acquisition through construction and to disposition, the reality was far different. By early 2016, Fixler knew or should have known that the average holding time for the Barnett Homes properties was or was going to be at least two years and often even more.

46.      Needless to say, such a substantial increase in turnaround time would, and did, correspondingly create a substantial increase in carrying costs across the portfolio.

47.      Upon information and belief, by early 2016, Fixler knew or should have known that Home Rehab was going to incur losses on the whole portfolio of properties that it held. Nonetheless, as of February 2016, Fixler continued to represent to the other members of Home Rehab, and to the outside lenders, that Home Rehab would turn a $12 million profit on the homes to be sold through the end of 2016, which represented approximately 60% of the total portfolio. *See* **Exhibit 4**, spreadsheet created by Fixler, showing estimated projections through end of 2016.

48.      Through most of 2016, Fixler continued to hide from Home Rehab's members that he had failed to manage Barnett Homes' construction schedule or properly estimate or account for carrying costs, and that Home Rehab was expecting losses that year rather than profits. Instead, Fixler continued to operate Home Rehab at a loss secretly while painting a rosy picture of Home Rehab's future profits in Home Rehab meetings and conversations with the other members. Ex. 1 at ¶ 20.

### *Fixler Finally Comes Clean*

49.      In or around September 2016, Fixler finally admitted to Home Rehab's other members that the expected profits he had promised to them and presented to the banks would not be forthcoming, and that the Home Rehab portfolio was instead running at a loss. *Id.* at ¶ 21.

50.      At the time of this bombshell of a disclosure, Fixler projected that Home Rehab's losses would total just over four million dollars ($4 million) and assured the other members that he would be able to effectuate a "soft landing" for Home Rehab. See updated spreadsheet, created by Fixler, dated September 30, 2016, attached as **Exhibit 5**; and Ex. 1 at ¶ 22.

51.     This constituted a swing of over sixteen million dollars ($16 million) and belies the validity and accuracy of the statements and reassurances made by Fixler just months earlier regarding expected profitability of the portfolio. Upon information and belief, this is merely further evidence that Fixler knew or should have known that the statements made to Home Rehab's members and outside lenders were simply false. Ex. 1 at ¶ 23.

52.     Immediately upon Fixler's disclosure of Home Rehab's losses, the other members determined that they had an obligation under the Operating Agreement to pay in capital to cover the funds previously fronted by Operations, which they had anticipated would be repaid with funds from the previously-expected profitable operations of Home Rehab.

53.     Therefore, in or around September 2016, the members of Home Rehab collectively paid in $3,637,179 to cover the losses for 2015 and the first half of 2016. Fixler paid his pro rata 20% and contributed $727,435.00.

54.     On or about January 1, 2017, Fixler, together with Home Rehab's other members, executed a Second Amended and Restated Operating Agreement ("***Second Amend. Op. Agt.***") for Home Rehab (attached as **Exhibit 6**). Notably, because of Home Rehab's 2016 losses, the Second Amend. Op. Agt. expressly called out and set forth the members' guarantee obligations with respect to funds loaned to Home Rehab by either Operations or the third-party lenders. Specifically, section 5.3 of the Second Amend. Op. Agt. states:

> Guaranty Capital Contributions. The Members hereby acknowledge that BCL-Operations LLC ("BCL-Operations") has prior to the date of this Agreement and may subsequent to the date of this Agreement make loans to the Company. Each of the Members hereby acknowledges that such Member agreed to reimburse an amount equal to its portion of such loans to the extent that upon the conclusion of the activities of the Company, the Company is not able to pay to BCL-Operations all of the outstanding principal and accrued but unpaid interest under such loans, as determined by the Members holding a majority of the Profit Percentages at such time,

which amount shall be known as the "Guaranteed Amount." To the extent that BCL-Operations is required to pay any amount to another third party in respect of a loan from such other third party to the Company that BCL-Operations guaranteed, such amount shall increase the amount of the Guaranteed Amount accordingly. Upon determination by the Members holding a majority of the Profit Percentages at such time that the activities of the Company have concluded, a final calculation shall be performed by the Company to determine the amount of the Guaranteed Amount. Within 10 days of such determination (or later upon determination by the Members holding a majority of the Profit Percentages at such time), the Members shall contribute to the Company in an amount equal to the Guaranteed Amount multiplied by such Member's Profit Percentage, which amounts the Company shall pay to BCL-Operations. For the avoidance of doubt, and notwithstanding the foregoing, the Guaranteed Amount shall not include, and no Member shall be required to contribute pursuant to this Section, any amount in duplication of amounts paid by such Members in respect of the Pay In Amount.

55.      On or about March 15, 2017, Home Rehab's members determined that it was necessary to make the next contribution of approximately $4 million to cover losses from the sale of the few homes that Fixler was able to finish and sell in the last half of 2016.

56.      Fixler dragged his feet on paying in this amount, but ultimately paid his 20% share of this contribution in two parts: $510,000 on or about June 6, 2017 and $290,000 on or about June 21, 2017.

### *Fixler Uses BCL and Home Rehab to Provide Employment and Substantial Income to His Son and Daughter-in-Law*

57.      During this same period of time, likely already knowing that Home Rehab was going to incur substantial losses, Fixler was still able to secure a job for his son, Jonathon Fixler, as Vice President of Barnett Homes. Upon information and belief, this was Jonathon's first job in real estate or business – prior to being hired by Fixler, Jonathon had spent a few years after college playing professional baseball. Ex. 1 at ¶ 25.

58.     In addition, Fixler caused Home Rehab to retain Jonathon's wife, Fixler's daughter-in-law, Chris Fixler, as Home Rehab's real estate broker for the sale of its properties. At the time that Fixler hired Chris, upon information and belief, she was only a few years out of college, with less than three years' experience in real estate. Yet Fixler entrusted Chris with an extensive portfolio of properties on which Home Rehab had expended over a hundred million dollars to purchase and rehab, and for which Home Rehab would need to rely on successful sales in order to generate profits. *Id.*

59.     Notably, even if Home Rehab were to lose money (which it did), Chris, as the broker, stood to make (and did make) millions of dollars on the sale of the Barnett Homes properties. Indeed, upon information and belief, the sale of Barnett Homes properties generated over five million dollars in commissions payable to Chris Fixler.

### *Fixler Recklessly Doubles Down*

60.     Home Rehab allowed Fixler to remain in control after the September 2016 disclosure, because he promised a soft landing and because, in part, he had a personal guarantee, that lead Home Rehab to believe he would act reasonably and swiftly to minimize losses. *Id*. at ¶ 26.

61.     Despite his personal guarantee, and despite promises of soft landings, over the course of 2017, Fixler failed to act reasonably to quickly complete and liquidate the portfolio.

62.     Rather, Fixler continued to cause Barnett Homes to miss completion targets and deadlines and continued to cause Home Rehab to incur inflated carrying costs and losses on the homes. *Id*. at ¶ 27.

63.     Upon information and belief, in 2017 there were also homes that Fixler rebuilt multiple times, at great cost, because he could not settle on a design that he liked.

64.    For all of these costs and expenses, Fixler continued to draw on the funds provided to Home Rehab by Operations and Private Bank, recklessly increasing the obligations that would need to be repaid by Home Rehab and all of its members. *Id.* at ¶ 28.

65.    During this time, Jonathon remained employed, and Chris continued to earn millions of dollars in commissions from sale of the properties. *Id.*

66.    Come January 1, 2018, Home Rehab's members again were obligated to make another contribution, this time in the amount of $8,664,806, to cover losses from the homes sold in 2017.

67.    This time, Fixler failed to pay his entire contribution when it came due. Instead, Fixler paid only $300,000 on or about March 20, 2018.

68.    Leaning on his Barnett family connection, Fixler went to Barnett to discuss his short-term liquidity situation. Fixler explained that the family money was there, through his father, to ensure that Fixler would be able to satisfy all of his obligations to Home Rehab, but he needed short term help until he could get the requisite funds from his father.

69.    Counting on these promises, Barnett and his wife (Fixler's wife's cousin), agreed to help Fixler obtain a mortgage by co-signing for him. With Joel and Nancy Barnett's help and personal guarantee, Fixler was able to take out a mortgage on his house on July 27, 2018. Fixler then paid the $441,272.39 in mortgage proceeds to partially pay down the outstanding contributions that he owed to Home Rehab for the 2017 losses.

70.    Also citing to his liquidity issue, Fixler asked Barnett if he could draw against capital in Home Rehab for living expenses while he turned the business around.

71.    Again, given the family relationship, Fixler's family's independent wealth, and Fixler's continued promises regarding his ability to get the funds from his father with more time

either through funds Fixler received during his father's lifetime or with his later inheritance, Barnett agreed to the request for monthly draws. Fixler was then provided with $15k monthly draws from April 2018 through May 2019, totaling $195k.

72.     Notably, the business was never "turned around" yet Fixler walked away with the $195k. *Id.* at ¶ 28.

73.     Given the actions of Fixler during the time he was taking the draws as set forth herein, as well as the timing of the draws, Home Rehab has a reasonable belief that Fixler took these draws despite knowing that he had no intention of repaying the draws or his remaining portion of Home Rehab's losses.

74.     The fact that Fixler took the draws despite knowing that he had no intention of repaying the draws is bolstered by the fact that Fixler could have attempted to obtain a loan to repay his obligations, including the draws, but chose not even to try obtaining such financing after making representations to the other members that he would do so.

75.     Fixler remained in his role as President of Barnett Homes, and he continued to miss deadlines and his own projections.

76.     Home Rehab had every reason to believe that Fixler was exercising his fiduciary duties and making good use of the funds that Home Rehab had borrowed – he was himself personally obligated for losses.

77.     Yet, as a result of Fixler's unwillingness or inability to take any reasonable action to timely complete the projects and dispose of the properties, the losses continued to build over 2018.

78.     By April 2019, Home Rehab's members were required to make an additional contribution of approximately $10 million to cover 2018 losses.

79.     Fixler did not pay anything toward the April 2019 contribution demand or any contributions demanded or made by the other members of Home Rehab thereafter.

80.     As further evidence Fixler did not intend to repay the $195k in draws at the time he took them, Fixler took a draw in April of 2019, despite not paying his portion of the additional contribution at this time.

81.     But Fixler did continue to make statements that he was working to pull together the funds from family or other sources and that he would never walk away from his Home Rehab guarantee obligations and would never leave Barnett, his family, "holding the bag."

82.     Notwithstanding these representations, on May 13, 2019, Fixler met with Barnett and informed him that he would not be paying anything toward the debt that he owed to Home Rehab.  Fixler then left Barnett's office and has not returned since.

83.     Again, as additional evidence that Fixler did not intend to repay the $195k in draws at the time he took them, Fixler took a draw in May of 2019, despite walking away from Barnett's office that very same month.

84.     By mid-2019, the total losses on the entire Barnett Homes portfolio were approaching thirty million dollars ($30 million), and by the time the portfolio had been completely liquidated, the total losses were $30,947,721.60. See attached summary profit and loss statement for Barnett Homes portfolio, attached as **Exhibit 7**. Fixler's 20% share of those losses totals $6,189,544.32, of which $3,920,836.93 remains outstanding and unpaid.

### *Fixler's Continued Actions to Harm Barnett and Home Rehab*

85.     Upon information and belief, Fixler has not been employed, nor sought employment, since May 2019, thereby effectively preventing him from even trying to make good on his obligations to Home Rehab.

86.     Upon information and belief, Fixler receives a monthly allowance from his father, paid to Fixler's wife, to cover their living expenses.

87.     Notably, Fixler does not use this monthly allowance to pay his mortgage payment (which he convinced Barnett and his wife to personally guarantee, and which is now in default), but he does use the money from his father to pay his monthly country club dues of approximately $1500 to Lake Shore Country Club.

88.     Upon information and belief, Fixler has also granted his father a second mortgage on his home.

### *Lawsuits and Warranty Claims Caused by Subpar Work on Fixler Projects*

89.     Beyond the substantial losses that Home Rehab incurred as a result of Fixler's reckless treatment of the portfolio and the funds with which he was entrusted, Fixler's actions have also caused third-party claims and litigation to be filed against Home Rehab.

90.     Upon information and belief, as a general matter, Fixler caused Barnett Homes to hire contractors and superintendents that were unqualified and lacked appropriate construction knowledge or expertise.

91.     Fixler's hiring of subpar and unqualified contractors and superintendents resulted in faulty workmanship at the projects, which in turn has resulted in lawsuits being filed against Home Rehab.

92.     For example, Luis and Christina Bowers, the owners of 3817 N. Wayne, Chicago, Illinois, a Fixler-led Barnett Homes project, filed a lawsuit against Home Rehab, among others (including Barnett), which is presently pending in the Circuit Court of Cook County, Case Number 19 CH 11018 (the "***Bowers Lawsuit***"), which includes allegations of mold and water infiltration at their property caused by faulty construction.

93.    In the Bowers Lawsuit, the Bowers allege that they met and discussed the mold and water infiltration issues with Fixler multiple times with no resolution.

94.    In addition to the lawsuits filed as a result of faulty construction at Fixler's properties, Home Rehab has also been forced to pay out approximately $2.5 million in warranty claims relating to faulty construction claims.

95.    As recent as this month, September 2022, Home Rehab continues to receive additional warranty claims as a result of faulty construction caused by Fixler's hiring of subpar and unqualified contractors and his lack of proper oversight of those contractors or superintendents, among other things.

***Home Rehab Has Continued to Accrue Additional Losses Post-Petition***

96.    Home Rehab is only able to calculate its losses for a given year at the conclusion of that year when the books are closed.

97.    Fixler filed his petition for relief under the Bankruptcy Code on December 31, 2019. In the nearly two years since the Petition Date, Home Rehab has incurred additional losses of $5,101,905.10 for 2019, $1,606,647.70 for 2020, and $269,968.44 for 2021, totaling $6,978,521.24.

98.    Fixler's share of those 2019, 2020, and 2021 losses totals $1,395,704.25, which constitutes a postpetition obligation.

## COUNT I – OBJECTION TO DISCHARGEABILITY
### (11 U.S.C. § 523 (A)(2)(A))

99.    Home Rehab re-alleges paragraphs 1-98 of this Adversary Complaint as though fully set forth herein.

100.     Section 523(a)(2)(A) of the Bankruptcy Code provides that a debtor shall not be discharged from any debt "… to the extent obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition."

101.     Fixler falsely represented that he would not walk away from his obligations to Home Rehab, and in reliance on those representations he was permitted to take monthly draws on the line carrying his capital contributions in the amount of $15,000 per month, for a total of $195,000 in draws.

102.     Given the long-standing and family relationships in play, Home Rehab reasonably and justifiably relied upon the false representations made by Fixler, who was the President of Barnett Homes at all relevant times herein.

103.     Given Fixler's actions, as set forth herein, as well as the timing of the draws, BCL reasonably believes that Fixler had no intention of ever repaying the draws at the time he took them.

104.     Home Rehab has suffered damages as a result of the false representations made by Fixler related to the draws and his failure to repay the obligations that accrued as a result of those false representations.

**WHEREFORE**, Home Rehab respectively requests that this Court enter a judgment against Fixler as follows:

A.     Denying discharge of Fixler's debt to Home Rehab as it relates to the $195k in draws pursuant to 11 U.S.C. § 523(a)(2)(A); and

B.     Granting any other such relief as this Court deems equitable and just.

## COUNT II – OBJECTION TO DISCHARGEABILITY
### (11 U.S.C. § 523 (A)(4))

105. Home Rehab re-alleges paragraphs 1-98 of this Adversary Complaint as though fully set forth herein.

106. Section 523(a)(4) of the Bankruptcy Code provides that a debtor shall not be discharged from any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny."

107. At all relevant times herein, Fixler, as a member of Home Rehab and the President of Barnett Homes, owed Home Rehab a fiduciary duty and was acting in a fiduciary capacity as the President of Barnett Homes.

108. While the Operating Agreement and/or Second Amended Operating Agreement may have purported to grant authority to the members of Home Rehab, the reality of the business was that the sole authority for the business decisions of Home Rehab was vested with Fixler. Ex. 1 at ¶ 15.

109. In his role as President of Barnett Homes, Fixler was the only member of Home Rehab who was involved in and with knowledge of the day-to-day business operations and construction activities of Barnett Homes.

110. In his role as President of Barnett Homes a member of Home Rehab, and the only member with actual control and authority over the business of Home Rehab, Fixler had a fiduciary obligation to use and account for the funds provided to Home Rehab in a reasonable manner to achieve the business plan and profits that he presented to Home Rehab.

111. Fixler committed defalcation while acting in his fiduciary capacity by (i) grossly overstating Plaintiff's expected profits, (ii) holding properties for excessively lengthy periods of time before even beginning construction, (iii) causing Plaintiff to incur massive holding costs, (iv)

not completing construction in a timely fashion, (v) using an inexperienced and unqualified broker

(his daughter-in-law) to sell the properties, and (vi) recklessly and cavalierly incurring substantial

debt for Home Rehab, without sufficient means to even repay his 20% share of the losses.

112.    In addition to causing Home Rehab substantial damage, Fixler's reckless actions

allowed him to remain in his role as President of Barnett Homes, to help generate income for his

son and daughter-in-law, to draw $195k out of Home Rehab for his individual personal benefit,

and to saddle a personal guarantee on Barnett and his wife for Fixler's home mortgage payments

(which Fixler presently appears to be selectively not paying in favor of his country club dues).

113.    Home Rehab has suffered damages as a result of the defalcation committed by

Fixler in his fiduciary capacity.

114.    Fixler has failed to repay Home Rehab for the debt obligation that he owes to Home

Rehab as a result of the losses incurred as a result of Fixler's defalcation.

**WHEREFORE**, Home Rehab respectively requests that this Court enter a judgment

against Fixler as follows:

A.    Denying discharge of Fixler's debt to Home Rehab pursuant to 11 U.S.C. §
523(a)(4); and

B.    Granting any other such relief as this Court deems equitable and just.

Dated:  September 22, 2022                    Respectfully submitted,

                                              **BCL-HOME REHAB LLC**

                                By:      /s/ Elizabeth B. Vandesteeg
                                         One of Its Attorneys

                                         Elizabeth B. Vandesteeg (ARDC 6291426)
                                         (evandesteeg@lplegal.com)
                                         Jamie L. Burns (ARDC 6300120)
                                         (jburns@lplegal.com)
                                         LEVENFELD PEARLSTEIN, LLC
                                         2 N. LaSalle St., Ste. 1300
                                         Chicago, Illinois 60602
                                         Tel: 312-346-8380

# EXHIBIT 1

**UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| In Re: | ) | |
| | ) | |
| KENNETH FIXLER, | ) | |
| | ) | Chapter 7 |
| Debtor. | ) | |
| _____ | ) | Case No. 19-36659 |
| | ) | Honorable A. Benjamin Goldgar |
| BCL-HOME REHAB LLC, | ) | Lake County |
| | ) | |
| Plaintiff, | ) | Adversary Case No. 21-00215 |
| | ) | |
| v. | ) | |
| | ) | |
| KENNETH FIXLER, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## AFFIDAVIT OF ELAN PERETZ

Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned, ELAN PERETZ, certifies that the statements set forth in this instrument are true and correct, except as to matters therein stated to be on information and belief and as to such matters the undersigned certifies as aforesaid that he verily believes the same to be true.

1.      I am over the age of 18 and, if called as a witness in this matter, can competently testify to the facts set forth herein.

2.      I have worked in the real estate industry as both lawyer and on the business side, including in connection with various classes of real estate acquisition, construction, development, and financing for nearly twenty years. I am currently the Managing Director and General Counsel of Barnett Capital, Ltd. ("***Barnett***"). Barnett is the affiliated parent company of BCL-Home Rehab

LLC ("**Home Rehab**"), the Plaintiff herein. I am and have been since its inception, through my revocable trust, a member in Home Rehab.

3.      For the purposes of this affidavit, I am also a duly authorized in my capacity as a member and possess the legal authority to make this Affidavit on behalf of myself, as a member, and on behalf of Home Rehab. In my capacity as member of Home Rehab, I have personal knowledge of the facts set forth herein.

4.      Pursuant to the Amended and Restated Operating Agreement of Home Rehab (the "**2012 Agreement**"), a true and correct copy of which is attached hereto as *Exhibit A*, the members of Home Rehab from October 19, 2012 through December 31, 2016 were BCL-Business Holdings LLC and Kenneth Fixler ("**Ken**"). The members of BCL Business Holdings LLC were BCL-Family LLC (of which Joel Barnett is the sole manager), myself, and the Daniel Shachtman Trust.

5.      On January 1, 2017, given that BCL-Business Holdings LLC had distributed the interest therein to its members, Home Rehab entered into the Second Amended and Restated Operating Agreement (the "**Operating Agreement**"), a true and correct copy of which is attached hereto as *Exhibit B.* Pursuant to the Operating Agreement, the members of BCL were, at all relevant times thereafter, BCL-Family LLC (again, the sole manager of which is Joel Barnett); myself, not individually, but as Trustee of the Elan Peretz Trust; Daniel Shachtman, not individually, but as trustee of the Daniel Shachtman Trust dated October 14, 2008 (**Shachtman Trust**"); Ken; and Ken's son, Jonathon Fixler ("**Jonathon**" and collectively, the "**Members**").

6.      Next to the membership interest of BCL-Family LLC, Ken had the largest membership interest in BCL at twenty percent (20%).

7.      Although the Operating Agreement provided for management by the Members, it was Ken (and only Ken) that had the real and actual authority and control over Home Rehab. To

2

that end, it was Ken (and only Ken) that was specifically entrusted with the management and operations of Home Rehab.

8.      Home Rehab operated under a decentralized structure – meaning Ken was in complete control of the day-to-day business of Home Rehab and merely gave the other Members periodic updates and sometimes consulted with us regarding strategy for the business.

9.      Ken's job duties as president of Home Rehab included purchasing properties, overseeing the staff and the construction, entering into contracts on Home Rehab's behalf and arranging for and overseeing the sale of the properties – essentially all the business of Home Rehab.

10.      Despite the profitability of Home Rehab from 2009 – 2013, during which time the business of Home Rehab was focused on the low-end housing market, in the first quarter of 2014, Ken told me and the other Members that he was unhappy with his take-home profits and wanted to expand Home Rehab's business into the "luxury home market." Specifically, Ken led a strategic discussion at a meeting with the other Members where he represented that he would seek projects with gross margins of 13-18% and leveraged annualized returns to investment capital of 24-35%. Those figures were provided to the other Members by Ken and Ken alone, and the other Members relied on those figures when modeling returns.

11.      At that same 2014 meeting, Ken also represented that his plan was based on the premise that he could complete the rehab of existing homes in a nine-to-twelve month timeframe and tear down and rebuild new homes in a twelve-to-fifteen month timeframe. Those timeframes were provided to the other members by Ken and Ken alone.

12.      At that same 2014 meeting, Ken also represented that he wanted to bring general contracting "in-house" to increase gross margins for Home Rehab by eliminating the necessity for

3

a general contractor. This idea, which greatly increased Ken's staff and overhead, was promoted to the other Members by Ken and Ken alone.

13.     The foregoing "business plan" was completely dictated by Ken and given Ken's prior success in the low-end market and his family relationship, Ken was solely and fully entrusted with implementing and executing on that plan.

14.     Just as when he ran the low-end housing projects for BCL, once it entered the luxury market at Ken's direction, he continued to serve at the helm, including being solely responsible for finding the opportunities, finding the properties, staffing the company, overseeing the construction staff and subcontractors, and arranging for and overseeing the sale of the properties. The other Members did not have any responsibility for the foregoing, notwithstanding any powers or authority given to those other Members in the Operating Agreement.

15.     Ken embarked on his new business plan for Home Rehab under the name "Barnett Homes" and began acquiring properties rapidly without any input or direction from the other Members. To be clear, Ken was the only member of Home Rehab that was involved in the day-to-day business operations. He had the sole control over what properties to buy, as well as the design, implementation and timeline of his various projects. Ken was also solely responsible for visiting the projects in person to make sure those projects were on track. While the Operating Agreement may purport to grant authority to the other Members, the reality of the business was that the sole authority for these decisions was vested with Ken.

16.     The decision to vest Ken with such authority came as a result of Ken's knowledge and understanding of "Barnett Homes" given he had boots on the ground and given it was his business plan, including his houses, his projections, and his timelines.

4

17.     In or around the fall of 2015, I, and the other Members of BCL, became concerned about the pace of Ken's acquisitions, and we held a meeting to discuss our concerns and to check in on Ken's business plan. One of the items discussed was Ken's decision to list numerous homes at a price point in excess of $2 million, which was troubling to me and represented a large percentage of houses for sale at that price point in the market at that time.

18.     However, Ken allayed the concerns of the other Members for the time being by insisting that his business plan was good and that the pace of Barnett Homes' acquisitions was in line with the sales that he specifically, as President, could achieve. Ken reiterated at that meeting that he was confident that the acquired properties would have the ability to create the expected profits set forth in his business plan. I remember this meeting vividly as Ken went as far as pounding his fists on the table to make his point.

19.     Ken's reassurances, coupled with the fact that I knew he had "skin in the game" as a result of his 20% membership interest in and guarantee to Home Rehab, as well as his relationship with Joel Barnett, led me to believe that Ken had the best interest of the Members in mind as he continued to execute his business plan. In retrospect, I see that Ken had only his own interests in mind, as well as seemingly the interests of his daughter-in-law Chris Fixler, who served as broker for the properties, and his son Jonathon, who continued to be employed by Barnett, as Ken continued to rack up losses for Home Rehab without divulging the true state of affairs to me or the other Members.

20.     Through most of 2016, Ken continued to hide the fact that he failed to manage Barnett Homes' construction schedule or properly estimate or account for carrying costs. At that time Ken had to have known that Home Rehab was expecting losses that year rather than profits, yet he said nothing of that fact to me nor did he ever disclose that fact in any Home Rehab meeting

prior to September 2016. Instead, Ken continued to operate Home Rehab at a loss secretly while painting a rosy picture of Home Rehab's future profits in Home Rehab meetings and in my conversations with him.

21.    Finally, Ken admitted in a September 2016 to the other Members that the profits he had promised us (and which had been presented to banks to obtain financing) would not be forthcoming and instead that the Home Rehab portfolio was operating at a loss.

22.    During that meeting – a meeting where I felt as if I bombshell had been dropped on us – Ken pegged the loss at just over $4 million and further assured us he would be able to facilitate a "soft landing" for Home Rehab, presenting a spreadsheet detailing this information, which is attached hereto as *Exhibit C.*

23.    Just months earlier Ken had promised us an expected profitability of $12 million, so a swing of over $16 million was unimaginable to me. It belies logic to think that Ken presented us with accurate statements and made valid representations to us regarding the profitability of Home Rehab prior to September 2016 given the state of Home Rehab in September of 2016.

24.    While the Operating Agreement gave certain authority to the Members, the actual authority for the day-to-day operations rested with Ken and Home Rehab relied on Ken's statements and projections including those presented at the September 2016 meeting in allowing him to remain in control to effectuate the "soft landing" he promised. Those statements and projections proved drastically wrong.

25.    During the same period of time that Home Rehab was bleeding, Ken was able to secure a job for his son Jonathon and was able to cause Home Rehab to retain Jonathon's wife, Chris Fixler, as Home Rehab's real estate broker. I am not aware of any prior experience that Jonathon had in real estate. Similarly, it is my understanding that Chris Fixler was only a few years

out of college and had only a few years' experience in the real estate industry before Ken entrusted

her with an extensive portfolio of properties on which Home Rehab had expended over a hundred

million dollars to purchase and rehab. Ken (and Ken alone) was entrusted with the selection of the

broker for the properties – just like he was entrusted with the other operations of the business. Ken

also signed all of the listing agreements for the properties – just as he signed all of Home Rehab's

other contracts.

26.     Home Rehab allowed Ken to remain in control after the September 2016 disclosure,

because he promised a soft landing and because, in part, he had a personal guarantee, that lead

Home Rehab to believe he would act reasonably and swiftly to minimize losses.

27.     Instead, Ken continued to cause Barnett Homes to miss completion targets and

deadlines and continued to cause Home Rehab to incur inflated carrying costs and losses on the

homes, which ultimately made no difference to him as he would eventually ignore his obligation

to repay his portion of the losses and ultimately file the instant bankruptcy proceeding.

28.     While Ken continued to drag out the timing for completion of Home Rehab's

existing projects, he also continued to draw on funds provided to Home Rehab by BCL-Operations

LLC and Private Bank, which recklessly increased the obligations which would need to be repaid

by the Members, including myself. Despite this fact, Jonathon remained employed. Chris

continued to earn commissions from the sale of properties, and Ken audaciously drew against

capital in Home Rehab for living expenses while he purported to turn the business around. Notably,

the business was never "turned around" yet Ken walked away with $195,000, comprised of

monthly draws of $15,000 per month from April 2018 through May 2019.

29.     As the losses mounted Ken continued to represent to me that he would never walk

out on his Home Rehab guarantee obligations and would never leave Barnett, his family, "holding

the bag." Yet, on May 13, 2019, at a meeting with myself and Joel Barnett, Ken told us that he would not be paying anything toward the debt that he owed to Home Rehab. Ken then left the office and has not returned since.

30.    The total losses by the time the Home Rehab portfolio was completely liquidated totaled over $30 million.

31.    As set forth herein, although the Operating Agreement purported to give equal authority to the Members, that was not in actuality the way the business was run. In actuality, it was Ken who was vested with the sole authority to operate the business – authority which he surreptitiously used to hide extreme losses from the other Members.

32.    Ken was the only person running the Home Rehab business despite any statements in the Operating Agreement which would indicate otherwise.

**FURTHER AFFIANT SAYETH NAUGHT.**

**Date: September 22, 2022**

ELAN PERETZ, member of BCL-HOME REHAB
LLC as Trustee of the Elan Peretz Trust

# Exhibit A to Exhibit 1

EIN: [27-1778301

AMENDED AND RESTATED
OPERATING AGREEMENT
*of*
BCL-HOME REHAB LLC

THIS AGREEMENT is made and entered into on October 19, 2012, by the following persons ("Members"):

BCL-BUSINESS HOLDINGS LLC
KENNETH FIXLER

This Agreement supersedes any and all prior operating agreements of the Company, including the Operating Agreement of the Company dated January 21, 2010, as the same may have been amended from time to time.

Article 1
Select Definitions

"Act" means the Limited Liability Company Act from time to time in force in the State.

"Agreement" means this Amended and Restated Operating Agreement, as originally executed and as amended, modified, supplemented or restated from time to time.

"Charter" means the articles of organization, certificate of formation or similar instrument, as amended from time to time, issued by the State evidencing the formation of the Company. The Charter was issued on January 21, 2010, and bears State File No. 03220982.

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Company" means the limited liability company formed upon the filing of the Charter and whose affairs are governed by this Agreement.

"Member" means the person or persons identified as such in this Agreement, including persons subsequently admitted to the Company as Members in accordance with Article 10.

"Profit Percentages" has the meaning set forth in Section 6.1.

"State" means the State of Illinois which has issued the Company's Charter.

Article 2
Organizational Matters

2.1     Formation and Statutory Authority.

(a)     *Formation.* The Company was formed upon the issuance of the Charter by the State. The Members hereby ratify and adopt the acts and conduct of the Company's organizer in connection with the filing of the Charter as acts and conduct by and on behalf of the Company. The organizer is hereby released and indemnified by the Company from any liability on account of its actions in connection with the formation of the Company.

(b)     *Statutory Authority*.   The Company shall operate as a limited liability company in accordance with this Agreement and the Act.  The rights and obligations of the Members among themselves and in relation to the Company shall be determined in accordance with this Agreement and the Act.   To the extent that anything contained in this Agreement conflicts with the Act, or modifies, supplements or otherwise affects any rights or obligations under the Act, this Agreement shall supersede the Act, except to the extent expressly restricted by the Act.

2.2     Filings.  The Members shall make such filings and do or cause to be done such other acts and things as shall be required to continue the existence of the Company in the State and shall cause the Company to be qualified or registered under assumed or fictitious names statutes or similar laws in any jurisdiction in which the Company owns property or transacts business to the extent the same is necessary or, in the judgment of the Members, advisable in order to protect the limited liability of the Members or to permit the Company to lawfully own property or transact business.  The Members shall, to the extent the same is necessary or, in the judgment of the Members, advisable, execute, file and publish all such certificates, notices, statements or other instruments necessary to permit the Company lawfully to own property and conduct business as a limited liability company in all jurisdictions where the Company elects to own property or transact business and to maintain the limited liability of the Members.

2.3     Principal Office of the Company.  The principal office of the Company shall be located at such place within or outside the State as the Members may from time to time designate.  The Company may have secondary offices at such other place or places as the Members may from time to time designate.

2.4     Records to be Maintained.  The Company shall at all times during the continuance of the Company keep at the Company's principal office such records and information as the Company may be required to maintain in accordance with the Act.

2.5     Registered Office and Registered Agent.  The Members shall designate a registered office and a registered agent in accordance with the Act.  The Members have the right to change the Company's registered office and/or registered agent from time to time in accordance with the Act.  The Members shall select and designate a registered office and registered agent for the Company in each other state in which the Company is required to maintain or appoint one.

Article 3
Purpose of the Company

The purpose of the Company is to engage in any and all lawful businesses, make any and all lawful investments and undertake such other activities related or incidental thereto as the Members may determine is in the interests of the Company.

Article 4
Duration of the Company

4.1     Duration of the Company.  The Company shall continue in perpetuity unless sooner dissolved in accordance with the other provisions of this Article.

4.2     Winding-Up.  The Company shall commence a winding-up of its affairs upon the earliest of:

2

(a)     *Decision of the Members*.  The decision of the Members to do so.  A decision of the Members under this paragraph shall require the approval of Members holding at least a majority of the Profit Percentages.

(b)     *Judicial Dissolution*.  Upon the entry of a judicial decree of dissolution of the Company in accordance with the Act.

The winding-up of the Company shall be conducted in accordance with this Agreement generally and Article 12 in particular.

4.3     Continuation of Company Upon Certain Events.  The death, disability, court declaration of incompetence, bankruptcy, dissolution, liquidation or other dissociation of a Member shall not dissolve the Company, but it shall be continued with the successor or legal representative of such Member; such successor or legal representative shall, to the extent of the interest acquired, be entitled only to the predecessor Member's rights, if any, in the distributions of the Company, and no such person shall have any right to participate in the management of the affairs of the Company or vote on any Company matter without the written consent of the Members holding at least a majority of the Profit Percentages.  See Article 10 for additional provisions applicable to any such successor or legal representative.

### Article 5
### Capital Contributions to the Company

5.1     Capital Contributions.  Each Member (or its predecessors, if any) has made such contributions to the capital of the Company as are reflected in the books and records of the Company.

5.2     Additional Capital Contributions.  The Members may, by unanimous agreement, at any time or from time to time, make additional capital contributions to the Company.  Except as set forth in this Agreement or as required by the Act, no Member shall be assessed for additional capital contributions.

### Article 6
### Distributions by the Company

6.1     Definitions.  The following terms shall have the following meanings:

(a)     *"Available Cash"* shall consist of all cash on hand of the Company irrespective of its source, excluding, however, such reserves as Members holding at least a majority of the Profit Percentages may establish.

(b)     *"Unreturned Capital"* consists of so much of a Member's capital contributions to the Company that have not been returned to such Member by way of distributions made under this Article that are identified (in the distribution provisions of this Article) as distributions of Unreturned Capital.  If a person acquires all or a portion of another Member's interest in the Company, the transferee shall succeed to the corresponding proportion of the transferor Member's Unreturned Capital at the time of the transfer.

(c)     *"Profit Percentages"* shall be as set forth opposite each Member's signature to this Agreement (or, if applicable, in such Member's joinder to this Agreement or other instrument admitting the Member to the Company), as the same may be adjusted from time to time in accordance with this Agreement.

3

6.2     Distributions of Available Cash.  Available Cash shall be distributed to the Members in such amounts and at such times as Members holding at least a majority of the Profit Percentages shall determine in the following rank and order:

(a)     Among the Members in proportion to, and to the extent of, their Unreturned Capital.

(b)     The remainder, if any, among the Members according to their Profit Percentages.

6.3     Priorities.  Except as may be expressly provided in this Agreement, no Member shall have a priority right over any other Member as to distributions.

6.4     Interest on Capital Contributions.   Except as may be expressly provided in this Agreement, no interest shall be allowed to any Member upon the amount of its capital contributions.

6.5     Set-Off Rights.  The Company shall be entitled to set-off against any distributions or other amounts that may be or become due to a Member from the Company any amounts that may be due from such Member to the Company or another Member.

6.6     Restrictions on Distributions.  No distributions may be made to the Members if, after giving effect to such distributions, either the Company would be unable to pay its debts as they become due in the usual course of business or the net assets of the Company would be less than zero.

Article 7
Accounting and Tax Matters

7.1     Books of Account.  The Members shall cause proper and true books of account to be maintained for the Company in conformity with sound accounting principles consistently applied.  There shall be recorded in the Company's books of account the particulars of all monies, goods or effects belonging to or owing to or by the Company, or paid, received, sold or purchased in the course of the Company's activities and all of such other transactions, matters and things relating to the Company as are usually entered in books of account kept by companies engaged in activities of a like kind and character.

7.2     Method of Accounting and Fiscal Year.  The Company's books of account shall be maintained on the cash or accrual basis, as determined by Members holding at least a majority of the Profit Percentages.  The Company's fiscal year shall be the calendar year unless determined otherwise by Members holding at least a majority of the Profit Percentages.

7.3     Reports and Returns.  As soon as practicable after the close of each fiscal year the Company shall provide each Member with such statements as shall be necessary to advise the Members properly about their investment in the Company for income tax reporting purposes.  The Company shall engage an accountant to prepare and to see to the filing of all Federal, state and local tax returns on behalf of the Company.  Members acknowledge that the Company may not be able to provide all information required for income tax reporting purposes on a timely basis and that they should expect to extend the time for filing their income tax returns.

7.4     Capital Accounts.  As part of the Company's books of account, an individual "Capital Account" shall be maintained for each Member at all times in accordance with sound accounting principles consistently applied.

7.5     Financial (Book) Allocations.  The net profit or net loss of the Company, determined on an annual basis in accordance with sound accounting principles, shall be allocated as follows:

4

(a)     *In the case of a net profit*:

    (i)     If any net losses were allocated in any prior fiscal year pursuant to clause (b):

        (A)     Among the Members to the extent of and in proportion to the prior period allocations made to them or their predecessors in accordance with clause (b)(iii) not previously eliminated by allocations under this clause. Allocations hereunder shall be made in the reverse order in which such net losses were originally allocated (*i.e.*, most recent net loss allocations are reversed first).

        (B)     Among the Members to the extent of and in proportion to the prior period allocations made to them or their predecessors in accordance with clause (b)(ii) not previously eliminated by allocations under this clause. Allocations hereunder shall be made in the reverse order in which such net losses were originally allocated (*i.e.*, most recent net loss allocations are reversed first).

        (C)     Then in accordance with clause (ii).

    (ii)    If net losses were not previously allocated among the Members pursuant to clause (b) or if clause (i)(C) applies, then among all of the Members according to their Profit Percentages.

(b)     *In the case of a net loss*:

    (i)     If any net profits were allocated in any prior fiscal year in accordance with clause (a)(ii), then among the Members to the extent of and in proportion to the prior period allocations made to them or their predecessors in accordance with clause (a)(ii) not previously eliminated by allocations under this clause. Allocations hereunder shall be made in the reverse order in which such net profits were originally allocated (*i.e.*, most recent net profit allocations are reversed first).

    (ii)    Then among the Members, to the extent of and in proportion to their Unreturned Capital (without duplication of prior period allocations made under this clause).

    (iii)   Then among the Members according to their Profit Percentages.

    No allocation of loss or deduction shall be made to a Member pursuant to clauses (ii) or (iii) to the extent such allocation causes or increases a deficit in such Member's Capital Account balance at the end of the fiscal year to which such allocation relates; such loss or deduction shall instead be allocated among the other Members in accordance with their relative Profit Percentages, subject to the limitations of this clause; except that once all of the Members' Capital Account balances have been reduced to zero, such loss or deduction shall be allocated among the Members in a manner that fairly comports with the Members' economic interests in the Company and risk of loss.

(c)     *Other Reasonable Methods*.  In the discretion of Members holding at least a majority of the Profit Percentages, the net profit or net loss of the Company may be allocated among the Members in accordance with any other reasonable method selected by such Members that takes due account of the

Members' economic interests in the Company and risk of loss as reflected by their capital contributions, rights to distributions and liability (direct and indirect) for the Company's debts and other obligations.

7.6     Tax Allocations.  Except as provided herein, or as otherwise required by the Code or Treasury Regulations promulgated thereunder (including, without limitation, Treasury Regulations Section 1.704-1 and 1.704-2), Company income, gain, loss, deduction, credit and other partnership items, as computed for Federal income tax purposes, shall be allocated among the Members in the same manner as the corresponding book items are allocated pursuant to Section 7.5.

7.7     Tax Elections.  Members holding at least a majority of the Profit Percentages shall have the right to make (and revoke) any and all tax elections for the Company, including, without limitation, an election to adjust the tax basis of Company assets under Code Section 754.

7.8     Administration of Tax Proceedings.  The Members holding at least a majority of the Profit Percentages shall appoint, remove and replace the Company's "Tax Matters Partner" as defined in Code Section 6231(a)(7) (referred to herein as the "Tax Matters Member").  The Tax Matters Member shall have the right to resign by giving 30 days written notice to the Members.  Upon the resignation of the Tax Matters Member, a successor Tax Matters Member shall be selected by the Members.  The Members hereby appoint BCL-Business Holdings as the initial Tax Matters Member.

Article 8
Management of the Company

8.1     Management by Members.  The affairs of the Company shall be managed and controlled by the Members in accordance with this Agreement generally and this Article in particular.  Except as otherwise provided in this Agreement, any action, decision or exercise of discretion by the Members in the name of the Company shall require the approval of any one of the Members.

8.2     Authority of Management.

(a)     *Power and Authority.*  Without limiting the generality of the foregoing, and consistent with the purposes of the Company, each Member acting alone on behalf of the Company shall have the right, power and authority to acquire assets; purchase goods and services; sell, exchange, lease, license or otherwise deal in or with any and all assets of the Company; open and maintain one or more bank accounts; borrow funds (other than from a Member or an affiliate of a Member) to finance the Company's activities and in connection with such borrowing, mortgage, hypothecate, pledge, lien or otherwise encumber the revenues and assets of the Company; guaranty the debts of affiliates and others when such Member believes it will benefit the Company to do so; confess, settle, compromise or otherwise satisfy debts, claims, judgments and other obligations, including by way of a deed in lieu of foreclosure or similar transaction; enter into any contract or agreement or amend or cancel the same; and invest and reinvest any funds or other assets of the Company – all as incident to or necessary for the operations of the Company.

(b)     *No Duty to Inquire.*  Nothing herein contained shall impose any obligation on any person or firm doing business with the Company to inquire as to whether or not a Member has exceeded its power and authority in executing any agreement, contract, lease, mortgage, security agreement, deed or other instrument on behalf of the Company, and any such third person shall be fully protected in relying upon such authority.

6

(c) *Major Action Approval Rights.* Notwithstanding any other provisions of this Agreement, a Member shall not be authorized to take, and shall not take, any of the actions that are set out below without the prior written consent of Members holding at least a majority of the Profit Percentages:

    (i)    Making an assignment for the benefit of creditors or admitting in writing the inability of the Company to pay its debts generally as they become due or petitioning or applying to any tribunal for the appointment of a custodian, trustee, receiver or liquidator for the Company or of any substantial part of the assets, or commencing of any proceeding relating to the Company under any bankruptcy, reorganization, arrangement insolvency, readjustment of debt, dissolution or liquidation law of any jurisdiction.

    (ii)    Hiring, firing, materially changing the responsibilities or duties, or altering the compensation (including salary, bonus or other benefits) of any employee.

    (iii)    Determining the compensation, if any, of any Member or its affiliates in respect of such Member's or its affiliate's services to the Company.

(d) *Subsidiaries.* The provisions of this Agreement regarding the management and governance of the Company shall apply as well to the management and governance of the Company's subsidiaries, whether the subsidiaries are managed or controlled directly or indirectly by the Company, as a member, manager, partner, stockholder or otherwise. Any action to be taken by any such subsidiary shall be construed as an action taken by the Company and shall be subject to the same rights and limitations granted and imposed on the Members under this Agreement.

8.3    Members' Time Commitment. Each Member shall cause so much time to be devoted to the business of the Company as, in its judgment, the conduct of the Company's business shall reasonably require.

8.4    Reimbursement of Members. The Company shall reimburse the Members for any costs that may be properly expended on behalf of the Company made out of funds other than those of the Company.

8.5    Related Business Partners. The Company may employ, contract for services with, acquire or sell goods, property and materials from or to, borrow money from and otherwise deal with any Member or any affiliate of a Member on any basis which is customary and competitive, or otherwise fair and reasonable.

8.6    Liability of Member. A Member shall not be liable to another Member or the Company for honest mistakes of judgment, or for action or inaction, taken reasonably and in good faith for a purpose that was reasonably believed to be in the best interests of the Company, or for losses due to such mistakes, action or inaction, or for the negligence, dishonesty or bad faith of any employee, broker or other agent of the Company, but only if such employee, broker or agent was selected, engaged or retained and supervised with reasonable care. The Members may consult with counsel and accountants in respect of Company affairs and be fully protected and justified in any action or inaction that is taken in accordance with the advice or opinion of such counsel or accountants if, and only if, they shall have been selected with reasonable care. The Members shall look solely to the assets of the Company for the return of their capital and, if the assets of the Company remaining after payment or discharge of the debts and liabilities of the Company are insufficient to return such capital, they shall have no recourse against the Members for such purpose. Notwithstanding any of the foregoing to the contrary, the provisions of this Section shall not be construed to relieve (or attempt to relieve) any person of any liability by reason of

gross negligence, recklessness or intentional wrongdoing or to the extent (but only to the extent) that such liability may not be waived, modified or limited under applicable law, but shall be construed so as to effectuate the provisions of this Section to the fullest extent permitted by law. This Section shall also apply to the officers, directors, shareholders, partners, members, managers, employees, trustees, agents and other representatives of any entity that is a Member.

8.7    Indemnification.  The Company shall indemnify any person who was or is a party, or is threatened to be made a party, to any threatened, pending or completed action, suit or proceeding (other than an action by or in the right of the Company), whether civil, criminal, administrative or investigative, by reason of the fact that the person is or was a member, manager, officer, employee, agent or other representative of the Company, or is or was serving at the request of the Company as a director, manager, officer, employee or agent of another limited liability company, corporation, partnership, joint venture, trust or other enterprise, against expenses (including attorney's fees and costs), judgments, fines and amounts paid in settlement actually and reasonably incurred by the person in connection with the action, suit or proceeding, if the person acted in good faith and in a manner the person reasonably believed to be in, or not opposed to, the best interests of the Company or, with respect to any criminal action or proceeding, had no reasonable cause to believe the person's conduct was unlawful. The termination of any action, suit or proceeding by judgment, order, settlement, conviction or upon a plea of *nolo contendere* or its equivalent shall not, of itself, create a presumption that the person did not act in good faith and in a manner that the person reasonably believed to be in, or not opposed to, the best interests of the Company or, with respect to any criminal action or proceeding, that the person had reasonable cause to believe that the person's conduct was unlawful. This Section shall also apply to the officers, directors, shareholders, partners, members, managers, employees, trustees, agents and other representatives of any entity that is a Member.

8.8    Authorized Signatories and Officers of the Company.  The Members may from time to time appoint one or more persons to act as authorized signatories to execute agreements, contracts, documents (including promissory notes, mortgages, security agreements and other loan documents) and other instruments (including deeds) on behalf of the Company. The Members may also from time to time appoint one or more persons to serve as officers of the Company, in such capacities and with such delegated rights and powers as the Members may approve. No such authorized signatory or officer shall have any different or greater rights and powers than the Members have under this Agreement. Authorized signatories and officers appointed by the Members shall be entitled to be indemnified by the Company in accordance with Section 8.7.

Article 9
Membership in the Company

9.1    Rights and Obligations of the Members.  Unless admitted to the Company as a Member in accordance with Article 10, no person who is not a signatory to this Agreement shall be considered a Member. The Company need deal only with persons as Members that are so admitted and shall not be required to deal with any other person (other than with respect to distributions to assignees pursuant to assignments in compliance with Article 10) merely because of an assignment or transfer of an interest to such person or by reason of the incapacity of a Member. Any distribution made in accordance with this Agreement by the Company to the person shown on the Company records as a Member or to its legal representatives, or to the assignee of the right to receive Company distributions as provided herein, shall acquit the Company with respect to such distribution of all liability to any other person that may have an interest in or claim to such distribution by reason of any other assignment by the Member with respect to such distribution or by reason of such Member's incapacity, or for any other reason.

8

9.2     <u>Liability</u>.  No Member shall be personally liable for any of the debts of the Company or any of the losses thereof beyond the amount contributed or required to be contributed by it to the Company under this Agreement and as otherwise specified in this Agreement or in the Act.

9.3     <u>No Partition</u>.  No Member shall have the right to partition any property of the Company during the term of this Agreement, or while such assets are held in trust pursuant to Section 12.4, nor shall any Member make application to any court of authority having jurisdiction in the matter or commence or prosecute any action or proceeding for such partition and the sale thereof, and upon any breach of the provisions of this Section by any Member, the other Members, in addition to all of the rights and remedies in law and in equity that they may have, shall be entitled to a decree or order restraining and enjoining such application, action or proceeding.

9.4     <u>Withdrawals and Resignations</u>.  No Member shall be entitled to withdraw, resign or voluntarily dissociate from the Company, except pursuant to the terms of this Agreement.  No Member shall be entitled to receive any money or property from the Company except (a) by way of distributions as provided pursuant to Article 6, (b) by way of distributions upon the winding-up of the Company pursuant to Article 12, (c) in respect of any loans to the Company then due and owing to such Member and (d) as expressly provided elsewhere in this Agreement.

9.5     <u>Uncertificated or Certificated Securities</u>.  Unless the Members decide otherwise, the interests of the Members in the Company shall not be certificated.

9.6     <u>Trustee Liability</u>.

(a)     *Actions as Trustees*.  When this Agreement is executed by the trustee of any trust, such execution is by the trustee, not individually, but solely as trustee in the exercise and under the power of authority conferred upon and vested in such trustee, and nothing herein contained shall be construed as creating any liability on the part of any such trustee personally to pay any amounts required to be paid hereunder, or to perform any covenant, either express or implied, contained herein, all such liability, if any, being expressly waived by the parties hereto by their execution hereof.  Any liability of any Member which is a trust to the Company or to any third person shall be only that of such trust to the full extent of its trust estate and shall not be a personal liability of any trustee, grantor or beneficiary thereof.

(b)     *Successor Trustee*.  Any successor trustee or trustees of any trust which is a Member herein shall be entitled to exercise the same rights and privileges and be subject to the same duties and obligations as its predecessor trustee.  As used in this Agreement, the term "trustee" shall include any or all such successor trustees.

(c)     *Termination of Trust*.  The termination of any trust which is a Member shall not terminate the Company.  Upon the allocation or distribution of all or any portion of the Company interest of a trust which is a Member pursuant to the exercise of any power of appointment, or otherwise, to a beneficiary of such trust or to another person or persons or to another trust or trusts, whether or not such distribution shall terminate such distributing trust, each such distributee shall be entitled to be admitted to the Company as a Member to the extent of the proportionate share of the Company interest distributed to it, subject to the terms of this Agreement, including, without limitation, the restrictions contained in Article 10.

9.7     <u>Right of Reimbursement</u>.  In the event any Member guarantees any indebtedness or other obligation of the Company, then the Company shall promptly reimburse the guarantor for any and all payments made by the guarantor for such indebtedness or other obligation.  The Company shall not be obligated to reimburse the guarantor for any obligation under the guaranty that arises by reason of the

9

gross negligence, willful misconduct or fraud of the guarantor or its affiliate. This Section shall also apply to any guaranty of any indebtedness or other obligation of the Company given by, and this Section shall then so benefit, any affiliate of a Member.

9.8   Competitive Undertakings. Any Member may engage in business ventures of any nature and description independently or with others, and neither the Company nor any of the Members shall have any rights in or to such independent ventures or the income or profits derived therefrom.

Article 10
Transfers and Rights Offerings

10.1   Transfers by Members. No Member shall sell, exchange, pledge, mortgage, hypothecate or otherwise transfer or encumber its interest in the Company without the prior written consent of Members holding at least a majority of the Profit Percentages. Any such transfer or encumbrance shall be void from inception and of no force or effect whatsoever. Direct or indirect transfers of interests in entities that are Members shall also be subject to the limitations of this Section.

10.2   Additional Membership Interests. The Members may issue additional membership interests in the Company (including so-called carried interests), or options, warrants or other rights to acquire membership interests in the Company, to new or existing Members on such terms as Members holding at least a majority of the Profit Percentages may determine is fair and reasonable. Upon the issuance of additional membership interests to new or existing Members, Members holding at least a majority of the Profit Percentages are authorized to adjust the Profit Percentages, Capital Account balances, Unreturned Capital balances and other attributes of the membership interests of the existing Members to take due account of the additional membership interests issued by the Company.

10.3   General Provisions. The following rules shall apply to transfers of Company interests and the admission of additional persons to the Company:

(a)   *Procedure for Admission.* No person shall be admitted as a transferee or additional Member hereunder unless and until (i) in the case of an assignment of an interest in the Company permitted hereby, the assignment is made in writing, signed by the assignor and accepted in writing by the assignee, and a duplicate original of the assignment is delivered to and accepted by the Company, and (ii) the prospective admittee executes and delivers to the Company a written agreement, in form and substance satisfactory to the Company, pursuant to which said person agrees to be bound by this Agreement.

(b)   *Binding Effect.* Any person acquiring or claiming an interest in the Company, in any manner whatsoever, shall be subject to and bound by all terms, conditions and obligations of this Agreement to which its predecessor in interest, if any, was subject or bound, without regard to whether such person has executed a counterpart hereof or any other document contemplated hereby. No person, including the legal representatives, heirs or legatees of a deceased Member, shall have any rights or obligations greater than those set forth herein and no person shall acquire an interest in the Company or become a Member except as permitted hereby.

(c)   *Actions Prior to Acceptance of Assignment.* Notwithstanding that a person acquiring or claiming an interest in the Company is bound by all terms, conditions and obligations of this Agreement to which its predecessor in interest, if any, was subject or bound, the Company shall be entitled to treat the assignor of the assigned interest as the absolute owner thereof in all respects and shall incur no liability for distributions made in good faith to such assignor prior to such time as the documents specified in this Section have been delivered to and accepted by the Company. Any person to whom an

10

gross negligence, willful misconduct or fraud of the guarantor or its affiliate. This Section shall also apply to any guaranty of any indebtedness or other obligation of the Company given by, and this Section shall then so benefit, any affiliate of a Member.

9.8    Competitive Undertakings. Any Member may engage in business ventures of any nature and description independently or with others, and neither the Company nor any of the Members shall have any rights in or to such independent ventures or the income or profits derived therefrom.

## Article 10
## Transfers and Rights Offerings

10.1    Transfers by Members. No Member shall sell, exchange, pledge, mortgage, hypothecate or otherwise transfer or encumber its interest in the Company without the prior written consent of Members holding at least a majority of the Profit Percentages. Any such transfer or encumbrance shall be void from inception and of no force or effect whatsoever. Direct or indirect transfers of interests in entities that are Members shall also be subject to the limitations of this Section.

10.2    Additional Membership Interests. The Members may issue additional membership interests in the Company (including so-called carried interests), or options, warrants or other rights to acquire membership interests in the Company, to new or existing Members on such terms as Members holding at least a majority of the Profit Percentages may determine is fair and reasonable. Upon the issuance of additional membership interests to new or existing Members, Members holding at least a majority of the Profit Percentages are authorized to adjust the Profit Percentages, Capital Account balances, Unreturned Capital balances and other attributes of the membership interests of the existing Members to take due account of the additional membership interests issued by the Company.

10.3    General Provisions. The following rules shall apply to transfers of Company interests and the admission of additional persons to the Company:

(a)    *Procedure for Admission.* No person shall be admitted as a transferee or additional Member hereunder unless and until  (i) in the case of an assignment of an interest in the Company permitted hereby, the assignment is made in writing, signed by the assignor and accepted in writing by the assignee, and a duplicate original of the assignment is delivered to and accepted by the Company, and (ii) the prospective admittee executes and delivers to the Company a written agreement, in form and substance satisfactory to the Company, pursuant to which said person agrees to be bound by this Agreement.

(b)    *Binding Effect.* Any person acquiring or claiming an interest in the Company, in any manner whatsoever, shall be subject to and bound by all terms, conditions and obligations of this Agreement to which its predecessor in interest, if any, was subject or bound, without regard to whether such person has executed a counterpart hereof or any other document contemplated hereby. No person, including the legal representatives, heirs or legatees of a deceased Member, shall have any rights or obligations greater than those set forth herein and no person shall acquire an interest in the Company or become a Member except as permitted hereby.

(c)    *Actions Prior to Acceptance of Assignment.* Notwithstanding that a person acquiring or claiming an interest in the Company is bound by all terms, conditions and obligations of this Agreement to which its predecessor in interest, if any, was subject or bound, the Company shall be entitled to treat the assignor of the assigned interest as the absolute owner thereof in all respects and shall incur no liability for distributions made in good faith to such assignor prior to such time as the documents specified in this Section have been delivered to and accepted by the Company. Any person to whom an

10

interest in the Company is attempted to be transferred in violation of this Article or any other provision of this Agreement shall not have any of the rights of a Member of the Company otherwise provided under this Agreement or the Act, including, but not limited to, the right (i) to receive distributions from the Company, (ii) to vote on any matter, (iii) to participate in the management of the Company, (iv) to act as an agent of the Company, (v) to obtain any information or accounting of the affairs of the Company or (vi) to inspect the books or records of the Company. If, however, by law, the Company is required to recognize the purported transfer of a Member's interest in the Company, the purported transferee's rights shall be strictly an economic interest in the Company limited solely to distributions (and accompanying allocations of accounting and tax items) as provided by this Agreement with respect to such economic interest, and the Member whose interest in the Company has purportedly been transferred shall have no right to any distributions with respect to such interest in the Company. Any distributions to such purported transferee may be applied (without limiting any other legal or equitable rights of the Company) to satisfy any debts, obligations or liabilities that the transferor or transferee may have to the Company (including for damages). A Member attempting to engage in any purported transfer that has not been approved in writing by Members holding at least a majority of the Profit Percentages shall be liable to indemnify and hold harmless the Company and the other Members from all costs, liability and damages that they may incur (including, but not limited to, incremental tax liability and attorney's fees and expenses) as a result of such purported transfer; any purported transferee shall be jointly and severally liable to do the same, including by way of set-off as provided in Section 6.5. For purposes of this paragraph, an economic interest in the Company shall mean a person's rights to distributions (and accompanying accounting and tax allocations), but excluding the right to vote, approve or disapprove, or otherwise to participate in, the management and control of the affairs of the Company.

(d)    *Costs.*   The costs incurred by the Company in processing an assignment (including attorney's fees and costs) shall be borne by the assignee, and shall be payable prior to and as a condition of admission to the Company.

## Article 11
### Amendments to the Agreement

The terms of this Agreement may be modified or amended at any time and from time to time upon the written consent of all of the Members.

## Article 12
### Winding-Up and Dissolution of the Company

12.1   Winding-Up and Dissolution Procedures.   Upon an event described in Section 4.2, the affairs of the Company shall be wound-up and the Company shall be dissolved. A Member (the "Winding-Up Member") appointed by Members holding at least a majority of the Profit Percentages shall preside over the winding-up and dissolution of the Company or may appoint one or more agents to do so. The Winding-Up Member shall make such filings in the State and in such other states in which the activities of the Company make it necessary or desirable to do so and do or cause to be done such other acts and things as shall be required to dissolve the Company.

12.2   Distributions Upon Winding-Up.   Except as otherwise provided in this Article, the winding-up and dissolution of the Company shall involve:

(a)    The orderly sale or other disposition of the Company's non-cash assets within a commercially reasonable time.

11

(b)     The payment or settlement of (and where appropriate, the establishment of reasonable reserves for) the Company's debts and other obligations, including to Members who are creditors, in the order of priority and to the extent provided by law.

(c)     The distribution of any remaining sums among the Members in accordance with Section 6.2.

12.3     Distributions In Kind.  In the event that the Winding-Up Member determines that it is necessary or desirable to make a distribution of Company assets in kind, such assets shall be transferred and conveyed either to (a) the Members as tenants in common so as to vest in them undivided interests in the whole of such assets in proportion to their respective rights to share in the proceeds of the sale of such assets in accordance with the provisions of Section 12.2(c); or (b) any one or more of the Members either as tenants in common (so as to vest in them undivided interests in the whole of such assets, in the proportions reasonably determined by the Winding-Up Member) or otherwise, on the condition that each such distributee receives aggregate value (whether in kind, cash or both) in accordance with the provisions of Section 12.2(c).  All such Company assets shall be valued at fair market value as determined by the Winding-Up Member and shall be subject to such reasonable conditions and restrictions as are necessary or desirable in order to preserve the value of the assets distributed or for legal reasons.

12.4     Liquidating Trust.  In the discretion of the Winding-Up Member, all or any portion of the distributions that would otherwise be made to the Members pursuant to Section 12.2(c) may be distributed to a trust established for the benefit of the Members for the purposes of liquidating Company assets, collecting amounts owed to the Company and paying any debts or other obligations of the Company arising out of or in connection with the Company.  The Winding-Up Member shall appoint one or more persons as liquidating trustee.  The assets of any such trust shall be distributed to the Members from time to time in the discretion of the Liquidating Trustee in the same proportions as the amount distributed to such trust by the Company would otherwise have been distributed to the Members pursuant to this Agreement.

12.5     Final Accounting.  As part of the winding-up of the Company, a final accounting shall be made of the activities of the Company from the date of the last previous accounting to the date of dissolution.  If a Member has a deficit in its Capital Account, such Member shall not be obligated to contribute any amount of that deficit to the Company; any such deficit shall not be considered an asset of the Company.

Article 13
General Provisions

13.1     Notices.  All notices, demands, offers or other communications required or permitted to be given pursuant to this Agreement shall be in writing and shall be transmitted by courier, recognized overnight delivery service (such as FedEx) or first class (postage prepaid) certified U.S. mail.  Any notice, demand, offer or other communication shall be effective on the date of receipt at the address of the addressee.  Notices, demands, offers or other communications to a Member shall be addressed to the Member at the address beneath the Member's name on the signature page of this Agreement or, if applicable, in such Member's joinder to this Agreement or other instrument admitting the Member to the Company.  Any Member may change its address for all future notices, demands, offers or other communications by giving notice to all of the other Members stating its new address.

12

13.2 <u>Successors</u>. This Agreement and all the terms and provisions hereof shall be binding upon the parties hereto and their respective legal representatives, heirs, successors and assigns, except as expressly herein otherwise provided.

13.3 <u>Third Party Benefits</u>. Without limiting Section 13.2, the provisions of this Agreement are intended solely to benefit the Company and the parties hereto and, to the fullest extent permitted by applicable law, shall not be construed as conferring any benefit upon any other person, including without limitation any creditor of the Company (and no such creditor or other person shall be a third party beneficiary of this Agreement), and except as required by the Act, the Members shall have no duty or obligation to any such creditor or other person to make any contributions or return any money or other property to the Company.

13.4 <u>Governing Law</u>. This Agreement shall be construed in conformity with the domestic laws of the State, as applied to agreements whose only parties are residents of the State and which are to be performed entirely within the State.

13.5 <u>Severability</u>. If any provision of this Agreement, or the application of such provision to any person or circumstance, shall be held invalid by a court of competent jurisdiction, the remainder of this Agreement, or the application of such provision to persons or circumstances other than those to which it is held invalid by such court, shall not be affected thereby.

13.6 <u>Other Rules of Construction</u>. Every provision of this Agreement shall be construed simply according to its fair meaning and not strictly for or against any Member (notwithstanding any rule of law requiring an Agreement to be construed against the drafting party). The following additional rules of construction shall apply to this Agreement:

(a) All pronouns shall include the masculine, feminine or neuter thereof, wherever the context and facts require such construction.

(b) The term "person" refers to an individual, corporation, partnership, joint venture, limited liability company, limited liability partnership, a cell of a series organization, association, joint stock company, statutory trust, common-law trust, unincorporated organization, government authority or any other organization whether or not a legal entity.

(c) The term "party" means a signatory to this Agreement, including a Member and any successor to any Member, whether or not such successor has executed or otherwise joined in this Agreement. The fact that a successor is a party shall not give that person any greater rights than it has under the express terms of this Agreement. By way of illustration, a successor who has not been admitted to the Company in accordance with Article 10 is a party to this Agreement for purposes of the dispute resolution procedures in Section 13.8, but despite being a party is still subject to the limitations of Section 10.3(c).

(d) The term "affiliate" is to have a meaning reasonably appropriate to its context; without limiting the generality of the foregoing, when used in connection with conduct that by the terms of this Agreement is to be circumscribed, the term shall be interpreted broadly. Without limiting the generality of the foregoing, an "affiliate" of a specified person, or a person "affiliated" with a specified person, is a person that directly, or indirectly through one or more intermediaries, controls, is controlled by or is under common control with the specified person.

(e) All terms defined in this Agreement in the singular have the same meanings when used in the plural and vice versa.

13

(f)    The use of the word "including" herein shall not be considered to limit the provisions which it modifies but instead shall mean "including without limitation" unless the provision states otherwise.

(g)    An "Article" of this Agreement is typically identified with a number (*e.g.*, "Article 13"). A "Section" of this Agreement corresponds to an Article and is typically identified with a number that includes a decimal (*e.g.*, "Section 13.6"). A "paragraph" of this Agreement corresponds to a Section and is typically identified by a lower case letter (*e.g.*, paragraph "(g)"). A "clause" of this Agreement corresponds to a paragraph and is typically identified with a roman numeral or an upper case letter (*e.g.*, "(i)," "(I)" or "(A)").

(h)    Headings, titles and subtitles are inserted for convenience of reference only and are to be ignored in any construction of the provisions hereof.

(i)    In the interpretation of this Agreement, no inference shall be drawn from the fact that a provision not included in this Agreement was included and then deleted from a draft of this Agreement.

13.7    <u>Members Not Agents</u>.  Nothing contained herein shall be construed to constitute any Member the agent of another Member, except as specifically provided herein.

13.8    <u>Dispute Resolution</u>.

(a)    *Jurisdiction, Venue and Service of Process.*  The Company and the parties to this Agreement hereby irrevocably and unconditionally agree that any suit, action or proceeding arising out of or related to this Agreement or the Company shall be brought only in the United States District Court for the Northern District of Illinois or in the Circuit Court of Cook County, Chicago, Illinois, and the specific choice from among the foregoing shall be determined by the party initiating such suit, action or proceeding.  To the fullest extent permissible by law, the Company and the parties to this Agreement hereby consent to the personal jurisdiction, venue and forum of such courts and hereby irrevocably and unconditionally waive any claim or objection that it is not subject to the jurisdiction of such courts, that the venue is improper, that the forum is inconvenient or any similar objection, claim or argument.  Service of process on any of the parties hereto with regard to any such action may be made and is considered legally proper by mailing the process to such person by certified mail to the address of such person as provided in Section 13.1 or to any subsequent address to which notices shall be sent.

(b)    *Waiver of Trial by Jury.*  Each party acknowledges and agrees that any controversy which may arise under this Agreement is likely to involve complicated and difficult issues, and therefore each such party hereby irrevocably and unconditionally waives any right such party may have to a trial by jury with respect to any litigation directly or indirectly arising out of or relating to this Agreement.  Each party understands and has considered the implications of this waiver. Each party makes this waiver voluntarily.

(c)    *Attorney's Fees.*  If the Company or any Member obtains a judgment in connection with a dispute arising under or in connection with any this Agreement, such party shall be entitled to recover from the non-prevailing party its court costs, and reasonable attorney's fees and disbursements incurred in connection therewith and in any appeal or enforcement proceeding thereafter, in addition to all other recoverable costs.

13.9    <u>Remedies</u>.  Subject to any express provisions of this Agreement, no remedy conferred upon the Company or any Member is intended to be exclusive of any other remedy herein or by law provided or permitted, but each shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law, in equity or by statute.

14

13.10   Waiver.  No waiver by the Company or any Member of any breach of this Agreement shall be deemed to be a waiver of any other breach of any kind or nature, and no acceptance of payment or performance by the Company or any Member after any such breach shall be deemed to be a waiver of any breach of this Agreement, whether or not the Company or any Member knows of such breach at the time it accepts such payment or performance.  No failure or delay on the part of the Company or any Member to exercise any right it may have shall prevent the exercise thereof by the Company or any Member at any time such other may continue to be so in default, and no such failure or delay shall operate as a waiver of any default.

13.11   Entire Understanding.  This Agreement constitutes the entire understanding among the Members and supersedes any prior understanding and/or written or oral agreements among them with respect to the Company.  In the event of any conflict between this Agreement and any other written or oral communications among the Members, this Agreement shall control and take precedence.

13.12   Further Assurances.  Each of the parties hereto shall hereafter execute and deliver such further instruments and do such further acts and things as may be required or useful to carry out the intent and purpose of this Agreement and as are not inconsistent with the terms hereof.

13.13   Counterparts.  This Agreement may be executed in counterparts, each of which shall be an original, but all of which shall constitute one and the same instrument.

13.14   Electronic Transmission.  Signatures to this Agreement that are transmitted electronically (*i.e.*, via e-mail or facsimile) shall be binding.

13.15   Counsel.  Joel Barnett BCL-Business Holdings (collectively the "Directing Party") have selected Levenfeld Pearlstein, LLC ("LP") to prepare this Agreement.  LP is counsel to Directing Party.  Each party to this Agreement acknowledges that LP (a) does not represent the interests of any party other than Directing Party and (b) that LP shall owe no duties to the Company or any other party other than Directing Party.  In the event any dispute or controversy arises between the Company or a party, on the one hand, and Directing Party, on the other hand, each party agrees that LP may represent Directing Party in any such dispute or controversy.  To the extent that Directing Party requests that LP do so, LP may represent the Company in any dispute with any party other than Directing Party.  The Company and each party consent to such representation.  Each party further acknowledges that, whether or not LP has in the past represented or is currently representing such party with respect to other matters, LP has not represented the interest of any party other than Directing Party in the preparation or negotiation of this Agreement.

*[Signatures begin on the next page]*

*[Signature Page to Amended and Restated Operating Agreement]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed.

PROFIT
PERCENTAGES

BCL-Business Holdings LLC                                              80%

By:  BCL-Family LLC, Member

_____
Joel I. Barnett, Manager

450 Skokie Boulevard
Suite 604
Northbrook, Illinois  60062

By: _____
Elan Peretz, Member

450 Skokie Boulevard
Suite 604
Northbrook, Illinois  60062

By:  The Daniel Shachtman Trust, Member

_____
Daniel Shachtman, Trustee

450 Skokie Boulevard
Suite 604
Northbrook, Illinois  60062

_____                                       20%
Kenneth Fixler
450 Skokie Boulevard
Suite 604
Northbrook, Illinois  60062

# Exhibit B to Exhibit 1

FILED DATE: 7/31/2019 4:27 PM   2019L008483

EIN: 27-1778301

## SECOND AMENDED AND RESTATED
## OPERATING AGREEMENT
*of*
## BCL-HOME REHAB LLC

THIS AGREEMENT is made and entered into on January 1, 2017, by the following persons ("Members"):

### BCL-FAMILY LLC
("BCL-Family")

### ELAN PERETZ, NOT INDIVIDUALLY, BUT AS TRUSTEE OF THE ELAN PERETZ TRUST
(the "Peretz Trust")

### DANIEL SHACHTMAN, NOT INDIVIDUALLY, BUT AS TRUSTEE OF THE DANIEL SHACHTMAN TRUST DATED OCTOBER 14, 2008
(the "Shachtman Trust")

### KENNETH FIXLER
("Kenneth")

### JONATHON FIXLER
("Jonathon")

### PRELIMINARY STATEMENTS:

A.      The Company was established on January 21, 2010, under and pursuant to the Act, and governed by that certain Operating Agreement (the "Initial Operating Agreement") dated January 21, 2010, by and between Kenneth and BCL-Business Holdings LLC.

B.      The Initial Operating Agreement was amended and restated by that certain Amended and Restated Operating Agreement (the "Amended Operating Agreement") dated October 19, 2012, by Kenneth and BCL-Business Holdings LLC.

C.      As of the date hereof, BCL-Business Holdings LLC has distributed its interest in the Company to the members of BCL-Business Holdings LLC.

D.      The parties hereto are desirous of continuing to operate the Company under the laws of the State.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein and other good and valuable consideration, the receipt, adequacy and sufficiency of which are hereby acknowledged by the parties, the parties agree to amend and restate the Amended Operating Agreement as follows:

### Article 1
### Select Definitions

"Act" means the Limited Liability Company Act from time to time in force in the State.

FILED DATE: 7/31/2019 4:27 PM   2019L008483

"Agreement" means this Second Amended and Restated Operating Agreement, as originally executed and as amended, modified, supplemented or restated from time to time.

"Charter" means the articles of organization, certificate of formation or similar instrument, as amended from time to time, issued by the State evidencing the formation of the Company. The Charter was issued on January 21, 2010, and bears State File No. 03220982.

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Company" means the limited liability company formed upon the filing of the Charter and whose affairs are governed by this Agreement.

"Determination Portfolio" means the investment portfolio of the Company (including its subsidiaries, including, without limitation, BCL-Jacksonville LLC, FB Realty, LLC and BCL-Home Lending Parent LLC), as such portfolio existed at 11:59 p.m. Central Standard Time on December 31, 2016.

"First Determination Date" means the date on which the last house in the Determination Portfolio has been sold to a third party.

"Member" means the person or persons identified as such in this Agreement, including persons subsequently admitted to the Company as Members in accordance with Article 10.

"Pay In Amount" means the amount, as calculated by BCL-Family in its reasonable discretion following the First Determination Date, of the net loss from the operation of the Company's business with respect to the Determination Portfolio, *less* the amount the Members contributed to the Company in 2016 in respect of such net loss.

"Profit Percentages" shall be as set forth below and as may be adjusted from time to time in accordance with this Agreement:

| Member | Prior to the First Determination Date | Following the First Determination Date | Following the Second Determination Date |
|---|---|---|---|
| BCL-Family | 56% | 62% | 56% |
| Peretz Trust | 12% | 12% | 12% |
| Shachtman Trust | 12% | 0% | 0% |
| Kenneth | 20% | 20% | 20% |
| Jonathon | 0% | 6% | 12% |

"Second Determination Date" means the date upon which 9.68% of the aggregate amount distributed pursuant to Section 6.2 to BCL-Family following the First Determination Date is equal to 12% of the Pay In Amount.

"State" means the State of Illinois, which has issued the Company's Charter.

FILED DATE: 7/31/2019 4:27 PM   2019L008483

### Article 2
### Organizational Matters

2.1     Formation and Statutory Authority.

(a)     *Formation.* The Company was formed upon the issuance of the Charter by the State. The Members hereby ratify and adopt the acts and conduct of the Company's organizer in connection with the filing of the Charter as acts and conduct by and on behalf of the Company. The organizer is hereby released and indemnified by the Company from any liability on account of its actions in connection with the formation of the Company.

(b)     *Statutory Authority.* The Company shall continue to operate as a limited liability company in accordance with this Agreement and the Act. The rights and obligations of the Members among themselves and in relation to the Company shall be determined in accordance with this Agreement and the Act. To the extent that anything contained in this Agreement conflicts with the Act, or modifies, supplements or otherwise affects any rights or obligations under the Act, this Agreement shall supersede the Act, except to the extent expressly restricted by the Act.

2.2     Filings. The Members shall make such filings and do or cause to be done such other acts and things as shall be required to continue the existence of the Company in the State and shall cause the Company to be qualified or registered under assumed or fictitious names statutes or similar laws in any jurisdiction in which the Company owns property or transacts business to the extent the same is necessary or, in the judgment of the Members, advisable in order to protect the limited liability of the Members or to permit the Company to lawfully own property or transact business. The Members shall, to the extent the same is necessary or, in the judgment of the Members, advisable, execute, file and publish all such certificates, notices, statements or other instruments necessary to permit the Company lawfully to own property and conduct business as a limited liability company in all jurisdictions where the Company elects to own property or transact business and to maintain the limited liability of the Members.

2.3     Principal Office of the Company. The principal office of the Company shall be located at such place within or outside the State as the Members may from time to time designate. The Company may have secondary offices at such other place or places as the Members may from time to time designate.

2.4     Records to be Maintained. The Company shall at all times during the continuance of the Company keep at the Company's principal office such records and information as the Company may be required to maintain in accordance with the Act.

2.5     Registered Office and Registered Agent. The Members shall designate a registered office and a registered agent in accordance with the Act. The Members have the right to change the Company's registered office and/or registered agent from time to time in accordance with the Act. The Members shall select and designate a registered office and registered agent for the Company in each other state in which the Company is required to maintain or appoint one.

### Article 3
### Purpose of the Company

The purpose of the Company is to engage in any and all lawful businesses, make any and all lawful investments and undertake such other activities related or incidental thereto as the Members may determine is in the interests of the Company.

3

FILED DATE: 7/31/2019 4:27 PM   2019L008483

Article 4
Duration of the Company

4.1     Duration of the Company.  The Company shall continue in perpetuity unless sooner dissolved in accordance with the other provisions of this Article.

4.2     Winding-Up.  The Company shall commence a winding-up of its affairs upon the earliest of:

(a)     *Decision of the Members.*  The decision of the Members to do so.  A decision of the Members under this paragraph shall require the approval of Members holding at least a majority of the Profit Percentages as of the date such decision is made.

(b)     *Judicial Dissolution.*  Upon the entry of a judicial decree of dissolution of the Company in accordance with the Act.

The winding-up of the Company shall be conducted in accordance with this Agreement generally and Article 12 in particular.

4.3     Continuation of Company Upon Certain Events.  The death, disability, court declaration of incompetence, bankruptcy, dissolution, liquidation or other dissociation of a Member shall not dissolve the Company, but it shall be continued with the successor or legal representative of such Member; such successor or legal representative shall, to the extent of the interest acquired, be entitled only to the predecessor Member's rights, if any, in the distributions of the Company, and no such person shall have any right to participate in the management of the affairs of the Company or vote on any Company matter without the written consent of the Members holding at least a majority of the Profit Percentages at such time.  See Article 10 for additional provisions applicable to any such successor or legal representative.

Article 5
Capital Contributions to the Company

5.1     Capital Contributions.  Each Member (or its predecessors, if any) has made such contributions to the capital of the Company as are reflected in the books and records of the Company.

5.2     Additional Capital Contributions.  Except as set forth in this Agreement or as required by the Act, no Member shall be assessed for additional capital contributions.

(a)     *By Agreement of Members.*  The Members may, by unanimous agreement, at any time or from time to time, make additional capital contributions to the Company.

(b)     *By Action of BCL-Family.*  If BCL-Family determines that it is necessary or desirable for the Company to obtain additional funds in the form of additional capital contributions, then:

(i)     BCL-Family shall send to each Member (other than the Shachtman Trust) a notice (the "First Requirement Notice"), which shall advise Members as to the total amount of capital required by the Company (the "Requirement Amount"), the portion of the Requirement Amount which may be contributed by each Member (determined pro rata according to the Members' Profit Percentages at the time such First Requirement Notice is delivered; provided, that if such First Requirement Notice is delivered on or prior to the Second Determination Date, then the portion of the Requirement Amount which may be contributed by each

4

FILED DATE: 7/31/2019 4:27 PM   2019L008483

Member shall be determined pro rata according to the Members' Profit Percentages as of the day before the Second Determination Date) and the date on which such capital is required to be contributed to the Company (the "Requirement Date"). The Requirement Date shall be not less than five days after the date of the First Requirement Notice.

(ii)      Should any Member not exercise its option and contribute its capital within the period provided in clause (i), BCL-Family may (but shall not be obligated to) send to each Member who made contributions pursuant to clause (i) a notice (the "Second Requirement Notice") of the uncontributed portion of the Requirement Amount, each of whom may elect to make a further additional capital contribution to the Company by delivering to BCL-Family, within five days of the date of the Second Requirement Notice, written notice of the same, which notice shall include a statement of the maximum amount of the uncontributed Requirement Amount such Member would be willing to contribute. The portion of the uncontributed Requirement Amount that may be contributed by each Member shall be determined by BCL-Family ratably according to the relative maximum amounts that the Members propose to contribute in their notices to BCL-Family or otherwise as BCL-Family shall determine, and shall be paid by the Member to the Company immediately upon demand therefor. No Member, however, shall be required to pay more than the maximum amount it proposed to contribute to the Company.

(iii)     *Additional capital contributions under this Section are voluntary,* but once a Member has agreed to make an additional capital contribution hereunder, the Company shall have all of the rights and remedies at law, in equity and as set forth in this Agreement resulting from the failure of the Member to make such capital contribution.

(iv)      In the event that the entire Requirement Amount is not contributed by all Members in proportion to their Profit Percentages in effect immediately prior to the First Requirement Notice, the Profit Percentages of the Members shall be adjusted with prospective effect to take account of the additional capital contributions made by the contributing Members in relation to the sum of (A) those additional capital contributions and (B) in BCL-Family's discretion, either (i) the aggregate amount of the capital contributions (whether or not returned) of the Members immediately prior to the additional capital contributions or (ii) the net fair market value of the Company's assets at such time (as determined by BCL-Family). Notwithstanding the foregoing, prior to the First Determination Date, no adjustment shall be made to the Profit Percentage of the Shachtman Trust.

(c)      *Pay In Amount.*   Upon determination of the Pay In Amount, each Member shall contribute to the capital of the Company an amount equal to such Member's pro rata portion of the Pay In Amount (determined in accordance with the Profit Percentages of the Members prior to the First Determination Date), and the Company shall pay the Pay In Amount to BCL-Operations LLC.

5.3     Guaranty Capital Contributions.   The Members hereby acknowledge that BCL-Operations LLC ("BCL-Operations") has prior to the date of this Agreement and may subsequent to the date of this Agreement make loans to the Company. Each of the Members hereby acknowledges that such Member agreed to reimburse an amount equal to its portion of such loans to the extent that upon the

FILED DATE: 7/31/2019 4:27 PM   2019L008483

conclusion of the activities of the Company, the Company is not able to pay to BCL-Operations all of the outstanding principal and accrued but unpaid interest under such loans, as determined by the Members holding a majority of the Profit Percentages at such time, which amount shall be known herein as the "Guaranteed Amount."  To the extent that BCL-Operations is required to pay any amount to another third party in respect of a loan from such other third party to the Company that BCL-Operations guaranteed, such amount shall increase the amount of the Guaranteed Amount accordingly.  Upon determination by the Members holding a majority of the Profit Percentages at such time that the activities of the Company have concluded, a final calculation shall be performed by the Company to determine the amount of the Guaranteed Amount.  Within 10 days of such determination (or later upon determination by the Members holding a majority of the Profit Percentages at such time), the Members shall contribute to the Company an amount equal to the Guaranteed Amount multiplied by such Member's Profit Percentage, which amounts the Company shall pay to BCL-Operations.  For the avoidance of doubt, and notwithstanding the foregoing, the Guaranteed Amount shall not include, and no Member shall be required to contribute pursuant to this Section, any amount in duplication of amounts paid by such Members in respect of the Pay In Amount.

5.4     Defaulting Members.   The Company, acting at the sole direction of BCL-Family, shall be entitled to enforce the obligations of each Member to make the contributions and other payments due to the Company that are provided in this Article and elsewhere in this Agreement, and the Company shall have all remedies available at law or in equity in the event any such contribution or payment is not so made.   The Company, acting at the sole direction of BCL-Family, shall be entitled to recover the reasonable attorney's fees and other costs of enforcing the Members' contribution and payment obligations under this Agreement, and shall also be entitled to recover interest on any unpaid amount, from the due date of such payment to the date of payment at 500 basis points over the prime rate of interest from time to time in effect at large US money center banks most recently published in The Wall Street Journal (US Edition) or similar publication if The Wall Street Journal (US Edition) is not available.

## Article 6
## Distributions by the Company

6.1     Definitions.  The following terms shall have the following meanings:

(a)     "*Available Cash*" shall consist of all cash on hand of the Company irrespective of its source, excluding, however, such reserves as Members holding at least a majority of the Profit Percentages as of the date of the determination of such reserves may establish.

(b)     "*Unreturned Capital*" consists of so much of a Member's capital contributions to the Company that have not been returned to such Member by way of distributions made under this Article that are identified (in the distribution provisions of this Article) as distributions of Unreturned Capital.  If a person acquires all or a portion of another Member's interest in the Company, the transferee shall succeed to the corresponding proportion of the transferor Member's Unreturned Capital at the time of the transfer.

6.2     Distributions of Available Cash.  Available Cash shall be distributed to the Members in such amounts and at such times as Members holding at least a majority of the Profit Percentages as of the date such distributions are made shall determine in the following rank and order:

(a)     Among the Members in proportion to, and to the extent of, their Unreturned Capital.

(b)     The remainder, if any, among the Members according to their Profit Percentages during the period in which such distributions are made.

FILED DATE: 7/31/2019 4:27 PM    2019L008483

6.3    Priorities.  Except as may be expressly provided in this Agreement, no Member shall have a priority right over any other Member as to distributions.

6.4    Interest on Capital Contributions.  Except as may be expressly provided in this Agreement, no interest shall be allowed to any Member upon the amount of its capital contributions.

6.5    Set-Off Rights.  The Company shall be entitled to set-off against any distributions or other amounts that may be or become due to a Member from the Company any amounts that may be due from such Member to the Company or another Member.

6.6    Restrictions on Distributions.  No distributions may be made to the Members if, after giving effect to such distributions, either the Company would be unable to pay its debts as they become due in the usual course of business or the net assets of the Company would be less than zero.

Article 7
Accounting and Tax Matters

7.1    Books of Account.  The Members shall cause proper and true books of account to be maintained for the Company in conformity with sound accounting principles consistently applied.  There shall be recorded in the Company's books of account the particulars of all monies, goods or effects belonging to or owing to or by the Company, or paid, received, sold or purchased in the course of the Company's activities and all of such other transactions, matters and things relating to the Company as are usually entered in books of account kept by companies engaged in activities of a like kind and character.

7.2    Method of Accounting and Fiscal Year.  The Company's books of account shall be maintained on the cash or accrual basis, as determined by Members holding at least a majority of the Profit Percentages as of the date such determination is made.  The Company's fiscal year shall be the calendar year unless determined otherwise by Members holding at least a majority of the Profit Percentages as of the date such determination is made.

7.3    Reports and Returns.  As soon as practicable after the close of each fiscal year the Company shall provide each Member with such statements as shall be necessary to advise the Members properly about their investment in the Company for income tax reporting purposes.  The Company shall engage an accountant to prepare and to see to the filing of all Federal, state and local tax returns on behalf of the Company.  Members acknowledge that the Company may not be able to provide all information required for income tax reporting purposes on a timely basis and that they should expect to extend the time for filing their income tax returns.  Each Member does hereby consent to the electronic furnishing of Schedule K-1 information.

7.4    Capital Accounts.  As part of the Company's books of account, an individual "Capital Account" shall be maintained for each Member at all times in accordance with sound accounting principles consistently applied.

7.5    Financial (Book) Allocations.  The net profit or net loss of the Company, determined on an annual basis in accordance with sound accounting principles, shall, in the discretion of Members holding at least a majority of the Profit Percentages at such time, be allocated among the Members in accordance with any reasonable method selected by such Members that takes due account of the Members' economic interests in the Company and risk of loss as reflected by their capital contributions, rights to distributions and liability (direct and indirect) for the Company's debts and other obligations.

FILED DATE: 7/31/2019 4:27 PM    2019L008483

7.6    Tax Allocations.    Except as provided herein, or as otherwise required by the Code or Treasury Regulations promulgated thereunder (including, without limitation, Treasury Regulations Section 1.704-1 and 1.704-2), Company income, gain, loss, deduction, credit and other partnership items, as computed for Federal income tax purposes, shall be allocated among the Members in the same manner as the corresponding book items are allocated pursuant to Section 7.5.

7.7    Tax Elections.    Members holding at least a majority of the Profit Percentages at any given time shall have the right to make (and revoke) any and all tax elections for the Company, including, without limitation, an election to adjust the tax basis of Company assets under Code Section 754.

7.8    Administration of Tax Proceedings.    The Members holding at least a majority of the Profit Percentages at any given time shall appoint, remove and replace the Company's "Tax Matters Partner" as defined in Code Section 6231(a)(7) (referred to herein as the "Tax Matters Member"). The Tax Matters Member shall have the right to resign by giving 30 days written notice to the Members. Upon the resignation of the Tax Matters Member, a successor Tax Matters Member shall be selected by the Members. The Members hereby appoint BCL-Family as the initial Tax Matters Member.

Article 8
Management of the Company

8.1    Management by Members.    Except as otherwise provided in this Agreement, the affairs of the Company shall be managed and controlled by the Members (other than the Shachtman Trust) in accordance with this Agreement generally and this Article in particular. Except as otherwise provided in this Agreement, any action, decision or exercise of discretion by the Members in the name of the Company shall require the approval of any one of the Members (other than the Shachtman Trust).

8.2    Authority of Members.

(a)    *Power and Authority.*    Without limiting the generality of the foregoing, and consistent with the purposes of the Company, each Member (other than the Shachtman Trust) acting alone on behalf of the Company shall have the right, power and authority to acquire assets; purchase goods and services; sell, exchange, lease, license or otherwise deal in or with any and all assets of the Company; open and maintain one or more bank accounts; borrow funds to finance the Company's activities and in connection with such borrowing, mortgage, hypothecate, pledge, lien or otherwise encumber the revenues and assets of the Company; guaranty the debts of affiliates and others when such Member believes it will benefit the Company to do so; confess, settle, compromise or otherwise satisfy debts, claims, judgments and other obligations, including by way of a deed in lieu of foreclosure or similar transaction; enter into any contract or agreement or amend or cancel the same; and invest and reinvest any funds or other assets of the Company – all as incident to or necessary for the operations of the Company.

(b)    *No Duty to Inquire.*    Nothing herein contained shall impose any obligation on any person or firm doing business with the Company to inquire as to whether or not a Member has exceeded its power and authority in executing any agreement, contract, lease, mortgage, security agreement, deed or other instrument on behalf of the Company, and any such third person shall be fully protected in relying upon such authority.

(c)    *Major Action Approval Rights.*    Notwithstanding any other provisions of this Agreement, a Member shall not be authorized to take, and shall not take, any of the actions that are set out below without the prior written consent of Members holding at least a majority of the Profit Percentages for the period in which such action is taken:

FILED DATE: 7/31/2019 4:27 PM    2019L008483

(i)    Making an assignment for the benefit of creditors or admitting in writing the inability of the Company to pay its debts generally as they become due or petitioning or applying to any tribunal for the appointment of a custodian, trustee, receiver or liquidator for the Company or of any substantial part of the assets, or commencing of any proceeding relating to the Company under any bankruptcy, reorganization, arrangement insolvency, readjustment of debt, dissolution or liquidation law of any jurisdiction.

(ii)    Hiring, firing, materially changing the responsibilities or duties, or altering the compensation (including salary, bonus or other benefits) of any employee.

(iii)    Determining the compensation, if any, of any Member or its affiliates in respect of such Member's or its affiliate's services to the Company.

(d)    *Subsidiaries.*    The provisions of this Agreement regarding the management and governance of the Company shall apply as well to the management and governance of the Company's subsidiaries, whether the subsidiaries are managed or controlled directly or indirectly by the Company, as a member, manager, partner, stockholder or otherwise. Any action to be taken by any such subsidiary shall be construed as an action taken by the Company and shall be subject to the same rights and limitations granted and imposed on the Members under this Agreement.

8.3    Members' Time Commitment.    Each Member shall cause so much time to be devoted to the business of the Company as, in its judgment, the conduct of the Company's business shall reasonably require.

8.4    Reimbursement of Members.    The Company shall reimburse the Members for any costs that may be properly expended on behalf of the Company made out of funds other than those of the Company.

8.5    Related Business Partners.    The Company may employ, contract for services with, acquire or sell goods, property and materials from or to, borrow money from and otherwise deal with any Member or any affiliate of a Member on any basis which is customary and competitive, or otherwise fair and reasonable.

8.6    Liability of Member.    A Member shall not be liable to another Member or the Company for honest mistakes of judgment, or for action or inaction, taken reasonably and in good faith for a purpose that was reasonably believed to be in the best interests of the Company, or for losses due to such mistakes, action or inaction, or for the negligence, dishonesty or bad faith of any employee, broker or other agent of the Company, but only if such employee, broker or agent was selected, engaged or retained and supervised with reasonable care. The Members may consult with counsel and accountants in respect of Company affairs and be fully protected and justified in any action or inaction that is taken in accordance with the advice or opinion of such counsel or accountants if, and only if, they shall have been selected with reasonable care. The Members shall look solely to the assets of the Company for the return of their capital and, if the assets of the Company remaining after payment or discharge of the debts and liabilities of the Company are insufficient to return such capital, they shall have no recourse against the Members for such purpose. Notwithstanding any of the foregoing to the contrary, the provisions of this Section shall not be construed to relieve (or attempt to relieve) any person of any liability by reason of gross negligence, recklessness or intentional wrongdoing or to the extent (but only to the extent) that such liability may not be waived, modified or limited under applicable law, but shall be construed so as to effectuate the provisions of this Section to the fullest extent permitted by law. This Section shall also

FILED DATE: 7/31/2019 4:27 PM    2019L008483

apply to the officers, directors, shareholders, partners, members, managers, employees, trustees, agents and other representatives of any entity that is a Member.

8.7      Indemnification.  The Company shall indemnify any person who was or is a party, or is threatened to be made a party, to any threatened, pending or completed action, suit or proceeding (other than an action by or in the right of the Company), whether civil, criminal, administrative or investigative, by reason of the fact that the person is or was a member, manager, officer, employee, agent or other representative of the Company, or is or was serving at the request of the Company as a director, manager, officer, employee or agent of another limited liability company, corporation, partnership, joint venture, trust or other enterprise, against expenses (including attorney's fees and costs), judgments, fines and amounts paid in settlement actually and reasonably incurred by the person in connection with the action, suit or proceeding, if the person acted in good faith and in a manner the person reasonably believed to be in, or not opposed to, the best interests of the Company or, with respect to any criminal action or proceeding, had no reasonable cause to believe the person's conduct was unlawful.  The termination of any action, suit or proceeding by judgment, order, settlement, conviction or upon a plea of *nolo contendere* or its equivalent shall not, of itself, create a presumption that the person did not act in good faith and in a manner that the person reasonably believed to be in, or not opposed to, the best interests of the Company or, with respect to any criminal action or proceeding, that the person had reasonable cause to believe that the person's conduct was unlawful.  This Section shall also apply to the officers, directors, shareholders, partners, members, managers, employees, trustees, agents and other representatives of any entity that is a Member.

8.8      Authorized Signatories and Officers of the Company.  The Members holding a majority of the Profit Percentages at any given time may from time to time appoint one or more persons to act as authorized signatories to execute agreements, contracts, documents (including promissory notes, mortgages, security agreements and other loan documents) and other instruments (including deeds) on behalf of the Company.  The Members holding a majority of the Profit Percentages at any given time may also from time to time appoint one or more persons to serve as officers of the Company, in such capacities and with such delegated rights and powers as the Members may approve.  No such authorized signatory or officer shall have any different or greater rights and powers than the Members have under this Agreement.  Authorized signatories and officers appointed by the Members shall be entitled to be indemnified by the Company in accordance with Section 8.7.

Article 9
Membership in the Company

9.1      Rights and Obligations of the Members.  Unless admitted to the Company as a Member in accordance with Article 10, no person who is not a signatory to this Agreement shall be considered a Member.  The Company need deal only with persons as Members that are so admitted and shall not be required to deal with any other person (other than with respect to distributions to assignees pursuant to assignments in compliance with Article 10) merely because of an assignment or transfer of an interest to such person or by reason of the incapacity of a Member.  Any distribution made in accordance with this Agreement by the Company to the person shown on the Company records as a Member or to its legal representatives, or to the assignee of the right to receive Company distributions as provided herein, shall acquit the Company with respect to such distribution of all liability to any other person that may have an interest in or claim to such distribution by reason of any other assignment by the Member with respect to such distribution or by reason of such Member's incapacity, or for any other reason.

9.2      Liability.  No Member shall be personally liable for any of the debts of the Company or any of the losses thereof beyond the amount contributed or required to be contributed by it to the Company under this Agreement and as otherwise specified in this Agreement or in the Act.

FILED DATE: 7/31/2019 4:27 PM   2019L008483

9.3    No Partition. No Member shall have the right to partition any property of the Company during the term of this Agreement, or while such assets are held in trust pursuant to Section 12.4, nor shall any Member make application to any court of authority having jurisdiction in the matter or commence or prosecute any action or proceeding for such partition and the sale thereof, and upon any breach of the provisions of this Section by any Member, the other Members, in addition to all of the rights and remedies in law and in equity that they may have, shall be entitled to a decree or order restraining and enjoining such application, action or proceeding. To the extent not prohibited by law, the Shachtman Trust specifically renounces, waives and forfeits all rights, whether arising under contract or statute or by operation of law, to seek, bring or maintain any action in any court of law or equity for an accounting.

9.4    Withdrawals and Resignations. No Member shall be entitled to withdraw, resign or voluntarily dissociate from the Company, except pursuant to the terms of this Agreement. No Member shall be entitled to receive any money or property from the Company except (a) by way of distributions as provided pursuant to Article 6, (b) by way of distributions upon the winding-up of the Company pursuant to Article 12, (c) in respect of any loans to the Company then due and owing to such Member and (d) as expressly provided elsewhere in this Agreement.

9.5    Uncertificated or Certificated Securities. Unless the Members decide otherwise, the interests of the Members in the Company shall not be certificated.

9.6    Trustee Liability.

(a)    *Actions as Trustees.* When this Agreement is executed by the trustee of any trust, such execution is by the trustee, not individually, but solely as trustee in the exercise and under the power of authority conferred upon and vested in such trustee, and nothing herein contained shall be construed as creating any liability on the part of any such trustee personally to pay any amounts required to be paid hereunder, or to perform any covenant, either express or implied, contained herein, all such liability, if any, being expressly waived by the parties hereto by their execution hereof. Any liability of any Member which is a trust to the Company or to any third person shall be only that of such trust to the full extent of its trust estate and shall not be a personal liability of any trustee, grantor or beneficiary thereof.

(b)    *Successor Trustee.* Any successor trustee or trustees of any trust which is a Member herein shall be entitled to exercise the same rights and privileges and be subject to the same duties and obligations as its predecessor trustee. As used in this Agreement, the term "trustee" shall include any or all such successor trustees.

(c)    *Termination of Trust.* The termination of any trust which is a Member shall not terminate the Company. Upon the allocation or distribution of all or any portion of the Company interest of a trust which is a Member pursuant to the exercise of any power of appointment, or otherwise, to a beneficiary of such trust or to another person or persons or to another trust or trusts, whether or not such distribution shall terminate such distributing trust, each such distributee shall be entitled to be admitted to the Company as a Member to the extent of the proportionate share of the Company interest distributed to it, subject to the terms of this Agreement, including, without limitation, the restrictions contained in Article 10.

9.7    Right of Reimbursement. In the event any Member guarantees any indebtedness or other obligation of the Company, then the Company shall promptly reimburse the guarantor for any and all payments made by the guarantor for such indebtedness or other obligation. The Company shall not be obligated to reimburse the guarantor for any obligation under the guaranty that arises by reason of the gross negligence, willful misconduct or fraud of the guarantor or its affiliate. This Section shall also

11

FILED DATE: 7/31/2019 4:27 PM   2019L008483

apply to any guaranty of any indebtedness or other obligation of the Company given by, and this Section shall then so benefit, any affiliate of a Member.

9.8     Competitive Undertakings.  Any Member may engage in business ventures of any nature and description independently or with others, and neither the Company nor any of the Members shall have any rights in or to such independent ventures or the income or profits derived therefrom.

Article 10
Transfers and Rights Offerings; Bring-Along Rights; Purchase of Interests

10.1     Transfers by Members.  No Member shall sell, exchange, pledge, mortgage, hypothecate or otherwise transfer or encumber its interest in the Company without the prior written consent of Members holding at least a majority of the Profit Percentages at such time.  Any such transfer or encumbrance shall be void from inception and of no force or effect whatsoever.  Direct or indirect transfers of interests in entities that are Members shall also be subject to the limitations of this Section.

10.2     Additional Membership Interests.  The Members may issue additional membership interests in the Company (including so-called carried interests), or options, warrants or other rights to acquire membership interests in the Company, to new or existing Members on such terms as Members holding at least a majority of the Profit Percentages at any given time may determine is fair and reasonable.  Upon the issuance of additional membership interests to new or existing Members, Members holding at least a majority of the Profit Percentages at such time are authorized to adjust the Profit Percentages, Capital Account balances, Unreturned Capital balances and other attributes of the membership interests of the existing Members to take due account of the additional membership interests issued by the Company.

10.3     General Provisions.  The following rules shall apply to transfers of Company interests and the admission of additional persons to the Company:

(a)     *Procedure for Admission.*  No person shall be admitted as a transferee or additional Member hereunder unless and until  (i) in the case of an assignment of an interest in the Company permitted hereby, the assignment is made in writing, signed by the assignor and accepted in writing by the assignee, and a duplicate original of the assignment is delivered to and accepted by the Company, and (ii) the prospective admittee executes and delivers to the Company a written agreement, in form and substance satisfactory to the Company, pursuant to which said person agrees to be bound by this Agreement.

(b)     *Binding Effect.*  Any person acquiring or claiming an interest in the Company, in any manner whatsoever, shall be subject to and bound by all terms, conditions and obligations of this Agreement to which its predecessor in interest, if any, was subject or bound, without regard to whether such person has executed a counterpart hereof or any other document contemplated hereby.  No person, including the legal representatives, heirs or legatees of a deceased Member, shall have any rights or obligations greater than those set forth herein and no person shall acquire an interest in the Company or become a Member except as permitted hereby.

(c)     *Actions Prior to Acceptance of Assignment.*  Notwithstanding that a person acquiring or claiming an interest in the Company is bound by all terms, conditions and obligations of this Agreement to which its predecessor in interest, if any, was subject or bound, the Company shall be entitled to treat the assignor of the assigned interest as the absolute owner thereof in all respects and shall incur no liability for distributions made in good faith to such assignor prior to such time as the documents specified in this Section have been delivered to and accepted by the Company.  Any person to whom an

FILED DATE: 7/31/2019 4:27 PM    2019L008483

interest in the Company is attempted to be transferred in violation of this Article or any other provision of this Agreement shall not have any of the rights of a Member of the Company otherwise provided under this Agreement or the Act, including, but not limited to, the right (i) to receive distributions from the Company, (ii) to vote on any matter, (iii) to participate in the management of the Company, (iv) to act as an agent of the Company, (v) to obtain any information or accounting of the affairs of the Company or (vi) to inspect the books or records of the Company. If, however, by law, the Company is required to recognize the purported transfer of a Member's interest in the Company, the purported transferee's rights shall be strictly an economic interest in the Company limited solely to distributions (and accompanying allocations of accounting and tax items) as provided by this Agreement with respect to such economic interest, and the Member whose interest in the Company has purportedly been transferred shall have no right to any distributions with respect to such interest in the Company. Any distributions to such purported transferee may be applied (without limiting any other legal or equitable rights of the Company) to satisfy any debts, obligations or liabilities that the transferor or transferee may have to the Company (including for damages). A Member attempting to engage in any purported transfer that has not been approved in writing by Members holding at least a majority of the Profit Percentages shall be liable to indemnify and hold harmless the Company and the other Members from all costs, liability and damages that they may incur (including, but not limited to, incremental tax liability and attorney's fees and expenses) as a result of such purported transfer; any purported transferee shall be jointly and severally liable to do the same, including by way of set-off as provided in Section 6.5. For purposes of this paragraph, an economic interest in the Company shall mean a person's rights to distributions (and accompanying accounting and tax allocations), but excluding the right to vote, approve or disapprove, or otherwise to participate in, the management and control of the affairs of the Company.

(d)    *Costs.*  The costs incurred by the Company in processing an assignment (including attorney's fees and costs) shall be borne by the assignee, and shall be payable prior to and as a condition of admission to the Company.

10.4    Bring-Along Rights.  In the event that BCL-Family proposes to enter into one or more agreements to sell to any person or persons (referred to herein collectively as the "purchaser") all or substantially all of the membership interests in the Company in a single transaction or related series of transactions in lieu of a sale of all or a substantial part of the assets of the Company, all of the Members hereby agree to sell their respective interests in the Company to the purchaser on the terms set forth in such agreements. The agreements shall provide for the payment to the Members for their interests in the Company amounts equal to the amounts that they would have received had the Company (a) sold all of its assets at the price implicit in the price to be paid by the purchaser for the membership interests in the Company, (b) satisfied all of its obligations and (c) made liquidating distributions to the Members in accordance with Article 16. The costs associated with the sale shall, in general, be borne by the Members in the same proportion as they shared the considerations received in accordance with the preceding sentence. BCL-Family may reallocate among the Members so much of the considerations that a Member would be entitled to receive as equals the amounts which such Member then owes to the Company or to another Member. BCL-Family is hereby granted by each Member a power of attorney, coupled with an interest, to execute in the name of the Member any and all agreements, contracts, documents and other instruments (including instruments of assignment) that BCL-Family deems necessary or useful in order to consummate these transactions. These instruments shall be deemed to have been executed on behalf of the Members as if signed by the Members themselves.

10.5    Purchase of Interests.

(a)    *Membership Interests Subject to Purchase.*  The interests of any Member in the Company (which for purposes of this Section shall include any other person possessing an economic interest in the Company) shall be subject to purchase by BCL-Family as provided in this Section.

FILED DATE: 7/31/2019 4:27 PM   2019L008483

(b)      *Election to Purchase Made by BCL-Family.*  The decision to purchase a Member's interest in the Company in accordance with this Section shall be made by BCL-Family in its sole discretion and for any reason, including, without limitation, for "Cause" (as defined herein):

      (i)      As used in this Section, "Cause" means:

           (A)      A material breach by the Member of any of the terms, conditions or obligations of the Member contained in (1) this Agreement, including, without limitation, transferring (voluntarily, by operation of law or otherwise) an interest in the Company without the requisite approval of the Members in accordance with Section 10.1, or (2) any other operating agreement or governing document with respect to the Company.

           (B)      Fraud, dishonesty or willful and serious misconduct by the Member with respect to the business or affairs of the Company.

           (C)      Fraud, dishonesty or serious misconduct by the Member, other than with respect to the business or affairs of the Company, which involves an act of moral turpitude or could adversely affect the business, affairs or reputation of the Company.

           (D)      Interference with the orderly conduct of the Company's affairs that is demonstrably and materially injurious to the Company, monetarily or otherwise.

           (E)      The Member becoming a disreputable person.

           (F)      A Member who is an employee or otherwise engaged to provide services to the Company (in each case, an "employee") is separated from service for good cause (as defined below).  As used in this clause, "good cause" with respect to an employee means any one or more of the following:

                (I)      Employee's material breach of any employment, services or restrictive covenant agreement between employee and the Company.

                (II)      Employee's continued failure to perform his duties and responsibilities to the Company in a competent and professional manner for a period of 10 days following written notice by the Company to employee of such failure.

                (III)      Employee's willful failure to adhere to the Company's codes, policies or procedures (as in effect or as amended from time to time).

                (IV)      Employee's breach of any statutory or common law fiduciary duty (including the duty of loyalty) to the Company.

                (V)      Employee's admission or conviction of, or plea of guilt or *nolo contendere* with respect to, a felony crime or any other crime involving moral turpitude.

FILED DATE: 7/31/2019 4:27 PM    2019L008483

(VI)    Employee's abuse of illegal drugs or other controlled substances or his habitual intoxication.

(VII)    Any act described in the other clauses of this clause (i).

For the avoidance of doubt, "good cause" with respect to any employee does not mean retiring (in accordance with the retirement policies of the Company) or voluntarily resigning from service to the Company at a time when the Company would not otherwise have the right to terminate employee for good cause.

(ii)    For purposes of clauses (i) and (ii), the term "Company" shall include the Company and any of its subsidiaries or other affiliates. For the avoidance of doubt, any entity owned directly or indirectly by Joel Barnett, Nancy Barnett, Sam Barnett, Lindsey Barnett or any of their respective relatives or any trusts established for the benefit of any of the foregoing shall be deemed affiliates of the Company.

(iii)    For purposes of clauses (i) and (ii), the term "Member" shall include the Member and any of his or its affiliates or family members. For illustrative purposes only, Elan Peretz, Daniel Shachtman, their respective spouses and any trust established for the benefit of their respective spouses shall be deemed "Members" for purposes of clauses (i) and (ii).

(iv)    The purchase of a Member's interest for Cause shall not be considered a remedy for breach and shall not limit or in any way diminish any right or remedy the Company may have on account of an act constituting Cause.

(v)    The interests of all transferees, successors or assignees of a Member also be subject to purchase under this Section if any transferee, successor or assignee has engaged in any of the acts described in clauses (i) or (ii), or if the assigning or another predecessor Member of the transferee, successor or assignee (whether or not a Member) engaged in any of the acts described in such clauses.

(c)    *Purchase Notice.* If BCL-Family decides to purchase a Member's interest in the Company in accordance with this Section, BCL-Family shall send such Member (the "Subject Member") written notice (the "Purchased Notice") of its decision. The Purchase Notice shall specify the date on which the purchase shall close (the "Purchase Closing Date"); the Purchase Closing Date shall be established in accordance with paragraph (f).

(d)    *Purchase Price.* The purchase price (the "Purchase Price") of a Subject Member's interest shall equal:

(i)    The amount that the Subject Member would have received had the Company (A) terminated on the date the Purchase Notice was given, (B) sold all of its assets at their fair market values (as determined by BCL-Family in its sole discretion) on the date the Purchase Notice was given (net of BCL-Family's estimate of the costs and expenses of such sale), (C) satisfied all of its debts and obligations and (D) made distributions to the Members in accordance with Section 12.2, *less* any distributions made to the Subject Member after the date the Purchase Notice is given to Purchase Closing Date, *multiplied by*

15

FILED DATE: 7/31/2019 4:27 PM    2019L008483

(ii)    a percentage discount determined by BCL-Family in its sole discretion based on a decrease in value by reason of minority discount, lack of marketability or similar theory and such other factors determined by BCL-Family in its sole discretion.

Notwithstanding anything to the contrary contained in this Agreement, in the case of a purchase for Cause, (I) the Purchase Price shall not exceed $100.00 and (II) the Purchase Price shall be reduced by all of the Company's costs and expenses associated with the redemption, including without limitation attorney's and other professional fees, filing fees and transfer taxes.

(e)    *Payment of Purchase Price.*  The Purchase Price shall be paid in immediately available funds on the Purchase Closing Date.

(f)    *Purchase Closing Date and Closing Deliveries.*  The Purchase Closing Date shall be on a date and at the time specified by BCL-Family in the Purchase Notice but not later than the 30th day following the date the Purchase Notice is given.  Closing shall occur at the Company's principal office or at such other place specified by BCL-Family in the Purchase Notice.  At the closing, the Company shall tender the Purchase Price (as provided in paragraph (e)) to the Subject Member and the Subject Member shall accept the same and execute such documents of transfer as BCL-Family may request.  If the Subject Member shall not accept the tender of the Purchase Price or execute said documents, BCL-Family shall be entitled to execute the documents of transfer for and on behalf of the Subject Member, with the same effect as if the Subject Member had done so itself, and the contemplated transfer shall be deemed closed once Management has deposited the Purchase Price (i) as an interpleader in any court of competent jurisdiction (the Subject Member hereby irrevocably consents to such interpleader) or (ii) with any bank, trust company, escrow company or law firm under instructions that the same may be withdrawn by the Subject Member upon demand.  The closing of a redemption as contemplated in this paragraph shall not prejudice a Subject Member's right to contest the calculation of the Purchase Price but a Subject Member shall not be permitted to contest the effectiveness of the closing as contemplated by this paragraph.

(g)    *Assignment of Right of Purchase.*  BCL-Family shall have the right to assign BCL-Family's right to acquire the Subject Member's interest in the Company to any one or more Members or affiliates of any of the foregoing, and the provisions of this Section shall be construed accordingly.

Article 11
Amendments to the Agreement

11.1    Amendments.

(a)    *In General.*  This Agreement may be modified or amended at any time and from time to time upon the written consent of BCL-Family.

(b)    *Limitations on Authority to Amend.*  In no event shall any modification or amendment to this Agreement made pursuant to clause (a) above (i) disproportionately decrease the right of any Member to distributions in relation to Members similarly situated; or (ii) cause any Member to incur any additional personal liability with respect to the Company – unless in each case the Members adversely affected thereby consent in writing to such modification or amendment.

11.2    Power of Attorney.  Each Member hereby appoints BCL-Family (and each of its managers) as its true and lawful attorney, coupled with an interest in its name, place and stead, to sign, execute, acknowledge, swear to and file any and all documents which in the discretion of such attorney are required to be signed, executed, acknowledged, sworn to or filed by the Member to discharge the

16

FILED DATE: 7/31/2019 4:27 PM    2019L008483

purposes of the Company as hereinabove stated or the provisions of this Agreement. Without limitation, among the documents BCL-Family (and each of its managers) may execute on behalf of each Member shall be the following:

(a)    Any amendments to this Agreement, when this Agreement is amended in accordance with Section 11.1.

(b)    The Charter and any other instrument which may be required of the Company pursuant to the Act or the laws of any other jurisdiction and any amendments thereto that are not prohibited by Section 11.1.

The grant of authority set forth in this Section is a special power of attorney coupled with an interest, is irrevocable and shall survive the death, incapacity, insolvency, bankruptcy, liquidation or dissolution of a Member; may be exercised by BCL-Family (or any of its managers) for a Member by a facsimile signature or by listing the names of all of the Members executing any instrument with the signature of BCL-Family (or any of its managers), as attorney in fact for all of them; and shall survive the delivery of an assignment by a Member of all or any portion of its interest, except that where the assignee has been approved for admission to the Company as a substituted Member by the requisite consent of the Members in accordance with the provisions of Article 10, the power of attorney shall survive the delivery of such assignment for the sole purpose of enabling BCL-Family (and each of its managers) to execute, acknowledge and file any instrument necessary to effect such substitution, and the grant of authority set forth in this Section shall be deemed to have been made by such substitute Member.

Article 12
Winding-Up and Dissolution of the Company

12.1    Winding-Up and Dissolution Procedures. Upon an event described in Section 4.2, the affairs of the Company shall be wound-up and the Company shall be dissolved. A Member (the "Winding-Up Member") appointed by Members holding at least a majority of the Profit Percentages shall preside over the winding-up and dissolution of the Company or may appoint one or more agents to do so. The Winding-Up Member shall make such filings in the State and in such other states in which the activities of the Company make it necessary or desirable to do so and do or cause to be done such other acts and things as shall be required to dissolve the Company.

12.2    Distributions Upon Winding-Up. Except as otherwise provided in this Article, the winding-up and dissolution of the Company shall involve:

(a)    The orderly sale or other disposition of the Company's non-cash assets within a commercially reasonable time.

(b)    The payment or settlement of (and where appropriate, the establishment of reasonable reserves for) the Company's debts and other obligations, including to Members who are creditors, in the order of priority and to the extent provided by law.

(c)    The distribution of any remaining sums among the Members in accordance with Section 6.2.

12.3    Distributions In Kind. In the event that the Winding-Up Member determines that it is necessary or desirable to make a distribution of Company assets in kind, such assets shall be transferred and conveyed either to (a) the Members as tenants in common so as to vest in them undivided interests in the whole of such assets in proportion to their respective rights to share in the proceeds of the sale of such

FILED DATE: 7/31/2019 4:27 PM    2019L008483

assets in accordance with the provisions of Section 12.2(c); or (b) any one or more of the Members either as tenants in common (so as to vest in them undivided interests in the whole of such assets, in the proportions reasonably determined by the Winding-Up Member) or otherwise, on the condition that each such distributee receives aggregate value (whether in kind, cash or both) in accordance with the provisions of Section 12.2(c). All such Company assets shall be valued at fair market value as determined by the Winding-Up Member and shall be subject to such reasonable conditions and restrictions as are necessary or desirable in order to preserve the value of the assets distributed or for legal reasons.

12.4    Liquidating Trust. In the discretion of the Winding-Up Member, all or any portion of the distributions that would otherwise be made to the Members pursuant to Section 12.2(c) may be distributed to a trust established for the benefit of the Members for the purposes of liquidating Company assets, collecting amounts owed to the Company and paying any debts or other obligations of the Company arising out of or in connection with the Company. The Winding-Up Member shall appoint one or more persons as liquidating trustee. The assets of any such trust shall be distributed to the Members from time to time in the discretion of the Liquidating Trustee in the same proportions as the amount distributed to such trust by the Company would otherwise have been distributed to the Members pursuant to this Agreement.

12.5    Final Accounting. As part of the winding-up of the Company, a final accounting shall be made of the activities of the Company from the date of the last previous accounting to the date of dissolution. If a Member has a deficit in its Capital Account, such Member shall not be obligated to contribute any amount of that deficit to the Company; any such deficit shall not be considered an asset of the Company.

Article 13<br>General Provisions

13.1    Notices. All notices, demands, offers or other communications required or permitted to be given pursuant to this Agreement shall be in writing and shall be transmitted by courier, recognized overnight delivery service (such as FedEx) or first class (postage prepaid) certified U.S. mail. Any notice, demand, offer or other communication shall be effective on the date of receipt at the address of the addressee. Notices, demands, offers or other communications to a Member shall be addressed to the Member at the address beneath the Member's name on the signature page of this Agreement or, if applicable, in such Member's joinder to this Agreement or other instrument admitting the Member to the Company. Any Member may change its address for all future notices, demands, offers or other communications by giving notice to all of the other Members stating its new address.

13.2    Successors. This Agreement and all the terms and provisions hereof shall be binding upon the parties hereto and their respective legal representatives, heirs, successors and assigns, except as expressly herein otherwise provided.

13.3    Third Party Benefits. Without limiting Section 13.2, the provisions of this Agreement are intended solely to benefit the Company and the parties hereto and, to the fullest extent permitted by applicable law, shall not be construed as conferring any benefit upon any other person, including without limitation any creditor of the Company (and no such creditor or other person shall be a third party beneficiary of this Agreement), and except as required by the Act, the Members shall have no duty or obligation to any such creditor or other person to make any contributions or return any money or other property to the Company.

FILED DATE: 7/31/2019 4:27 PM    2019L008483

13.4    Governing Law.  This Agreement shall be construed in conformity with the domestic laws of the State, as applied to agreements whose only parties are residents of the State and which are to be performed entirely within the State.

13.5    Severability.  If any provision of this Agreement, or the application of such provision to any person or circumstance, shall be held invalid by a court of competent jurisdiction, the remainder of this Agreement, or the application of such provision to persons or circumstances other than those to which it is held invalid by such court, shall not be affected thereby.

13.6    Other Rules of Construction.  Every provision of this Agreement shall be construed simply according to its fair meaning and not strictly for or against any Member (notwithstanding any rule of law requiring an Agreement to be construed against the drafting party).  The following additional rules of construction shall apply to this Agreement:

(a)    All pronouns shall include the masculine, feminine or neuter thereof, wherever the context and facts require such construction.

(b)    The term "person" refers to an individual, corporation, partnership, joint venture, limited liability company, limited liability partnership, a cell of a series organization, association, joint stock company, statutory trust, common-law trust, unincorporated organization, government authority or any other organization whether or not a legal entity.

(c)    The term "party" means a signatory to this Agreement, including a Member and any successor to any Member, whether or not such successor has executed or otherwise joined in this Agreement.  The fact that a successor is a party shall not give that person any greater rights than it has under the express terms of this Agreement.  By way of illustration, a successor who has not been admitted to the Company in accordance with Article 10 is a party to this Agreement for purposes of the dispute resolution procedures in Section 13.8, but despite being a party is still subject to the limitations of Section 10.3(e).

(d)    The term "affiliate" is to have a meaning reasonably appropriate to its context; without limiting the generality of the foregoing, when used in connection with conduct that by the terms of this Agreement is to be circumscribed, the term shall be interpreted broadly. Without limiting the generality of the foregoing, an "affiliate" of a specified person, or a person "affiliated" with a specified person, is a person that directly, or indirectly through one or more intermediaries, controls, is controlled by or is under common control with the specified person.

(e)    All terms defined in this Agreement in the singular have the same meanings when used in the plural and vice versa.

(f)    The use of the word "including" herein shall not be considered to limit the provisions which it modifies but instead shall mean "including without limitation" unless the provision states otherwise.

(g)    An "Article" of this Agreement is typically identified with a number (e.g., "Article 13"). A "Section" of this Agreement corresponds to an Article and is typically identified with a number that includes a decimal (e.g., "Section 13.6"). A "paragraph" of this Agreement corresponds to a Section and is typically identified by a lower case letter (e.g., paragraph "(g)"). A "clause" of this Agreement corresponds to a paragraph and is typically identified with a roman numeral or an upper case letter (e.g., "(i)," "(I)" or "(A)").

Case 21-00215 Doc 43 Filed 09/22/22 Entered 09/22/22 15:08:49 Desc Main
Document Page 69 of 110

FILED DATE: 7/31/2019 4:27 PM 2019L008483

(h)     Headings, titles and subtitles are inserted for convenience of reference only and are to be ignored in any construction of the provisions hereof.

(i)     In the interpretation of this Agreement, no inference shall be drawn from the fact that a provision not included in this Agreement was included and then deleted from a draft of this Agreement.

13.7     Members Not Agents.  Nothing contained herein shall be construed to constitute any Member the agent of another Member, except as specifically provided herein.

13.8     Dispute Resolution.

(a)     *Jurisdiction, Venue and Service of Process.*  The Company and the parties to this Agreement hereby irrevocably and unconditionally agree that any suit, action or proceeding arising out of or related to this Agreement or the Company shall be brought only in the United States District Court for the Northern District of Illinois or in the Circuit Court of Cook County, Chicago, Illinois, and the specific choice from among the foregoing shall be determined by the party initiating such suit, action or proceeding.  To the fullest extent permissible by law, the Company and the parties to this Agreement hereby consent to the personal jurisdiction, venue and forum of such courts and hereby irrevocably and unconditionally waive any claim or objection that it is not subject to the jurisdiction of such courts, that the venue is improper, that the forum is inconvenient or any similar objection, claim or argument.  Service of process on any of the parties hereto with regard to any such action may be made and is considered legally proper by mailing the process to such person by certified mail to the address of such person as provided in Section 13.1 or to any subsequent address to which notices shall be sent.

(b)     *Waiver of Trial by Jury.*  Each party acknowledges and agrees that any controversy which may arise under this Agreement is likely to involve complicated and difficult issues, and therefore each such party hereby irrevocably and unconditionally waives any right such party may have to a trial by jury with respect to any litigation directly or indirectly arising out of or relating to this Agreement.  Each party understands and has considered the implications of this waiver. Each party makes this waiver voluntarily.

(c)     *Attorney's Fees.*  If the Company or any Member obtains a judgment in connection with a dispute arising under or in connection with any this Agreement, such party shall be entitled to recover from the non-prevailing party its court costs, and reasonable attorney's fees and disbursements incurred in connection therewith and in any appeal or enforcement proceeding thereafter, in addition to all other recoverable costs.

13.9     Remedies.  Subject to any express provisions of this Agreement, no remedy conferred upon the Company or any Member is intended to be exclusive of any other remedy herein or by law provided or permitted, but each shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law, in equity or by statute.

13.10     Waiver.  No waiver by the Company or any Member of any breach of this Agreement shall be deemed to be a waiver of any other breach of any kind or nature, and no acceptance of payment or performance by the Company or any Member after any such breach shall be deemed to be a waiver of any breach of this Agreement, whether or not the Company or any Member knows of such breach at the time it accepts such payment or performance.  No failure or delay on the part of the Company or any Member to exercise any right it may have shall prevent the exercise thereof by the Company or any Member at any time such other may continue to be so in default, and no such failure or delay shall operate as a waiver of any default.

FILED DATE: 7/31/2019 4:27 PM   2019L008483

13.11   Entire Understanding.   This Agreement constitutes the entire understanding among the Members and supersedes any prior understanding and/or written or oral agreements among them with respect to the Company.  In the event of any conflict between this Agreement and any other written or oral communications among the Members, this Agreement shall control and take precedence.

13.12   Further Assurances.   Each of the parties hereto shall hereafter execute and deliver such further instruments and do such further acts and things as may be required or useful to carry out the intent and purpose of this Agreement and as are not inconsistent with the terms hereof.

13.13   Counterparts.   This Agreement may be executed in counterparts, each of which shall be an original, but all of which shall constitute one and the same instrument.

13.14   Electronic Transmission.   Signatures to this Agreement that are transmitted electronically (*i.e.*, via e-mail or facsimile) shall be binding.

13.15   Counsel.   Joel Barnett and BCL-Family (collectively, the "Directing Party") have selected Levenfeld Pearlstein, LLC ("LP") to prepare this Agreement.  LP is counsel to Directing Party.  Each party to this Agreement acknowledges that LP (a) does not represent the interests of any party other than Directing Party and (b) that LP shall owe no duties to the Company or any other party other than Directing Party. In the event any dispute or controversy arises between the Company or a party, on the one hand, and Directing Party, on the other hand, each party agrees that LP may represent Directing Party in any such dispute or controversy.  To the extent that Directing Party requests that LP do so, LP may represent the Company in any dispute with any party other than Directing Party. The Company and each party consent to such representation.  Each party further acknowledges that, whether or not LP has in the past represented or is currently representing such party with respect to other matters, LP has not represented the interest of any party other than Directing Party in the preparation or negotiation of this Agreement.

*[Signatures begin on the next page]*

FILED DATE: 7/31/2019 4:27 PM   2019L008483

*[Signature Page to Second Amended and Restated Operating Agreement]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed.

BCL-FAMILY LLC

By: _____
Joshua Barnett, Manager

450 Skokie Boulevard
Suite 604
Northbrook, Illinois  60062


_____
Kenneth Fixler

450 Skokie Boulevard
Suite 604
Northbrook, Illinois  60062


_____
Elan Peretz, not individually, but as
Trustee of the Elan Peretz Trust

450 Skokie Boulevard
Suite 604
Northbrook, Illinois  60062


_____
Jonathon Fixler

450 Skokie Boulevard
Suite 604
Northbrook, Illinois  60062


_____
Daniel Shachtman, not individually,
but as Trustee of the Daniel
Shachtman Trust Dated October 14,
2008

450 Skokie Boulevard
Suite 604
Northbrook, Illinois  60062

# **Exhibit C to Exhibit 1**

| Address | City | Purchase Price | Total Const. Cost | Interest 9/22/16 | Basis with Interest + Txs | Total Out (PP+Const.+O+I+B) | Est Monthly Increase for SG&A | Est Monthly Incr for Interest Finished | Total Est Monthly Increase | Est No Months to Sale from 9/1/16 | Additional Holding Costs to Sale | Commission (5%) Closing Cost (1%) | Sales Price | Net Sales | Est Completion | Profit (Loss) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1715 W Belle Plaine Ave | Chicago | $306,000 | $493,000 | $95,316 | $919,919 | $948,318 | $1,509 | $3,436 | $4,945 | 5 | $24,723.06 | -$51,000 | $850,000 | $799,000 | | (206,686) |
| 2236 W 113th Pl | Chicago | $115,000 | $140,579 | $20,311 | $306,535 | $315,998 | $503 | $1,193 | $1,695 | 5 | $8,476.75 | -$22,200 | $370,000 | $347,800 | Listed | 23,325 |
| 4730 S Greenwood Ave | Chicago | $515,000 | $440,879 | $65,922 | $691,966 | $713,327 | $1,135 | $2,609 | $3,743 | 5 | $18,717.05 | -$36,000 | $600,000 | $564,000 | | (168,044) |
| 2638 W North Shore Ave | Chicago | $265,000 | $285,765 | $65,136 | $683,670 | $704,776 | $1,121 | $2,577 | $3,699 | 5 | $18,492.58 | -$34,500 | $575,000 | $540,500 | Listed | (182,769) |
| 901 S Kensington Ave | La Grange | $325,000 | $700,000 | $70,225 | $1,164,491 | $1,200,440 | $1,910 | $4,559 | $6,469 | 5 | $32,346.63 | -$60,000 | $1,000,000 | $940,000 | Listed | (292,621) |
| 3912 N Janssen Ave | Chicago | $745,000 | $870,000 | $138,764 | $1,865,016 | $1,922,590 | $3,059 | $7,193 | $10,252 | 5 | $51,257.68 | -$111,000 | $1,850,000 | $1,739,000 | 9/15/2016 | (247,639) |
| 2447 W Belle Plaine Ave | Chicago | $445,000 | $645,000 | $76,759 | $1,234,661 | $1,272,776 | $2,025 | $4,825 | $6,850 | 5 | $34,247.82 | -$66,000 | $1,100,000 | $1,034,000 | Listed | (278,771) |
| 3619 N. Hermitage Ave. | Chicago | $480,000 | $704,000 | $71,195 | $1,314,991 | $1,355,588 | $2,157 | $5,182 | $7,339 | 5 | $36,696.08 | -$72,000 | $1,200,000 | $1,128,000 | Listed | (260,942) |
| 1514 Spencer | Berkeley | $44,000 | $74,000 | | | $43,605 | $72 | $182 | $253 | 8 | $2,025.63 | -$9,900 | $165,000 | $155,100 | 2/3/2017 | 35,074 |
| 1518 Ashland | Chicago | $368,900 | $100,000 | | | $368,900 | $605 | $1,537 | $2,142 | 9 | $19,279.06 | -$36,000 | $600,000 | $564,000 | 6/1/2017 | 75,821 |
| 1306 W Byron Ave | Chicago | $545,000 | $850,000 | $105,316 | $1,562,957 | $1,611,207 | $2,561 | $6,074 | $8,637 | 5 | $43,184.57 | -$91,500 | $1,525,000 | $1,433,500 | | (230,926) |
| 1957 W Balmoral Ave | Chicago | $570,000 | $295,000 | $62,706 | $820,180 | $845,499 | $1,345 | $3,156 | $4,501 | 5 | $22,506.60 | -$48,600 | $810,000 | $761,400 | Listed | (108,614) |
| 4031 N Oakley Ave | Chicago | $600,000 | $510,000 | $81,812 | $1,285,763 | $1,325,455 | $2,109 | $5,016 | $7,125 | 5 | $35,626.23 | -$69,000 | $1,150,000 | $1,081,000 | Listed | (256,520) |
| 1437 W Cuyler Ave | Chicago | $615,000 | $735,000 | $85,190 | $1,526,369 | $1,573,489 | $2,503 | $6,005 | $8,508 | 5 | $42,541.58 | -$93,000 | $1,550,000 | $1,457,000 | Listed | (159,673) |
| 9238 S Pleasant Ave | Chicago | $205,000 | $337,000 | $54,224 | $679,871 | $700,859 | $1,115 | $2,607 | $3,722 | 5 | $18,609.59 | -$42,000 | $700,000 | $658,000 | Listed | (68,090) |
| 10 W Elm Ave | Park Ridge | $375,000 | $625,000 | $99,148 | $1,173,680 | $1,209,912 | $1,925 | $4,477 | $6,402 | 5 | $32,010.87 | -$57,000 | $950,000 | $893,000 | Listed | (336,411) |
| 5921 N Kenneth Ave | Chicago | $375,000 | $537,000 | $73,884 | $1,082,120 | $1,115,526 | $1,775 | $4,201 | $5,976 | 5 | $29,878.86 | -$52,950 | $882,500 | $829,550 | Listed | (311,207) |
| 635 Elmore St | Park Ridge | $586,000 | $490,000 | $103,046 | $1,289,662 | $1,329,475 | $2,115 | $4,944 | $7,059 | 5 | $35,297.06 | -$61,500 | $1,025,000 | $963,500 | Listed | (400,508) |
| 3922 N Bell Ave | Chicago | $685,000 | $765,000 | $97,523 | $1,605,754 | $1,655,325 | $2,634 | $6,284 | $8,918 | 5 | $44,589.50 | -$102,000 | $1,700,000 | $1,598,000 | Listed | (118,467) |
| 2014 W Sunnyside Ave | Chicago | $775,000 | $990,000 | $109,447 | $1,443,036 | $1,487,583 | $2,367 | $5,557 | $7,923 | 9 | $71,310.13 | -$126,000 | $2,100,000 | $1,974,000 | 2/1/2017 | (28,962) |
| 1409 N Oakley Blvd | Chicago | $535,000 | $487,000 | $60,705 | $957,993 | $987,155 | $1,571 | $3,737 | $5,308 | 7 | $37,153.12 | -$57,000 | $1,200,000 | $1,128,000 | 12/1/2016 | (78,517) |
| 2152 N Maplewood Ave | Chicago | $500,000 | $429,000 | $33,431 | $548,791 | $565,733 | $900 | $2,147 | $3,047 | 6 | $24,379.26 | -$46,320 | $772,000 | $725,680 | 12/15/2016 | (101,978) |
| 3452 N. Marshfield Ave | Chicago | $570,000 | $587,000 | $64,250 | $980,744 | $1,011,020 | $1,609 | $3,819 | $5,427 | 7 | $37,990.72 | -$79,500 | $1,325,000 | $1,245,500 | 12/1/2016 | (100,119) |
| 1236 W Altgeld St | Chicago | $300,000 | $798,000 | $81,873 | $1,162,366 | $1,198,249 | $1,906 | $4,496 | $6,402 | 10 | $64,021.97 | -$114,000 | $1,900,000 | $1,786,000 | 10/21/2016 | (141,309) |
| 3824 N Claremont Ave | Chicago | $630,000 | $622,000 | $70,855 | $1,247,483 | $1,285,994 | $2,046 | $4,903 | $6,949 | 6 | $41,691.70 | -$90,000 | $1,500,000 | $1,410,000 | 10/18/2016 | (51,214) |
| 1255 W Cornelia Ave. | Chicago | $750,000 | $673,000 | $86,404 | $1,443,102 | $1,487,652 | $2,367 | $5,653 | $8,020 | 6 | $48,118.48 | -$114,000 | $1,900,000 | $1,786,000 | 10/30/2016 | 84,479 |
| 2150 W Farragut Ave. | Chicago | $360,000 | $430,583 | $42,185 | $838,491 | $864,376 | $1,375 | $3,318 | $4,693 | 6 | $28,158.91 | -$48,000 | $800,000 | $752,000 | 10/21/2016 | (174,594) |
| 1319 W Cornelia Ave. | Chicago | $800,000 | $676,000 | $81,220 | $1,389,335 | $1,432,225 | $2,279 | $5,450 | $7,729 | 6 | $46,374.79 | -$114,000 | $1,900,000 | $1,786,000 | 11/1/2016 | 50,631 |
| 4037 N Oakley Ave. | Chicago | $615,000 | $582,000 | $50,959 | $880,791 | $907,982 | $1,445 | $3,458 | $4,902 | 6 | $29,413.33 | -$72,000 | $1,200,000 | $1,128,000 | 12/1/2016 | (207,731) |
| 4308 N Troy St | Chicago | $275,000 | $413,000 | $42,698 | $779,155 | $803,208 | $1,278 | $3,069 | $4,346 | 5 | $21,732.32 | -$39,000 | $650,000 | $611,000 | Listed | (136,908) |
| 846 W. Webster Ave | Chicago | $1,200,000 | $780,000 | $93,408 | $1,418,997 | $1,462,803 | $2,327 | $5,523 | $7,851 | 12 | $94,207.12 | -$136,500 | $2,275,000 | $2,138,500 | 5/1/2017 | (136,908) |
| 5745 N Kostner Ave | Chicago | $325,000 | $175,000 | $25,572 | $367,714 | $379,065 | $603 | $1,426 | $2,029 | 6 | $12,172.07 | -$34,500 | $575,000 | $540,500 | 5/1/2017 | (23,223) |
| 7707 S. Euclid | Chicago | $0 | $100,000 | $4,523 | $86,819 | $89,590 | $142 | $343 | $485 | 6 | $2,911.76 | -$13,500 | $225,000 | $211,500 | 11/25/2016 | 43,089 |
| 3734 N. Marshfield | Chicago | $875,000 | $667,000 | $71,999 | $1,338,606 | $1,379,930 | $2,195 | $5,278 | $7,473 | 6 | $44,837.91 | -$105,000 | $1,750,000 | $1,645,000 | 11/1/2016 | (127,462) |
| 1839 N Orleans | Chicago | $1,610,000 | $1,097,000 | $123,808 | $2,008,462 | $2,070,464 | $3,294 | $7,853 | $11,147 | 1 | $11,146.81 | -$195,000 | $3,250,000 | $3,055,000 | 7/1/2017 | 85,497 |
| 3636 N Bosworth Ave. | Chicago | $875,000 | $633,000 | $64,981 | $1,170,830 | $1,206,975 | $1,920 | $4,608 | $6,528 | 9 | $58,751.93 | -$102,000 | $1,700,000 | $1,598,000 | 1/15/2017 | (23,709) |
| 4612 Franklin Ave | Western Springs | $325,000 | $644,000 | $64,710 | $1,002,543 | $1,033,492 | $1,644 | $3,908 | $5,552 | 7 | $27,759.57 | -$70,500 | $1,175,000 | $1,104,500 | 11/1/2016 | (53,052) |
| 4439 Franklin Ave | Western Springs | $355,000 | $658,000 | $72,655 | $1,135,480 | $1,170,534 | $1,862 | $4,428 | $6,291 | 5 | $31,453.73 | -$84,000 | $1,400,000 | $1,316,000 | Listed | 94,357 |
| 715 S Adams St | Hinsdale | $620,000 | $667,000 | $37,041 | $904,969 | $934,983 | $1,488 | $3,541 | $5,029 | 8 | $40,231.77 | -$84,000 | $1,400,000 | $1,316,000 | 1/1/2017 | 80,365 |
| 717 N Oak St | Hinsdale | $385,000 | $670,000 | $50,782 | $817,735 | $842,979 | $1,341 | $3,196 | $4,537 | 8 | $36,294.44 | -$87,000 | $1,450,000 | $1,363,000 | 1/1/2017 | 173,655 |
| 3817 N Wayne Ave | Chicago | $810,000 | $861,000 | $115,472 | $1,795,639 | $1,851,072 | $2,945 | $7,001 | $9,946 | 6 | $59,674.37 | -$132,000 | $2,200,000 | $2,068,000 | 10/24/2016 | 93,890 |
| 1319 N Bell Ave | Chicago | $295,000 | $667,000 | $48,495 | $1,030,192 | $1,061,995 | $1,690 | $4,101 | $5,791 | 6 | $34,743.64 | -$79,500 | $1,325,000 | $1,245,500 | 10/21/2016 | 115,267 |
| 1955 W Farragut Ave | Chicago | $325,000 | $556,000 | $42,062 | $498,392 | $513,778 | $817 | $1,901 | $2,719 | 12 | $32,625.48 | -$72,000 | $1,200,000 | $1,128,000 | 5/1/2017 | 93,003 |
| 2450 W. Belle Plaine Ave. | Chicago | $475,000 | $645,000 | $77,955 | $1,266,971 | $1,306,083 | $2,078 | $4,954 | $7,032 | 6 | $42,193.19 | -$66,000 | $1,100,000 | $1,034,000 | 11/1/2016 | (316,078) |
| 1437 W Melrose St | Chicago | $765,000 | $930,000 | $104,135 | $1,715,252 | $1,768,203 | $2,813 | $6,713 | $9,526 | 6 | $57,157.08 | -$126,000 | $2,100,000 | $1,974,000 | 11/14/2016 | (4,889) |
| 2903 N. Magnolia Ave. | Chicago | $400,000 | $725,000 | $71,724 | $1,324,318 | $1,365,201 | $2,172 | $5,219 | $7,391 | 5 | $36,955.28 | -$72,000 | $1,200,000 | $1,128,000 | 11/1/2016 | (303,556) |
| 3810 N. Wayne Ave. | Chicago | $975,000 | $1,100,000 | $98,399 | $1,381,759 | $1,424,415 | $2,266 | $5,347 | $7,614 | 10 | $76,135.62 | -$168,000 | $2,800,000 | $2,632,000 | 3/1/2017 | 314,674 |
| 1508 W. Byron St. | Chicago | $875,000 | $1,015,000 | $118,753 | $2,060,967 | $2,124,516 | $3,380 | $8,093 | $11,473 | 6 | $68,836.57 | -$153,000 | $2,550,000 | $2,397,000 | 10/15/2016 | 162,929 |
| 1220 W Henderson St. | Chicago | $875,000 | $998,000 | $93,484 | $1,685,335 | $1,737,363 | $2,764 | $6,632 | $9,396 | 7 | $65,772.01 | -$135,000 | $2,250,000 | $2,115,000 | 11/10/2016 | 52,596 |
| 3701 N. Hermitage Ave. | Chicago | $450,000 | $699,000 | $62,370 | $1,202,140 | $1,239,247 | $1,972 | $4,749 | $6,721 | 5 | $33,603.59 | -$72,000 | $1,200,000 | $1,128,000 | 11/1/2016 | (229,442) |
| 3703 N. Hermitage Ave. | Chicago | $450,000 | $644,000 | $61,159 | $1,140,820 | $1,176,038 | $1,871 | $4,499 | $6,370 | 5 | $31,848.26 | -$72,000 | $1,200,000 | $1,128,000 | 9/29/2016 | (139,989) |
| 3703 N. Wilton St. | Chicago | $450,000 | $600,000 | $64,121 | $1,161,027 | $1,661,802 | $2,644 | $6,366 | $9,010 | 8 | $72,081.84 | -$126,000 | $2,100,000 | $1,974,000 | 11/1/2016 | (53,591) |
| 1408 W. George St. | Chicago | $665,000 | $884,000 | $72,294 | $1,454,149 | $1,499,040 | $2,385 | $5,841 | $8,226 | 6 | $49,356.12 | -$114,000 | $1,900,000 | $1,786,000 | 11/1/2016 | 75,426 |
| 3257 N. Lakewood Ave. | Chicago | $881,000 | $884,000 | $75,270 | $1,404,466 | $1,447,823 | $2,303 | $5,538 | $7,842 | 11 | $86,262.04 | -$138,000 | $2,300,000 | $2,162,000 | 3/15/2017 | 149,815 |
| 1514 W. Henderson | Chicago | $835,000 | $918,000 | $64,415 | $1,396,479 | $1,439,538 | $2,290 | $5,549 | $7,840 | 9 | $70,563.11 | -$132,000 | $2,200,000 | $2,068,000 | 3/1/2017 | 118,623 |
| 3 W. Berwyn | Chicago | $835,000 | $960,000 | $74,192 | $1,316,056 | $1,356,684 | $2,158 | $5,174 | $7,333 | 9 | $65,996.12 | -$138,000 | $2,300,000 | $2,162,000 | 2/7/2017 | 149,248 |
| 1436 W Melrose | Chicago | $835,000 | $894,555 | $99,945 | $1,624,227 | $1,674,987 | $2,665 | $6,354 | $9,019 | 7 | $63,129.93 | -$126,000 | $2,100,000 | $1,974,000 | 11/10/2016 | (24,473) |
| 5137 N Kostner | Chicago | $210,000 | $160,000 | $11,992 | $244,062 | $252,215 | $401 | $969 | $1,371 | 8 | $10,966.88 | -$28,500 | $475,000 | $446,500 | 4/15/2017 | 30,658 |
| 3618 N. Magnolia | Chicago | $985,000 | $630,000 | $50,346 | $1,083,408 | $1,116,854 | $1,777 | $4,304 | $6,081 | 9 | $54,729.06 | -$120,000 | $2,000,000 | $1,880,000 | 5/1/2017 | 102,015 |
| 2931 N Claremont | Chicago | $655,000 | $500,000 | $46,223 | $1,343,398 | $1,390,024 | $2,212 | $5,426 | $7,637 | 5 | $38,186.20 | -$96,000 | $1,600,000 | $1,504,000 | 10/20/2016 | (65,935) |
| 2124 W. Shakespeare | Chicago | $655,000 | $630,000 | $13,323 | $704,086 | $725,822 | $1,155 | $2,876 | $4,030 | 1 | $4,030.02 | $0 | $679,906 | $679,906 | | 16,244 |
| 3541 N. Claremont | Chicago | $600,000 | $1,686 | $27,199 | $643,817 | $663,692 | $1,056 | $2,569 | $3,625 | 1 | | $0 | $679,906 | $679,906 | | 16,214 |
| 1847 W. Cortland St. | Chicago | $320,000 | $919,000 | $90,984 | $985,361 | $1,015,762 | $1,616 | $4,104 | $5,471 | 11 | $57,762.23 | -$126,000 | $2,100,000 | $1,974,000 | 4/1/2017 | 154,296 |
| 916 W. Willow | Chicago | $1,105,000 | $320,106 | $46,850 | $1,195,041 | $1,231,933 | $1,960 | $4,784 | $6,744 | 11 | $60,176.08 | -$127,500 | $2,125,000 | $1,261,170 | 4/1/2017 | 29,237 |
| 2431 W. Belle Plaine | Chicago | $476,000 | $3,750 | $19,914 | $509,956 | $525,699 | $836 | $2,042 | $2,878 | 1 | | $0 | $540,113 | $540,113 | | 14,414 |
| 1835 W. School | Chicago | $835,000 | $3,710 | $22,345 | $874,818 | $875,022 | $1,392 | $3,430 | $4,822 | 8 | $38,576.29 | -$87,600 | $1,460,000 | $1,372,400 | 2/14/2017 | 127,031 |
| 2338 W. Oakdale | Chicago | $720,000 | $1,030 | $7,651 | $749,298 | $772,430 | $1,229 | $3,090 | $4,319 | 1 | | $0 | $794,020 | $794,020 | | 21,590 |
| 2453 W. Belle Plaine | Chicago | $460,000 | $7,375 | $17,035 | $500,921 | $516,385 | $822 | $2,016 | $2,838 | 1 | | $0 | $532,088 | $532,088 | | 15,703 |

| | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2446 W. Belle Plaine | Chicago | $475,000 | $550,000 | $ 12,600 | $ 519,582 | $535,621 | $852 | $2,112 | $2,965 | 12 | $35,575.09 | -$72,000 | $1,200,000 | $1,128,000 | 6/1/2017 | $ 31,382 |
| 3250 N. Hoyne | Chicago | $525,000 | $595,000 | $ 10,673 | $ 589,638 | $607,841 | $967 | $2,412 | $3,379 | 10 | $33,794.24 | -$85,500 | $1,425,000 | $1,339,500 | 3/21/2017 | $ 147,445 |
| 1824 W Albany | Chicago | $525,000 | $110,000 | $ 9,735 | $ 648,814 | $668,843 | $1,064 | $2,663 | $3,727 | 5 | $18,634.77 | -$45,900 | $765,000 | $719,100 | Listed | $ 26,922 |
| 841 N Euclid | Oak Park | $319,000 | $425,000 | $ 5,309 | $ 326,627 | $336,710 | $536 | $1,339 | $1,875 | 10 | $18,745.24 | -$60,000 | $1,000,000 | $940,000 | 5/1/2017 | $ 160,315 |
| 4022 N Campbell | Chicago | $380,000 | $375 | $ 6,292 | $ 392,416 | $404,530 | $644 | $1,609 | $2,252 | 1 | | $0 | $414,529 | $414,529 | | $ 9,999 |
| 1227 W Wellington | Chicago | $675,000 | $780,000 | $ 10,271 | $ 711,578 | $733,545 | $1,167 | $2,922 | $4,089 | 12 | $49,070.09 | -$111,000 | $1,850,000 | $1,739,000 | 6/1/2017 | $ 197,178 |
| 5253 Mulford | Skokie | $205,000 | $94,000 | $ 1,963 | $ 223,673 | $223,673 | $367 | $924 | $1,291 | 7 | $9,034.47 | -$22,800 | $380,000 | $357,200 | 1/13/2017 | $ 40,512 |
| 943 Olive 4B | Homewood | $12,000 | $29,000 | $ 129 | $ 14,586 | $14,586 | $24 | $60 | $84 | 5 | $420.31 | -$3,600 | $60,000 | $56,400 | 10/28/2016 | $ 12,393 |
| 1371 Margret | Des Plaines | $167,000 | $84,000 | $ 1,257 | $ 223,047 | $223,047 | $366 | $924 | $1,290 | 5 | $6,449.72 | -$18,900 | $315,000 | $296,100 | 10/14/2016 | $ 38,287 |
| 511 S. Yale | Addison | $92,000 | $49,000 | $ 636 | $ 132,550 | $132,550 | $217 | $550 | $767 | 5 | $3,835.20 | -$11,940 | $199,000 | $187,060 | 10/14/2016 | $ 41,921 |
| 4 N324 Briar PL. | Bensonville | $170,000 | $89,000 | $ 1,904 | $ 250,385 | $250,385 | $411 | $1,035 | $1,446 | 1 | $1,445.99 | -$20,940 | $349,000 | $328,060 | SOLD | $ 57,129 |
| 4026 S. Artesian | Chicago | $55,000 | $104,000 | $ 636 | $ 91,600 | $91,600 | $150 | $379 | $529 | 6 | $3,175.48 | -$12,600 | $210,000 | $197,400 | 12/16/2016 | $ 32,772 |
| 532 Waikiki Dr. | Des Plaines | $235,000 | $120,350 | $ 333 | $ 249,553 | $249,553 | $409 | $1,038 | $1,448 | 6 | $8,686.27 | -$26,100 | $435,000 | $408,900 | 12/24/2016 | $ 48,895 |
| 8305 S. Yates | Chicago | $42,735 | $74,000 | $ 100 | $ 63,764 | $63,764 | $105 | $265 | $370 | 5 | $1,849.22 | -$9,600 | $160,000 | $150,400 | 11/4/2016 | $ 31,172 |
| 7126 W. Armitage | Chicago | $117,000 | $89,000 | $ 272 | $ 119,560 | $119,560 | $196 | $497 | $693 | 6 | $4,158.74 | -$16,080 | $268,000 | $251,920 | 12/24/2016 | $ 39,202 |
| 5026 W. Cullom | Chicago | $180,000 | $212,000 | $ 112 | $ 192,619 | $192,619 | $316 | $802 | $1,118 | 10 | $11,180.29 | -$30,000 | $500,000 | $470,000 | 5/1/2017 | $ 67,700 |
| 4748 Avon | Jacksonville | $220,000 | $132,000 | $ 19,393 | $ 405,372 | $405,372 | $665 | $1,608 | $2,273 | 3 | $6,819.30 | -$21,000 | $350,000 | $329,000 | Listed | $ (78,381) |
| 1371 Windsen Harbor Dr | Jacksonville | $583,000 | $202,000 | $ 33,484 | $ 850,235 | $850,235 | $1,394 | $3,403 | $4,798 | 3 | $14,392.81 | -$54,000 | $900,000 | $846,000 | Listed | $ (17,481) |
| 1827 Tierra Verde | Jacksonville | $386,000 | $178,000 | $ 21,926 | $ 647,650 | $647,650 | $1,062 | $2,607 | $3,669 | 3 | $11,008.20 | -$39,000 | $650,000 | $611,000 | Listed | $ (14,162) |
| 4919 S Lotus Ave | Chicago | $90,000 | $131,619 | $ 19,151 | $ 268,683 | $272,205 | $452 | $1,040 | $1,492 | 0.5 | $745.84 | -$17,940 | $299,000 | $281,060 | SOLD | $ 3,337 |
| 408 S. Wille St. | Mount Prospect | $205,000 | $134,000 | $ 26,956 | $ 397,536 | $397,536 | $0 | $1,544 | $1,544 | 1 | $1,544.08 | -$24,600 | $410,000 | $385,400 | SOLD | $ (26,543) |
| 9527 S. Claremont | Chicago | $147,000 | $104,000 | $ 1,405 | $ 201,173 | $201,173 | $330 | $832 | $1,162 | 6 | $6,973.86 | -$20,400 | $340,000 | $319,600 | 11/25/2016 | $ 57,453 |
| | | $52,438,635 | $50,301,068 | $5,398,933 | $94,744,935 | $97,483,245 | $154,751 | $372,275 | $527,026 | $618 | $3,258,817 | ($6,946,470) | $120,742,494 | $113,768,024 | $2,863,141 | $(4,383,399) |

# EXHIBIT 2

**Barnett Homes Sample Standard Timelines (Conservative) For Unoccupied Properties**

| Week | Full Gut Rehab Inside and Out Timeline | $ % of Whole | Scrape and Rebuild Timeline | % of Whole |
|---|---|---|---|---|
| 1 | Close on Acquisition of Existing SFH or 2-Flat | | Close on Acquisition of Existing SFH or 2-Flat | |
| 2 | | | | |
| 3 | | | | |
| 4 | Submit Architectural Plans and Specs for Permitting to City | 60% | Submit Architectural Plans and Specs for Permitting to City | 45% |
| 5 | | | | |
| 6 | | | | |
| 7 | | | | |
| 8 | | | | |
| 9 | | | | |
| 10 | | | | |
| 11 | Wait for Permit Issuance (sometimes receive demo permit prior to rehab permit and commence interior demo) | | Wait for Permit Issuance (sometimes receive demo permit prior to construction permit and DO NOT commence scraping house until construction permits is issued) | |
| 12 | | | | |
| 13 | | | | |
| 14 | | | | |
| 15 | | | | |
| 16 | Demo entire house inside (if not complete prior) | | Demo & Excavation & Foundation and Concrete | |
| 17 | Rough Framing | | | |
| 18 | | | | |
| 19 | Rough Mechanicals (Including Plumbing HVAC and Electric) | | Rough Framing (last day of framing the house is "Under Roof") | |
| 20 | | | | |
| 21 | Drywall | | Rough Mechanicals (Including Plumbing HVAC and Electric); Simultaneously Masonry on Exterior | |
| 22 | | | | |
| 23 | | | | |
| 24 | Interior Finishes (Kitchen Install, Trim, Floors, Prime & Paint) | | Complete Masonry on Exterior; Interior gets insulation | |
| 25 | | | | |
| 26 | | | | |
| 27 | | | Drywall | |
| 28 | | | | |
| 29 | | | Interior Finishes (Kitchen Install, Trim, Floors, Prime & Paint) | |
| 30 | | | | |
| 31 | | | | |
| 32 | | | | |
| 33 | | | | |
| 34 | | | | |
| 35 | | | | |
| 36 | | | | |
| 37 | Stage, List Market, Sell, Contract Period, Close Escrow | | | |
| 38 | | | | |
| 39 | | | | |
| 40 | | | | |
| 41 | | | | |
| 42 | | | | |
| 43 | | | Stage, List Market, Sell, Contract Period, Close Escrow | |
| 44 | | | | |
| 45 | | | | |
| 46 | | | | |
| 47 | | | | |
| 48 | | | | |
| 49 | | | | |
| 50 | | | | |
| 51 | | | | |
| 52 | | | | |
| 53 | | | | |
| 54 | | | | |
| 55 | | | | |
| 56 | | | | |
| 57 | | | | |
| 58 | | | | |
| 59 | | | | |
| 60 | | | | |

# EXHIBIT 3

| # | Address | City | Purchase Price | Const. Costs | Comission | Misc. | Total Costs | Projected Interest | Lvg (%) | Projected Project Days | Projected Sale Price | Projected Profit | Cash on Cash Project ROI | Projected Project ROI | Projected Annual ROI | Purchase Closing Date |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  | 7354 S Clyde Ave | Chicago | $ 32,500 | $ 100,000 | $ 22,350 | $ 14,000 | $ 168,850 | $ 3,250 | 0% | 250 | $ 215,000 | $ 42,900 | 31.50% | 27.34% | 39.92% | 02/27/13 |
| 1 | 112 S Clifton Ave | Park Ridge | $ 243,500 | $ 180,000 | $ 35,000 | $ 30,000 | $ 488,500 | $ 24,486 | 0% | 500 | $ 650,000 | $ 137,014 | 35.61% | 29.21% | 21.33% | 05/09/13 |
| 2 | 9051 S May St | Chicago | $ 41,000 | $ 76,000 | $ 19,650 | $ 14,000 | $ 150,650 | $ 3,132 | 0% | 250 | $ 185,000 | $ 31,218 | 26.22% | 22.26% | 32.50% | 06/26/13 |
| 3 | 10 W Elm Ave | Park Ridge | $ 375,000 | $ 400,000 | $ 40,000 | $ 40,000 | $ 855,000 | $ 43,264 | 10% | 500 | $ 1,100,000 | $ 201,736 | 30.06% | 27.13% | 19.81% | 07/12/13 |
| 4 | 1715 W Belle Plaine Ave | Chicago | $ 306,000 | $ 375,000 | $ 50,000 | $ 48,000 | $ 779,000 | $ 42,944 | 40% | 500 | $ 1,000,000 | $ 178,056 | 30.32% | 38.02% | 27.76% | 07/18/13 |
| 5 | 8405 S Crandon Ave | Chicago | $ 31,500 | $ 85,000 | $ 19,650 | $ 14,000 | $ 150,150 | $ 2,964 | 0% | 250 | $ 185,000 | $ 31,886 | 26.70% | 22.84% | 33.35% | 07/19/13 |
| 6 | 2245 W Berwyn Ave | Chicago | $ 300,000 | $ 148,000 | $ 37,500 | $ 35,000 | $ 520,500 | $ 23,018 | 10% | 400 | $ 680,000 | $ 136,482 | 33.02% | 30.38% | 27.72% | 07/19/13 |
| 7 | 17 E Stonegate Dr | Prospect Heights | $ 170,000 | $ 95,000 | $ 20,000 | $ 40,000 | $ 325,000 | $ 10,407 | 0% | 300 | $ 395,000 | $ 59,593 | 22.95% | 19.46% | 23.68% | 08/01/13 |
| 8 | 4612 Franklin Ave | Western Springs | $ 325,000 | $ 560,000 | $ 41,250 | $ 75,000 | $ 1,001,250 | $ 41,518 | 30% | 400 | $ 1,250,000 | $ 207,232 | 25.91% | 30.51% | 27.84% | 09/26/13 |
| 9 | 2638 W North Shore Ave | Chicago | $ 265,000 | $ 195,000 | $ 33,750 | $ 45,000 | $ 538,750 | $ 19,215 | 0% | 350 | $ 685,000 | $ 127,035 | 28.96% | 24.93% | 26.00% | 10/08/13 |
| 10 | 12120 S Lafeyette Ave | Chicago | $ 23,000 | $ 55,000 | $ 16,050 | $ 14,000 | $ 108,050 | $ 1,738 | 0% | 200 | $ 145,000 | $ 35,212 | 40.16% | 35.19% | 64.22% | 10/09/13 |
| 11 | 8336 S La Salle St | Chicago | $ 34,500 | $ 56,000 | $ 16,950 | $ 14,000 | $ 121,450 | $ 2,061 | 0% | 200 | $ 155,000 | $ 31,489 | 32.11% | 27.97% | 51.05% | 10/21/13 |
| 12 | 8100 S Kenwood Ave | Chicago | $ 28,000 | $ 97,000 | $ 21,000 | $ 14,000 | $ 160,000 | $ 3,658 | 0% | 300 | $ 200,000 | $ 36,342 | 28.78% | 24.35% | 29.62% | 10/29/13 |
| 13 | 1615 W Byron St | Chicago | $ 540,000 | $ 350,000 | $ 62,000 | $ 50,000 | $ 1,002,000 | $ 40,869 | 30% | 350 | $ 1,250,000 | $ 207,131 | 26.38% | 30.50% | 31.81% | 12/02/13 |
| 14 | 5921 N Kenneth Ave | Chicago | $ 375,000 | $ 300,000 | $ 44,000 | $ 40,000 | $ 759,000 | $ 34,496 | 30% | 400 | $ 925,000 | $ 131,504 | 23.22% | 25.39% | 23.17% | 12/27/13 |
| 15 | 4439 Franklin Ave | Western Springs | $ 355,000 | $ 560,000 | $ 41,250 | $ 75,000 | $ 1,031,250 | $ 39,415 | 40% | 350 | $ 1,250,000 | $ 179,335 | 22.10% | 29.77% | 31.04% | 01/03/14 |
| 16 | 8932 S East End Ave | Chicago | $ 38,150 | $ 60,000 | $ 18,300 | $ 14,000 | $ 130,400 | $ 2,212 | 0% | 200 | $ 170,000 | $ 37,388 | 35.33% | 30.93% | 56.45% | 01/08/14 |
| 17 | 635 Elmore St | Park Ridge | $ 586,000 | $ 300,000 | $ 55,000 | $ 35,000 | $ 976,000 | $ 42,801 | 40% | 350 | $ 1,200,000 | $ 181,199 | 24.32% | 31.47% | 32.82% | 01/09/14 |
| 18 | 135 W 83rd St | Chicago | $ 30,000 | $ 59,000 | $ 16,950 | $ 14,000 | $ 119,950 | $ 1,980 | 0% | 200 | $ 155,000 | $ 33,070 | 34.03% | 29.76% | 54.31% | 01/21/14 |
| 19 | 9238 S Pleasant Ave | Chicago | $ 205,000 | $ 380,000 | $ 27,500 | $ 50,000 | $ 662,500 | $ 26,107 | 20% | 400 | $ 800,000 | $ 111,393 | 21.65% | 21.91% | 19.99% | 01/22/14 |
| 20 | 1824 W Berwyn Ave | Chicago | $ 285,000 | $ 190,000 | $ 37,500 | $ 60,000 | $ 572,500 | $ 17,783 | 0% | 300 | $ 750,000 | $ 159,717 | 33.18% | 29.65% | 36.07% | 02/13/14 |
| 21 | 7856 Forest Hill Rd | Burr Ridge | $ 500,000 | $ 100,000 | $ 40,000 | $ 25,000 | $ 665,000 | $ 15,493 | 0% | 200 | $ 800,000 | $ 119,507 | 21.60% | 19.26% | 35.14% | 03/03/14 |
| 22 | 4919 S Lotus Ave | Chicago | $ 90,000 | $ 103,000 | $ 13,800 | $ 14,000 | $ 220,800 | $ 4,190 | 0% | 200 | $ 275,000 | $ 50,010 | 26.18% | 24.38% | 44.50% | 03/15/14 |
| 23 | 741 Oriole Ave | Park Ridge | $ 507,000 | $ 80,000 | $ 40,000 | $ 30,000 | $ 657,000 | $ 23,320 | 0% | 300 | $ 800,000 | $ 119,680 | 23.18% | 19.27% | 23.44% | 03/20/14 |
| 24 | 901 S Kensington Ave | La Grange | $ 325,000 | $ 532,000 | $ 65,000 | $ 50,000 | $ 972,000 | $ 32,905 | 20% | 350 | $ 1,250,000 | $ 245,095 | 30.65% | 33.10% | 34.52% | 05/05/14 |
| 25 | 1957 W Balmoral Ave | Chicago | $ 370,000 | $ 226,000 | $ 40,000 | $ 30,000 | $ 666,000 | $ 23,491 | 30% | 300 | $ 820,000 | $ 130,509 | 24.60% | 29.15% | 35.46% | 05/13/14 |
| 26 | 545 Woodside Ave | Hinsdale | $ 1,505,000 | $ 330,000 | $ 120,000 | $ 75,000 | $ 2,030,000 | $ 47,018 | 0% | 200 | $ 2,350,000 | $ 272,982 | 16.75% | 14.41% | 26.30% | 05/23/14 |
| 27 | 7620 S East End Ave | Chicago | $ 35,000 | $ 60,000 | $ 17,400 | $ 14,000 | $ 126,400 | $ 2,129 | 0% | 200 | $ 160,000 | $ 31,471 | 30.83% | 26.86% | 49.03% | 05/30/14 |
| 28 | 10028 S Sangamon St | Chicago | $ 31,120 | $ 75,000 | $ 18,750 | $ 14,000 | $ 138,870 | $ 2,226 | 0% | 200 | $ 175,000 | $ 33,904 | 30.08% | 26.36% | 48.11% | 06/02/14 |
| 1 | 2014 W Sunnyside Ave | Chicago | $ 775,000 | $ 510,000 | $ 97,000 | $ 75,000 | $ 1,457,000 | $ 52,104 | 0% | 350 | $ 1,950,000 | $ 440,896 | 36.25% | 32.00% | 33.37% | 06/06/14 |
| 2 | 4730 S Greenwood Ave | Chicago | $ 515,000 | $ 375,000 | $ 60,000 | $ 40,000 | $ 990,000 | $ 39,667 | 30% | 350 | $ 1,200,000 | $ 170,333 | 22.58% | 25.41% | 26.50% | 06/09/14 |
| 3 | 1627 S Beulah St | Philadelphia | $ 105,000 | $ 84,000 | $ 26,850 | $ 11,000 | $ 226,850 | $ 4,257 | 0% | 200 | $ 265,000 | $ 33,893 | 19.08% | 16.09% | 29.36% | 06/11/14 |
| 4 | 715 S Adams St | Hinsdale | $ 420,000 | $ 570,000 | $ 70,000 | $ 50,000 | $ 1,110,000 | $ 38,757 | 20% | 350 | $ 1,400,000 | $ 251,243 | 27.88% | 29.67% | 30.94% | 06/13/14 |
| 5 | 717 N Oak St | Hinsdale | $ 385,000 | $ 630,000 | $ 73,000 | $ 50,000 | $ 1,138,000 | $ 40,068 | 30% | 350 | $ 1,450,000 | $ 271,932 | 29.30% | 35.55% | 37.07% | 06/16/14 |
| 6 | 608 E First St | Hinsdale | $ 801,000 | $ 200,000 | $ 65,000 | $ 50,000 | $ 1,116,000 | $ 45,252 | 40% | 300 | $ 1,300,000 | $ 138,748 | 17.51% | 21.20% | 25.79% | 06/17/14 |
| 7 | 2424 W Belle Plaine Ave | Chicago | $ 600,000 | $ 270,000 | $ 55,000 | $ 50,000 | $ 975,000 | $ 29,955 | 30% | 250 | $ 1,155,000 | $ 150,045 | 19.57% | 23.05% | 33.65% | 06/20/14 |
| 8 | 5414 W Catalpa Ave | Chicago | $ 586,000 | $ 450,000 | $ 73,000 | $ 50,000 | $ 1,159,000 | $ 54,626 | 40% | 400 | $ 1,450,000 | $ 236,374 | 26.80% | 34.38% | 31.38% | 06/25/14 |
| 9 | 7950 S Woodlawn Ave | Chicago | $ 32,500 | $ 55,000 | $ 16,950 | $ 14,000 | $ 118,450 | $ 1,994 | 0% | 200 | $ 155,000 | $ 34,556 | 36.01% | 31.48% | 57.44% | 06/25/14 |
| 10 | 4308 N Troy St | Chicago | $ 275,000 | $ 236,000 | $ 35,000 | $ 48,000 | $ 594,000 | $ 16,828 | 30% | 250 | $ 700,000 | $ 89,172 | 18.96% | 22.56% | 32.94% | 06/25/14 |
| 11 | 4031 N Oakley Ave | Chicago | $ 600,000 | $ 320,000 | $ 60,000 | $ 50,000 | $ 1,030,000 | $ 30,909 | 30% | 250 | $ 1,250,000 | $ 189,091 | 22.68% | 27.52% | 40.18% | 06/27/14 |
| 12 | 1306 W Byron St | Chicago | $ 545,000 | $ 660,000 | $ 93,500 | $ 50,000 | $ 1,348,500 | $ 47,483 | 20% | 350 | $ 1,700,000 | $ 304,017 | 28.01% | 29.54% | 30.81% | 06/30/14 |
| 13 | 3912 N Janssen Ave | Chicago | $ 745,000 | $ 800,000 | $ 110,000 | $ 50,000 | $ 1,705,000 | $ 63,841 | 30% | 350 | $ 2,100,000 | $ 331,159 | 24.76% | 28.80% | 30.03% | 06/30/14 |
| 14 | 3328 N Claremont Ave | Chicago | $ 600,000 | $ 376,000 | $ 74,250 | $ 50,000 | $ 1,100,250 | $ 31,978 | 20% | 250 | $ 1,350,000 | $ 217,772 | 24.34% | 29.72% | 43.39% | 07/07/14 |
| 15 | 3540 N Hoyne Ave | Chicago | $ 670,000 | $ 310,000 | $ 72,325 | $ 50,000 | $ 1,102,325 | $ 32,083 | 20% | 250 | $ 1,315,000 | $ 180,592 | 20.65% | 21.64% | 31.59% | 07/15/14 |
| 16 | 1725 W 85th St | Chicago | $ 31,780 | $ 60,000 | $ 16,950 | $ 15,000 | $ 123,730 | $ 2,069 | 0% | 200 | $ 155,000 | $ 29,201 | 29.28% | 25.47% | 46.48% | 07/18/14 |
| 17 | 1010 Walnut St | Western Springs | $ 950,000 | $ 950,000 | $ 143,000 | $ 100,000 | $ 2,143,000 | $ 96,753 | 40% | 400 | $ 2,600,000 | $ 360,247 | 22.85% | 28.44% | 25.95% | 07/30/14 |
| 18 | 3824 N Paulina St | Chicago | $ 630,000 | $ 280,000 | $ 60,000 | $ 50,000 | $ 1,020,000 | $ 32,515 | 40% | 250 | $ 1,200,000 | $ 147,485 | 18.75% | 25.02% | 36.53% | 07/31/14 |
| 19 | 1217 W Cornelia Ave | Chicago | $ 880,000 | $ 420,000 | $ 90,000 | $ 80,000 | $ 1,470,000 | $ 53,576 | 30% | 300 | $ 1,800,000 | $ 276,424 | 23.91% | 27.92% | 33.97% | 07/31/14 |
| 20 | 1729 W Melrose St | Chicago | $ 625,000 | $ 366,000 | $ 66,000 | $ 50,000 | $ 1,107,000 | $ 32,741 | 30% | 250 | $ 1,350,000 | $ 210,259 | 23.34% | 28.49% | 41.60% | 08/03/14 |
| 21 | 1638 W Olive Ave | Chicago | $ 380,000 | $ 335,000 | $ 47,000 | $ 50,000 | $ 812,000 | $ 22,800 | 30% | 250 | $ 955,000 | $ 120,200 | 18.69% | 22.26% | 32.50% | 08/05/14 |
| 22 | 2440 W Belle Plaine Ave | Chicago | $ 605,000 | $ 298,000 | $ 60,000 | $ 50,000 | $ 1,013,000 | $ 38,257 | 40% | 300 | $ 1,200,000 | $ 148,743 | 19.62% | 25.15% | 30.60% | 08/07/14 |
| 23 | 2236 W 113th Pl | Chicago | $ 115,000 | $ 115,000 | $ 35,850 | $ 20,000 | $ 285,850 | $ 7,780 | 0% | 300 | $ 365,000 | $ 71,370 | 31.66% | 26.64% | 32.41% | 08/19/14 |
| 24 | 1925 W Schiller St | Chicago | $ 850,000 | $ 576,420 | $ 107,000 | $ 63,000 | $ 1,596,420 | $ 66,684 | 40% | 350 | $ 1,950,000 | $ 286,896 | 23.74% | 30.58% | 31.89% | 08/19/14 |
| 25 | 3817 N Wayne Ave | Chicago | $ 810,000 | $ 830,000 | $ 116,000 | $ 65,000 | $ 1,821,000 | $ 81,843 | 40% | 400 | $ 2,300,000 | $ 397,157 | 28.09% | 36.91% | 33.68% | 08/19/14 |
| 26 | 2447 W Leland Ave | Chicago | $ 445,000 | $ 525,000 | $ 71,500 | $ 40,000 | $ 1,081,500 | $ 33,003 | 40% | 350 | $ 1,300,000 | $ 185,497 | 21.63% | 29.75% | 31.03% | 08/28/14 |

| # | Address | City | | | | | | | | | | | | | | Date |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 27 | 2152 N Maplewood Ave | Chicago | $ 300,000 | $ 270,000 | $ 42,460 | $ 35,000 | $ 647,460 | $ 18,637 | 40% | 250 | $ 772,000 | $ 105,903 | 20.59% | 28.46% | 41.55% | 09/05/14 |
| 28 | 1409 N Oakley Blvd | Chicago | $ 535,000 | $ 292,000 | $ 60,500 | $ 40,000 | $ 927,500 | $ 28,590 | 40% | 250 | $ 1,100,000 | $ 143,910 | 19.90% | 26.90% | 39.27% | 09/05/14 |
| 29 | 2148 W Berwyn Ave | Chicago | $ 351,000 | $ 230,000 | $ 42,900 | $ 30,000 | $ 653,900 | $ 18,927 | 30% | 250 | $ 780,000 | $ 107,173 | 20.64% | 24.61% | 35.93% | 09/12/14 |
| 30 | 3922 N Bell Ave | Chicago | $ 685,000 | $ 775,000 | $ 105,000 | $ 90,000 | $ 1,655,000 | $ 59,675 | 20% | 350 | $ 2,100,000 | $ 385,325 | 28.71% | 30.47% | 31.78% | 09/15/14 |
| 31 | 3452 N. Marshfield Ave | Chicago | $ 570,000 | $ 405,000 | $ 72,875 | $ 40,000 | $ 1,087,875 | $ 37,206 | 30% | 300 | $ 1,325,000 | $ 199,919 | 23.36% | 27.38% | 33.31% | 09/17/14 |
| 32 | 1319 N Bell Ave | Chicago | $ 295,000 | $ 650,000 | $ 66,000 | $ 45,000 | $ 1,056,000 | $ 35,527 | 30% | 350 | $ 1,325,000 | $ 233,473 | 27.17% | 32.97% | 34.38% | 09/17/14 |
| 33 | 1955 W Farragut Ave | Chicago | $ 405,000 | $ 285,000 | $ 52,250 | $ 30,000 | $ 772,250 | $ 22,899 | 40% | 250 | $ 950,000 | $ 154,851 | 24.69% | 34.83% | 50.86% | 09/18/14 |
| 34 | 1437 W Cuyler Ave | Chicago | $ 615,000 | $ 630,000 | $ 93,500 | $ 50,000 | $ 1,388,500 | $ 54,404 | 40% | 350 | $ 1,700,000 | $ 257,096 | 24.05% | 31.64% | 33.00% | 09/26/14 |
| 35 | 8918 S Phillips Ave. | Chicago | $ 38,000 | $ 60,000 | $ 17,670 | $ 14,000 | $ 129,670 | $ 2,209 | 0% | 200 | $ 163,000 | $ 31,121 | 29.76% | 25.89% | 47.25% | 09/29/14 |
| 36 | 1236 W Altgeld St | Chicago | $ 800,000 | $ 445,000 | $ 90,000 | $ 65,000 | $ 1,400,000 | $ 66,398 | 30% | 400 | $ 1,800,000 | $ 333,602 | 30.53% | 34.82% | 31.77% | 09/30/14 |
| 37 | 2430 W. Belle Plaine Ave. | Chicago | $ 475,000 | $ 525,000 | $ 71,500 | $ 40,000 | $ 1,111,500 | $ 37,500 | 40% | 350 | $ 1,300,000 | $ 151,000 | 18.13% | 23.43% | 24.44% | 10/01/14 |
| 38 | 1437 W Melrose St | Chicago | $ 765,000 | $ 750,000 | $ 107,000 | $ 75,000 | $ 1,697,000 | $ 62,370 | 20% | 350 | $ 2,140,000 | $ 380,630 | 27.86% | 29.33% | 30.59% | 10/01/14 |
| 39 | 408 S. Wille St. | Mount Prospect | $ 205,000 | $ 110,000 | $ 24,750 | $ 25,000 | $ 364,750 | $ 10,024 | 10% | 250 | $ 450,000 | $ 75,226 | 25.07% | 24.36% | 35.57% | 10/02/14 |
| 40 | 3653 N. Albany Ave. | Chicago | $ 346,000 | $ 150,000 | $ 36,575 | $ 20,000 | $ 552,575 | $ 16,828 | 30% | 250 | $ 665,000 | $ 95,597 | 21.79% | 25.92% | 37.84% | 10/16/14 |
| 41 | 3824 N Claremont Ave | Chicago | $ 630,000 | $ 450,000 | $ 75,000 | $ 55,000 | $ 1,210,000 | $ 38,410 | 10% | 300 | $ 1,500,000 | $ 251,590 | 25.55% | 24.44% | 29.74% | 10/22/14 |
| 42 | 3621 N. Hermitage Ave. | Chicago | $ 480,000 | $ 522,000 | $ 77,000 | $ 50,000 | $ 1,129,000 | $ 43,911 | 40% | 350 | $ 1,400,000 | $ 227,089 | 25.76% | 34.39% | 35.86% | 10/30/14 |
| 43 | 3619 N. Hermitage Ave. | Chicago | $ 480,000 | $ 522,000 | $ 77,000 | $ 50,000 | $ 1,129,000 | $ 43,911 | 40% | 350 | $ 1,400,000 | $ 227,089 | 25.76% | 34.39% | 35.86% | 10/30/14 |
| 44 | 3810 N. Wayne Ave. | Chicago | $ 975,000 | $ 1,080,000 | $ 154,000 | $ 70,000 | $ 2,279,000 | $ 87,990 | 40% | 350 | $ 2,800,000 | $ 433,010 | 24.52% | 32.50% | 33.89% | 11/07/14 |
| 45 | 1255 W. Cornelia Ave. | Chicago | $ 750,000 | $ 400,000 | $ 99,000 | $ 65,000 | $ 1,314,000 | $ 42,841 | 10% | 300 | $ 1,800,000 | $ 443,159 | 40.00% | 39.60% | 48.18% | 11/14/14 |
| 46 | 2150 W Farragut Ave | Chicago | $ 360,000 | $ 224,000 | $ 44,825 | $ 35,000 | $ 663,825 | $ 17,846 | 20% | 240 | $ 815,000 | $ 133,329 | 24.42% | 26.61% | 40.46% | 11/24/14 |
| 47 | 1319 W Cornelia Ave. | Chicago | $ 800,000 | $ 420,000 | $ 90,750 | $ 70,000 | $ 1,380,750 | $ 61,316 | 40% | 300 | $ 1,650,000 | $ 207,934 | 20.87% | 25.51% | 31.03% | 11/25/14 |
| 48 | 1508 W. Byron St. | Chicago | $ 875,000 | $ 875,000 | $ 129,250 | $ 50,000 | $ 1,929,250 | $ 75,638 | 40% | 350 | $ 2,350,000 | $ 345,112 | 23.38% | 30.57% | 31.88% | 12/04/14 |
| 49 | 7446 S Ogelsby Ave. | Chicago | $ 46,000 | $ 90,000 | $ 21,450 | $ 14,000 | $ 171,450 | $ 3,395 | 0% | 240 | $ 205,000 | $ 30,155 | 22.37% | 18.92% | 28.77% | 12/12/14 |
| 50 | 1220 N. Henderson St. | Chicago | $ 850,000 | $ 870,000 | $ 129,250 | $ 50,000 | $ 1,899,250 | $ 71,321 | 30% | 350 | $ 2,350,000 | $ 379,429 | 25.47% | 29.62% | 30.89% | 12/15/14 |
| 51 | 3701 N. Hermitage Ave. | Chicago | $ 450,000 | $ 522,000 | $ 77,000 | $ 50,000 | $ 1,099,000 | $ 40,655 | 30% | 350 | $ 1,400,000 | $ 260,345 | 29.45% | 35.15% | 36.65% | 12/30/14 |
| 52 | 3703 N. Hermitage Ave. | Chicago | $ 450,000 | $ 522,000 | $ 77,000 | $ 50,000 | $ 1,099,000 | $ 40,655 | 30% | 350 | $ 1,400,000 | $ 260,345 | 29.45% | 35.15% | 36.65% | 12/30/14 |
| 53 | 8404 S Rhodes Ave. | Chicago | $ 30,000 | $ 90,000 | $ 20,100 | $ 14,000 | $ 154,100 | $ 2,878 | 0% | 240 | $ 190,000 | $ 33,022 | 26.79% | 23.08% | 35.09% | 01/17/15 |
| 54 | 1450 W. Melrose St. | Chicago | $ 785,000 | $ 760,000 | $ 115,500 | $ 65,000 | $ 1,725,500 | $ 88,109 | 60% | 420 | $ 2,100,000 | $ 286,391 | 23.26% | 39.99% | 34.75% | 02/03/15 |
| 55 | 542 E 84th St. | Chicago | $ 30,000 | $ 80,000 | $ 19,650 | $ 16,000 | $ 145,650 | $ 3,476 | 0% | 300 | $ 185,000 | $ 35,874 | 31.23% | 26.37% | 32.09% | 02/11/15 |
| 56 | 1408 W. George St. | Chicago | $ 665,000 | $ 714,000 | $ 104,500 | $ 73,000 | $ 1,556,500 | $ 78,439 | 60% | 420 | $ 1,900,000 | $ 265,062 | 23.66% | 41.09% | 35.71% | 02/11/15 |
| 57 | 3257 N. Lakewood Ave. | Chicago | $ 881,000 | $ 845,000 | $ 126,500 | $ 72,000 | $ 1,924,500 | $ 98,532 | 60% | 420 | $ 2,300,000 | $ 276,968 | 20.88% | 34.66% | 30.12% | 02/12/15 |
| 58 | 4037 N Oakley Ave. | Chicago | $ 615,000 | $ 330,000 | $ 70,125 | $ 50,000 | $ 1,065,125 | $ 43,884 | 60% | 310 | $ 1,275,000 | $ 165,991 | 21.09% | 38.46% | 45.28% | 02/20/15 |
| 59 | 5745 N Kostner Ave | Chicago | $ 325,000 | $ 345,000 | $ 45,000 | $ 45,000 | $ 760,000 | $ 30,116 | 40% | 350 | $ 925,000 | $ 134,884 | 23.08% | 30.31% | 31.60% | 02/23/15 |
| 60 | 846 W. Webster Ave. | Chicago | $ 1,200,000 | $ 464,000 | $ 125,125 | $ 74,000 | $ 1,863,125 | $ 88,594 | 60% | 350 | $ 2,275,000 | $ 323,281 | 23.70% | 42.16% | 43.97% | 02/28/15 |
| 61 | 3636 N Bosworth Ave. | Chicago | $ 875,000 | $ 380,000 | $ 92,125 | $ 50,000 | $ 1,397,125 | $ 66,559 | 60% | 350 | $ 1,675,000 | $ 211,316 | 21.29% | 36.74% | 38.32% | 03/02/15 |
| 62 | 7707 S. Euclid | Chicago | $ 40,000 | $ 90,000 | $ 23,250 | $ 16,000 | $ 169,250 | $ 4,762 | 0% | 350 | $ 225,000 | $ 50,988 | 38.18% | 32.11% | 33.49% | 03/05/15 |
| 63 | 1818 W. Berwyn | Chicago | $ 375,000 | $ 200,000 | $ 44,000 | $ 40,000 | $ 659,000 | $ 23,583 | 30% | 300 | $ 800,000 | $ 117,417 | 22.93% | 26.48% | 32.22% | 03/10/15 |
| 64 | 3734 N. Marshfield Ave | Chicago | $ 875,000 | $ 375,000 | $ 93,500 | $ 55,000 | $ 1,398,500 | $ 62,037 | 40% | 350 | $ 1,700,000 | $ 239,463 | 23.10% | 29.00% | 30.25% | 03/12/15 |
| 65 | 1514 W. Henderson | Chicago | $ 806,000 | $ 800,000 | $ 118,250 | $ 65,000 | $ 1,789,250 | $ 86,710 | 60% | 400 | $ 2,150,000 | $ 274,040 | 21.59% | 37.13% | 33.88% | 03/20/15 |
| 66 | 2924 N Burling | Chicago | $ 835,000 | $ 870,000 | $ 126,500 | $ 65,000 | $ 1,896,500 | $ 95,631 | 60% | 420 | $ 2,300,000 | $ 307,870 | 22.80% | 39.17% | 34.04% | 04/01/15 |
| 67 | 1839 N Orleans | Chicago | $ 1,610,000 | $ 800,000 | $ 178,750 | $ 100,000 | $ 2,688,750 | $ 125,955 | 60% | 350 | $ 3,250,000 | $ 435,295 | 22.36% | 39.41% | 41.09% | 04/01/15 |
| | | | | | | | $3,514,263 | | | | | | | | | |
| | | | | | | | $91,681,075 | | | | | 96.65% | | | | |
| | | | | | | | | | | | | 67.66% | | | | |

Leverage:
$ 18,566,568

**Key:**

| | |
|---|---|
| Recently Sold Properties (0) | |
| Under Contract/Not Closed (5) | |
| Listed MLS (3) | |
| Construction (0) | |
| Under Contract to Purchase (0) | |
| New Const | |
| Judicial Auction | |
| Philly (3) | |

| | | | | |
|---|---|---|---|---|
| $ - $ 899,999 | 37 | $ | 416,486 | South Side |
| $900,000-$1,099,999 | 5 | $ | 951,000 | |
| $1,100,000-$1,399,999 | 21 | $ | 1,249,762 | |
| $1,400,000-$1,799,999 | 13 | $ | 1,525,000 | |
| $1,800,000-$2,099,999 | 6 | $ | 1,866,667 | |
| $2,100,000-$2,399,999 | 12 | $ | 2,234,583 | |
| $2,400,000-2,799,999 | 1 | $ | 2,600,000 | |
| $2,800,000-$2,999,999 | 1 | $ | 2,800,000 | |
| $3,000,000+ | 1 | $ | 3,250,000 | |

# Exhibit 4

BCL Home Rehab and Subsidiaries
Consolidated to include all homes
Monthly Projected Income
November 2015-October 2016

|  |  | ACTUAL | ESTIMATE |  |  |  |  |  |  |  |  |  |  | Totals / Avgs |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  |  | Jan-16 | Feb-16 | Mar-16 | Apr-16 | May-16 | Jun-16 | Jul-16 | Aug-16 | Sep-16 | Oct-16 | Nov-16 | Dec-16 |  |
| Revenue from Home Sales | Gross Sales Proceeds | 2,840,000 | 170,000 | 547,000 | 2,880,000 | 4,780,000 | 4,475,000 | 9,975,000 | 23,560,000 | 17,170,000 | 9,325,000 | 5,872,000 | 9,500,000 | 91,094,000 |
|  | Less Commission(1) | (174,100) | (18,300) | (61,230) | (158,400) | (290,975) | (271,375) | (561,250) | (1,295,600) | (944,350) | (512,875) | (322,960) | (533,375) | (5,144,990) |
|  | Net Sales Proceeds | 2,665,900 | 151,700 | 485,770 | 2,721,600 | 4,489,025 | 4,203,625 | 9,413,750 | 22,264,200 | 16,225,650 | 8,812,125 | 5,549,040 | 8,966,625 | 85,949,010 |
| COGS | COGS - Home Purchases | (1,003,000) | (38,100) | (132,400) | (1,328,500) | (1,623,500) | (1,510,000) | (3,705,000) | (9,016,000) | (6,726,000) | (3,970,000) | (2,070,000) | (3,846,000) | (34,968,500) |
|  | COGS - Construction | (1,237,000) | (82,000) | (240,010) | (768,000) | (1,927,000) | (1,844,500) | (3,916,000) | (9,026,000) | (6,230,000) | (3,181,000) | (2,427,000) | (3,405,000) | (34,283,510) |
|  | COGS - Labor @ 7.5% * Const | - | - | - | - | - | - | - | - | - | - | - | - | - |
|  | TOTAL COGS | (2,240,000) | (120,100) | (372,410) | (2,096,500) | (3,550,500) | (3,354,500) | (7,621,000) | (18,042,000) | (12,956,000) | (7,151,000) | (4,497,000) | (7,251,000) | (69,252,010) |
|  | GROSS MARGIN | 425,900 | 31,600 | 113,360 | 625,100 | 938,525 | 849,125 | 1,792,750 | 4,222,200 | 3,269,650 | 1,661,125 | 1,052,040 | 1,715,625 | 16,697,000 |
|  |  | 19.0% | 26.3% | 30.4% | 29.8% | 26.4% | 25.3% | 23.5% | 23.4% | 25.2% | 23.2% | 23.4% | 23.7% | 24.1% |
| SG&A | Less Salaries | (70,000) | (70,000) | (70,000) | (70,000) | (70,000) | (70,000) | (70,000) | (70,000) | (70,000) | (70,000) | (70,000) | (70,000) | (840,000) |
|  | Less Marketing | (7,500) | (7,500) | (7,500) | (7,500) | (7,500) | (7,500) | (7,500) | (7,500) | (7,500) | (7,500) | (7,500) | (7,500) | (90,000) |
|  | Less Other SG&A | - | - | - | - | - | - | - | - | - | - | - | - | - |
|  | TOTAL SG&A | (77,500) | (77,500) | (77,500) | (77,500) | (77,500) | (77,500) | (77,500) | (77,500) | (77,500) | (77,500) | (77,500) | (77,500) | (930,000) |
|  | NET MARGIN | 348,400 | (45,900) | 35,860 | 547,600 | 861,025 | 771,625 | 1,715,250 | 4,144,700 | 3,192,150 | 1,583,625 | 974,540 | 1,638,125 | 15,767,000 |
|  |  | 15.6% | -38.2% | 9.6% | 26.1% | 24.3% | 23.0% | 22.5% | 23.0% | 24.6% | 22.1% | 21.7% | 22.6% | 22.8% |
|  | CUMULATIVE CASH AVAIL | 348,400 | 302,500 | 338,360 | 885,960 | 1,746,985 | 2,518,610 | 4,233,860 | 8,378,560 | 11,570,710 | 13,154,335 | 14,128,875 | 15,767,000 |  |
| DEBT COST ASSUMPTIONS | Debt Bal Beginning | 80,067,375 | 77,827,375 | 78,177,275 | 81,693,371 | 84,160,378 | 84,998,384 | 86,532,390 | 83,799,896 | 70,646,403 | 59,869,527 | 54,827,152 | 52,521,776 |  |
|  | Add Expended on 2016 Sales (2, | - | - | 2,779,882 | 2,779,882 | 2,779,882 | 2,779,882 | 2,779,882 | 2,779,882 | 1,108,625 | 1,108,625 | 1,108,625 | 1,108,625 | 16,679,290 |
|  | Add Expended on 2017 Sales (2) | - | - | 1,108,625 | 1,108,625 | 1,108,625 | 1,108,625 | 1,108,625 | 1,108,625 | 1,108,625 | 1,108,625 | 1,108,625 | 1,108,625 | 11,086,246 |
|  | Subtract COGS Paid Back | (2,240,000) | (120,100) | (372,410) | (2,096,500) | (3,550,500) | (3,354,500) | (7,621,000) | (18,042,000) | (12,956,000) | (7,151,000) | (4,497,000) | (7,251,000) | (69,252,010) |
|  | ADD ACQUISITIONS (3) | - | 470,000 | - | 675,000 | 500,000 | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 | 8,645,000 |
|  | ADD CONSTUCTION ON ACQ | - | - | - | - | - | - | - | - | 70,500 | - | 83,000 | 167,000 | 320,500 |
|  | End Debt Bal | 77,827,375 | 78,177,275 | 81,693,371 | 84,160,378 | 84,998,384 | 86,532,390 | 83,799,896 | 70,646,403 | 59,869,527 | 54,827,152 | 52,521,776 | 47,546,401 | 71,883,361 |
|  | Portion BCL Equity | 59% | 58% | 58% | 54% | 54% | 50% | 50% | 45% | 45% | 45% | 45% | 40% |  |
|  | Cost of BCL Part 1 (to JPM) | 1.50% | 1.50% | 1.50% | 1.50% | 1.50% | 1.50% | 1.50% | 1.50% | 1.50% | 1.50% | 1.50% | 1.50% |  |
|  | Cost of BCL Part 2 (to BFO) | 3.25% | 3.25% | 3.25% | 3.25% | 3.25% | 3.25% | 3.25% | 3.25% | 3.25% | 3.25% | 3.25% | 3.25% |  |
|  | Portion NR Leverage | 41% | 42% | 42% | 46% | 46% | 50% | 50% | 55% | 55% | 55% | 55% | 60% |  |
|  | IMPLIED BCL EQUITY AMT | 45,918,151 | 45,342,820 | 47,382,155 | 45,446,604 | 45,899,127 | 43,266,195 | 41,899,948 | 31,790,881 | 26,941,287 | 24,672,218 | 23,634,799 | 19,018,560 |  |
|  | IMPLIED BCL DEBT TOTAL | 31,909,224 | 32,834,456 | 34,311,216 | 38,713,774 | 39,099,257 | 43,266,195 | 41,899,948 | 38,855,521 | 32,928,240 | 30,154,933 | 28,886,977 | 28,527,841 |  |
|  | Cost of NR Leverage | 7.33% | 7.33% | 7.33% | 4.75% | 4.75% | 4.75% | 4.75% | 4.75% | 4.75% | 4.75% | 4.75% | 4.75% |  |
| AVERAGE EQUITY INVESTED | FOR ROI PURPOSES | 46,578,951 | 45,241,349 | 46,362,487 | 44,780,512 | 45,672,866 | 42,882,693 | 42,583,072 | 34,750,417 | 29,366,084 | 25,806,753 | 24,153,509 | 20,013,635 | 37,349,361 |
| INTEREST EXPENSE | Interest Out to JPM | (58,224) | (56,552) | (57,953) | (55,976) | (57,091) | (53,603) | (53,229) | (43,438) | (36,708) | (32,258) | (30,192) | (25,017) | (505,031) |
|  | Interest Out to BFO | (126,151) | (122,529) | (125,565) | (121,281) | (123,697) | (116,141) | (115,329) | (94,116) | (79,533) | (69,893) | (65,416) | (54,204) | (1,213,854) |
|  | Interest Out to 3PL | (197,717) | (200,115) | (205,074) | (150,996) | (154,005) | (169,744) | (168,558) | (168,121) | (142,072) | (124,852) | (116,854) | (118,831) | (1,916,939) |
|  | TOTAL DEBT COSTS | (382,092) | (379,195) | (388,592) | (328,252) | (334,793) | (339,488) | (337,116) | (305,675) | (258,313) | (227,004) | (212,461) | (198,052) | (3,691,034) |
|  | EARNINGS NET OF INTEREST | (33,692) | (425,095) | (352,732) | 219,348 | 526,232 | 432,137 | 1,378,134 | 3,839,025 | 2,933,837 | 1,356,621 | 762,079 | 1,440,073 | 12,075,966 |
|  |  |  |  |  |  |  |  |  |  |  |  |  |  | 32.3% |
| CUMULATIVR CASH AVAILABLE FOR DISTRIBUTION TO PTRS |  | (33,692) | (458,787) | (811,520) | (592,172) | (65,940) | 366,197 | 1,744,331 | 5,583,356 | 8,517,193 | 9,873,814 | 10,635,893 | 12,075,966 |  |
| INVESTMENT RETURNS | MONTHLY "SPOT" ROEC | -0.07% | -0.94% | -0.76% | 0.49% | 1.15% | 1.01% | 3.24% | 11.05% | 9.99% | 5.26% | 3.16% | 7.20% |  |
|  | CUMULATIVE ROEC | -0.07% | -1.01% | -1.75% | -1.32% | -0.14% | 0.85% | 4.10% | 16.07% | 29.00% | 38.26% | 44.03% | 60.34% |  |

Notes:

1. Commissions on "big ticket" homes are generally 5%.  On Small Ticket homes/South Side product Commissions include closing assistance and occasionally buy side commissions so run higher. Commissions are as indicated in the project underwriting but
   are set at a minimum of 5% of gross sales price.

2. Remaining construction spend based on assumption that ALL 2016 dollars remaining to spend are spent ratably from March to September, and that 2017 dollars are spent ratably from March to December

| As of today's date, remaining to be spent on 2016 houses | $ | 16,679,290 |
|---|---|---|
| As of today's date, remaining to be spent on 2017 houses | $ | 11,086,246 |

# EXHIBIT 5

| Address | City | Purchase Price | Total Const. Cost | Interest 9/22/16 | Basis with Interest + Txs | Total Out (PP+Const.+O+I+B) | Est Monthly Increase for SG&A | Est Monthly Incr for Interest Finished | Total Est Monthly Increase | Est No Months to Sale from 9/1/16 | Additional Holding Costs to Sale | Commission (5%) Closing Cost (1%) | Sales Price | Net Sales | Est Completion | Profit (Loss) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1715 N Belle Plaine Ave | Chicago | $306,000 | $493,000 | $ 95,316 | $ 919,919 | $948,318 | $1,509 | $3,436 | $4,945 | 5 | $24,723.06 | -$51,000 | $850,000 | $799,000 | | $ (206,686) |
| 2236 W 113th Pl | Chicago | $115,000 | $140,579 | $ 20,311 | $ 306,535 | $315,998 | $503 | $1,193 | $1,695 | 5 | $8,476.75 | -$22,200 | $370,000 | $347,800 | Listed | $ 23,325 |
| 4730 S Greenwood Ave | Chicago | $515,000 | $440,879 | $ 65,922 | $ 691,966 | $713,327 | $1,135 | $2,609 | $3,743 | 5 | $18,717.05 | -$36,000 | $600,000 | $564,000 | | $ (168,044) |
| 2638 W North Shore Ave | Chicago | $265,000 | $285,765 | $ 65,136 | $ 683,670 | $704,776 | $1,121 | $2,577 | $3,699 | 5 | $18,492.58 | -$34,500 | $575,000 | $540,500 | Listed | $ (182,769) |
| 901 S Kensington Ave | La Grange | $325,000 | $700,000 | $ 70,227 | $ 1,164,491 | $1,200,440 | $1,910 | $4,559 | $6,469 | 5 | $32,346.63 | -$60,000 | $1,000,000 | $940,000 | Listed | $ (292,621) |
| 3912 N Janssen Ave | Chicago | $745,000 | $870,000 | $ 138,764 | $ 1,865,016 | $1,922,590 | $3,059 | $7,193 | $10,252 | 5 | $51,257.68 | -$111,000 | $1,850,000 | $1,739,000 | 9/15/2016 | $ (247,639) |
| 2447 N Belle Plaine Ave | Chicago | $445,000 | $645,000 | $ 76,759 | $ 1,234,661 | $1,272,776 | $2,025 | $4,825 | $6,850 | 5 | $34,247.82 | -$66,000 | $1,100,000 | $1,034,000 | Listed | $ (278,771) |
| 3619 N Hermitage Ave. | Chicago | $480,000 | $704,000 | $ 71,195 | $ 1,314,993 | $1,355,588 | $2,157 | $5,182 | $7,339 | 5 | $36,696.08 | -$72,000 | $1,200,000 | $1,128,000 | Listed | $ (360,759) |
| 1514 Spencer | Berkeley | $44,000 | $74,000 | $ - | $ 43,605 | $0 | $72 | $182 | $253 | 8 | $2,025.63 | -$9,900 | $165,000 | $155,100 | 2/3/2017 | $ 35,074 |
| 1518 Ashland | Chicago | $368,900 | $100,000 | $ - | $ 368,900 | $368,900 | $605 | $1,537 | $2,142 | 9 | $19,279.06 | -$36,000 | $600,000 | $564,000 | 6/1/2017 | $ 75,821 |
| 1306 W Byron Ave | Chicago | $545,000 | $850,000 | $ 105,316 | $ 1,562,957 | $1,611,207 | $2,563 | $6,074 | $8,637 | 5 | $43,184.57 | -$91,500 | $1,525,000 | $1,433,500 | Listed | $ (230,926) |
| 1957 W Balmoral Ave | Chicago | $570,000 | $295,000 | $ 62,706 | $ 820,180 | $845,499 | $1,345 | $3,156 | $4,501 | 5 | $22,506.60 | -$48,600 | $810,000 | $761,400 | Listed | $ (108,614) |
| 4031 N Oakley Ave | Chicago | $600,000 | $510,000 | $ 81,812 | $ 1,285,763 | $1,325,455 | $2,109 | $5,016 | $7,125 | 5 | $35,626.23 | -$69,000 | $1,150,000 | $1,081,000 | Listed | $ (256,520) |
| 1437 W Cuyler Ave | Chicago | $615,000 | $735,000 | $ 85,190 | $ 1,526,369 | $1,573,489 | $2,503 | $6,005 | $8,508 | 5 | $42,541.58 | -$93,000 | $1,550,000 | $1,457,000 | Listed | $ (159,673) |
| 9238 S Pleasant Ave | Chicago | $295,000 | $337,000 | $ 54,224 | $ 679,871 | $700,859 | $1,115 | $2,607 | $3,722 | 5 | $18,609.59 | -$42,000 | $700,000 | $658,000 | Listed | $ (68,090) |
| 10 W Elm Ave | Park Ridge | $375,000 | $625,000 | $ 99,148 | $ 1,173,680 | $1,209,912 | $1,925 | $4,477 | $6,402 | 5 | $32,010.87 | -$57,000 | $950,000 | $893,000 | Listed | $ (336,411) |
| 5921 N Kenneth Ave | Chicago | $375,000 | $537,000 | $ 73,884 | $ 1,082,120 | $1,115,526 | $1,775 | $4,201 | $5,976 | 5 | $29,878.86 | -$52,950 | $882,500 | $829,550 | Listed | $ (311,207) |
| 635 Elmore St | Park Ridge | $586,000 | $490,000 | $ 103,046 | $ 1,289,662 | $1,329,475 | $2,115 | $4,944 | $7,059 | 5 | $35,297.06 | -$61,500 | $1,025,000 | $963,500 | Listed | $ (400,508) |
| 3922 N Bell Ave | Chicago | $685,000 | $765,000 | $ 97,523 | $ 1,605,754 | $1,655,325 | $2,634 | $6,284 | $8,918 | 5 | $44,589.50 | -$102,000 | $1,700,000 | $1,598,000 | Listed | $ (118,467) |
| 2014 W Sunnyside Ave | Chicago | $775,000 | $950,000 | $ 109,447 | $ 1,443,036 | $1,487,583 | $2,367 | $5,557 | $7,923 | 9 | $71,310.13 | -$126,000 | $2,100,000 | $1,974,000 | 2/1/2017 | $ (28,962) |
| 5424 W Belle Plaine Ave | Chicago | $600,000 | $500,000 | $ 84,919 | $ 1,272,314 | $1,311,592 | $2,087 | $4,947 | $7,034 | 5 | $35,171.04 | -$63,000 | $1,050,000 | $987,000 | 10/7/2016 | $ (344,421) |
| 3328 N Claremont Ave | Chicago | $600,000 | $558,000 | $ 79,321 | $ 1,304,957 | $1,345,242 | $2,140 | $5,107 | $7,247 | 5 | $36,235.42 | -$72,000 | $1,200,000 | $1,128,000 | 9/13/2016 | $ (262,770) |
| 3540 N Hoyne Ave | Chicago | $400,000 | $500,000 | $ 92,267 | $ 1,384,425 | $1,427,163 | $2,272 | $5,386 | $7,658 | 5 | $38,272.95 | -$72,000 | $1,200,000 | $1,128,000 | 9/12/2016 | $ (350,020) |
| 1217 W Cornelia Ave | Chicago | $880,000 | $694,000 | $ 111,555 | $ 1,652,898 | $1,703,925 | $2,711 | $6,422 | $9,133 | 6 | $54,799.13 | -$114,000 | $1,900,000 | $1,786,000 | 10/21/2016 | $ (84,868) |
| 3824 N Paulina St | Chicago | $630,000 | $540,000 | $ 75,545 | $ 1,070,100 | $1,103,135 | $1,755 | $4,144 | $5,899 | 7 | $41,293.39 | -$72,000 | $1,200,000 | $1,128,000 | 12/1/2016 | $ (242,848) |
| 1729 W Melrose St | Chicago | $500,000 | $538,000 | $ 71,632 | $ 1,030,528 | $1,062,342 | $1,690 | $3,995 | $5,686 | 7 | $39,799.03 | -$81,000 | $1,350,000 | $1,269,000 | 12/10/2016 | $ (82,381) |
| 1638 W Olive Ave | Chicago | $380,000 | $496,000 | $ 55,717 | $ 1,010,240 | $1,041,427 | $1,657 | $3,977 | $5,634 | 5 | $28,170.39 | -$51,000 | $850,000 | $799,000 | Listed | $ (274,753) |
| 2440 W Belle Plaine Ave | Chicago | $605,000 | $603,000 | $ 81,239 | $ 1,259,272 | $1,298,147 | $2,065 | $4,908 | $6,974 | 7 | $48,816.65 | -$66,000 | $1,100,000 | $1,034,000 | 12/1/2016 | $ (413,729) |
| 1925 W Schiller St | Chicago | $850,000 | $764,000 | $ 93,461 | $ 1,125,926 | $1,160,684 | $1,847 | $4,302 | $6,149 | 11 | $67,634.31 | -$117,000 | $1,950,000 | $1,833,000 | 5/1/2017 | $ (29,009) |
| 1409 N Oakley Blvd | Chicago | $535,000 | $487,000 | $ 60,705 | $ 957,593 | $987,155 | $1,571 | $3,737 | $5,308 | 7 | $37,153.12 | -$72,000 | $1,200,000 | $1,128,000 | 12/1/2016 | $ (78,517) |
| 2152 N Maplewood Ave | Chicago | $300,000 | $429,000 | $ 33,431 | $ 548,791 | $565,733 | $900 | $2,147 | $3,047 | 8 | $24,379.26 | -$46,320 | $772,000 | $725,680 | 12/15/2016 | $ (101,978) |
| 3452 N Marshfield Ave | Chicago | $570,000 | $587,000 | $ 64,250 | $ 980,744 | $1,011,020 | $1,609 | $3,819 | $5,427 | 7 | $37,990.72 | -$79,500 | $1,325,000 | $1,245,500 | 12/1/2016 | $ (100,119) |
| 1236 W Altgeld St | Chicago | $380,000 | $798,000 | $ 85,373 | $ 1,162,366 | $1,198,249 | $1,906 | $4,496 | $6,402 | 10 | $64,021.97 | -$108,000 | $1,800,000 | $1,692,000 | 3/1/2017 | $ (41,369) |
| 3824 N Claremont Ave | Chicago | $630,000 | $622,000 | $ 70,855 | $ 1,247,483 | $1,285,994 | $2,046 | $4,903 | $6,949 | 6 | $41,691.70 | -$90,000 | $1,500,000 | $1,410,000 | 10/18/2016 | $ (51,214) |
| 1255 W Cornelia Ave. | Chicago | $750,000 | $673,000 | $ 86,404 | $ 1,443,102 | $1,487,652 | $2,367 | $5,653 | $8,020 | 6 | $48,118.48 | -$114,000 | $1,900,000 | $1,786,000 | 10/30/2016 | $ 84,479 |
| 2150 W Farragut Ave. | Chicago | $360,000 | $430,583 | $ 42,185 | $ 839,491 | $864,376 | $1,375 | $3,318 | $4,693 | 6 | $28,158.91 | -$48,000 | $800,000 | $752,000 | 10/21/2016 | $ (174,764) |
| 1319 W Cornelia Ave. | Chicago | $800,000 | $676,000 | $ 81,220 | $ 1,389,335 | $1,432,225 | $2,279 | $5,450 | $7,729 | 6 | $46,374.79 | -$114,000 | $1,900,000 | $1,786,000 | 11/1/2016 | $ 50,631 |
| 4037 N Oakley Ave. | Chicago | $615,000 | $582,000 | $ 50,959 | $ 880,791 | $907,982 | $1,445 | $3,458 | $4,902 | 6 | $29,413.33 | -$72,000 | $1,200,000 | $1,128,000 | 12/16/2016 | $ (207,731) |
| 4308 N Troy St | Chicago | $275,000 | $413,000 | $ 42,698 | $ 779,155 | $803,208 | $1,278 | $3,069 | $4,346 | 5 | $21,732.32 | -$39,000 | $650,000 | $611,000 | Listed | $ (237,153) |
| 846 W. Webster Ave. | Chicago | $1,200,000 | $780,000 | $ 93,408 | $ 1,418,997 | $1,462,303 | $2,327 | $5,523 | $7,851 | 12 | $94,207.12 | -$136,500 | $2,275,000 | $2,138,500 | 5/1/2017 | $ (136,908) |
| 5745 N Kostner Ave | Chicago | $325,000 | $175,000 | $ 25,572 | $ 367,714 | $379,065 | $603 | $1,426 | $2,029 | 6 | $12,172.07 | -$34,500 | $575,000 | $540,500 | 5/1/2017 | $ (23,223) |
| 7707 S. Euclid | Chicago | $40,000 | $106,000 | $ 4,523 | $ 86,819 | $89,590 | $142 | $343 | $485 | 6 | $2,911.76 | -$13,500 | $225,000 | $211,500 | 11/25/2016 | $ 43,089 |
| 3734 N. Marshfield | Chicago | $875,000 | $667,000 | $ 71,999 | $ 1,338,606 | $1,379,930 | $2,195 | $5,278 | $5,473 | 5 | $44,837.91 | -$105,000 | $1,750,000 | $1,645,000 | 11/1/2016 | $ (127,462) |
| 1839 N Orleans | Chicago | $1,610,000 | $1,097,000 | $ 123,808 | $ 2,008,462 | $2,070,464 | $3,294 | $7,853 | $11,147 | 1 | $11,146.81 | -$195,000 | $3,250,000 | $3,055,000 | 7/1/2017 | $ 85,497 |
| 3636 N Bosworth Ave. | Chicago | $875,000 | $633,000 | $ 64,981 | $ 1,170,830 | $1,206,975 | $1,920 | $4,608 | $6,528 | 9 | $58,751.93 | -$102,000 | $1,700,000 | $1,598,000 | 1/15/2017 | $ (23,709) |
| 4612 Franklin Ave | Western Springs | $385,000 | $644,000 | $ 64,710 | $ 1,002,543 | $1,033,492 | $1,644 | $3,908 | $5,552 | 5 | $27,759.57 | -$70,500 | $1,175,000 | $1,104,500 | 11/1/2016 | $ (53,052) |
| 4439 Franklin Ave | Western Springs | $355,000 | $658,000 | $ 72,655 | $ 1,135,480 | $1,170,534 | $1,862 | $4,428 | $6,291 | 5 | $31,453.73 | -$84,000 | $1,400,000 | $1,316,000 | Listed | $ 94,357 |
| 715 S Adams St | Hinsdale | $420,000 | $567,041 | $ 57,041 | $ 906,983 | $934,983 | $1,488 | $3,541 | $5,029 | 8 | $40,231.77 | -$84,000 | $1,400,000 | $1,316,000 | 1/1/2017 | $ 80,365 |
| 717 N Oak St | Hinsdale | $385,000 | $670,000 | $ 50,782 | $ 817,735 | $842,979 | $1,341 | $3,196 | $4,537 | 8 | $36,294.18 | -$87,000 | $1,450,000 | $1,363,000 | 1/1/2017 | $ 173,655 |
| 3817 N Wayne Ave | Chicago | $810,000 | $861,000 | $ 115,472 | $ 1,795,639 | $1,851,072 | $2,945 | $7,001 | $9,946 | 6 | $59,674.37 | -$132,000 | $2,200,000 | $2,068,000 | 10/24/2016 | $ 93,890 |
| 1319 N Bell Ave | Chicago | $800,000 | $580,000 | $ 77,041 | $ 1,030,192 | $1,061,995 | $1,690 | $4,101 | $5,791 | 6 | $34,743.64 | -$79,500 | $1,325,000 | $1,245,500 | 10/21/2016 | $ 115,267 |
| 1955 W Farragut Ave | Chicago | $405,000 | $556,000 | $ 42,062 | $ 498,392 | $513,778 | $817 | $1,901 | $2,719 | 12 | $32,625.88 | -$72,000 | $1,200,000 | $1,128,000 | 5/1/2017 | $ 55,018 |
| 2430 W Belle Plaine Ave | Chicago | $475,000 | $645,000 | $ 77,955 | $ 1,266,971 | $1,306,083 | $2,078 | $4,954 | $7,032 | 6 | $42,193.19 | -$66,000 | $1,100,000 | $1,034,000 | 11/1/2016 | $ (316,078) |
| 1437 W Melrose St | Chicago | $765,000 | $930,000 | $ 104,135 | $ 1,715,252 | $1,768,203 | $2,813 | $6,713 | $9,526 | 6 | $57,157.08 | -$126,000 | $2,100,000 | $1,974,000 | 11/14/2016 | $ (4,889) |
| 3621 N. Hermitage Ave | Chicago | $630,000 | $955,000 | $ 71,740 | $ 1,324,318 | $1,365,301 | $2,172 | $5,219 | $7,391 | 5 | $36,955.28 | -$72,000 | $1,200,000 | $1,128,000 | 9/15/2016 | $ (303,556) |
| 3810 N. Wayne Ave. | Chicago | $875,000 | $1,100,000 | $ 105,399 | $ 1,401,739 | $1,424,415 | $2,266 | $5,347 | $7,614 | 10 | $76,135.08 | -$168,000 | $2,800,000 | $2,632,000 | 3/1/2017 | $ 314,674 |
| 1508 W. Byron St. | Chicago | $875,000 | $1,015,000 | $ 118,753 | $ 2,060,067 | $2,124,591 | $3,380 | $8,093 | $11,473 | 6 | $68,836.57 | -$153,000 | $2,550,000 | $2,397,000 | 10/15/2016 | $ 162,929 |
| 1220 W Henderson St. | Chicago | $925,000 | $958,000 | $ 93,684 | $ 1,683,335 | $1,737,363 | $2,764 | $6,632 | $9,396 | 7 | $65,772.03 | -$135,000 | $2,250,000 | $2,115,000 | 3/1/2017 | $ 32,596 |
| 3701 N. Hermitage Ave. | Chicago | $700,000 | $770,000 | $ 62,370 | $ 1,202,140 | $1,239,251 | $1,972 | $4,749 | $6,721 | 5 | $33,604.18 | -$72,000 | $1,200,000 | $1,128,000 | 9/23/2016 | $ (229,442) |
| 3703 N. Hermitage Ave. | Chicago | $450,000 | $644,000 | $ 61,159 | $ 1,140,820 | $1,176,038 | $1,871 | $4,499 | $6,370 | 5 | $31,848.26 | -$72,000 | $1,200,000 | $1,128,000 | 9/29/2016 | $ (139,989) |
| 1450 W. Melrose St. | Chicago | $450,000 | $644,000 | $ 84,121 | $ 1,621,657 | $1,661,802 | $2,644 | $6,366 | $9,010 | 8 | $72,081.84 | -$126,000 | $2,100,000 | $1,974,000 | 12/15/2016 | $ (135,503) |
| 1400 W. George St. | Chicago | $850,000 | $843,000 | $ 52,294 | $ 1,430,149 | $1,499,040 | $2,384 | $5,841 | $8,226 | 6 | $49,357.81 | -$114,000 | $1,900,000 | $1,786,000 | 11/1/2016 | $ 75,424 |
| 3257 N. Lakewood Ave. | Chicago | $881,000 | $884,000 | $ 75,270 | $ 1,404,466 | $1,447,823 | $2,303 | $5,538 | $7,840 | 11 | $86,250.64 | -$138,000 | $2,300,000 | $2,162,000 | 3/15/2017 | $ 149,819 |
| 1514 W. Henderson | Chicago | $375,000 | $556,000 | $ 64,415 | $ 1,396,429 | $1,439,538 | $2,290 | $5,540 | $7,840 | 9 | $70,563.11 | -$132,000 | $2,200,000 | $2,068,000 | 1/27/2017 | $ 138,621 |
| 1818 W. Byron | Chicago | $375,000 | $550,000 | $ 50,293 | $ 471,700 | $486,262 | $774 | $1,852 | $2,625 | 10 | $28,879.13 | -$72,000 | $1,200,000 | $1,128,000 | 3/1/2017 | $ 378,078 |
| 2624 N Burling | Chicago | $835,000 | $960,000 | $ 74,192 | $ 1,316,056 | $1,356,684 | $2,158 | $5,174 | $7,333 | 9 | $65,996.12 | -$138,000 | $2,300,000 | $2,162,000 | 2/1/2017 | $ 149,248 |
| 1436 W Melrose | Chicago | $800,000 | $894,500 | $ 59,997 | $ 1,624,827 | $1,674,987 | $2,665 | $6,354 | $9,019 | 7 | $63,131.91 | -$123,000 | $2,050,000 | $1,927,000 | 11/10/2016 | $ (24,573) |
| 5137 N Kostner Ave. | Chicago | $210,000 | $160,000 | $ 12,992 | $ 244,662 | $252,215 | $401 | $969 | $1,370 | 6 | $8,219.98 | -$28,500 | $475,000 | $446,500 | | $ 31,662 |
| 3618 N. Magnolia | Chicago | $985,000 | $630,000 | $ 50,346 | $ 1,083,408 | $1,116,854 | $1,777 | $4,300 | $6,081 | 7 | $42,570.18 | -$120,000 | $2,000,000 | $1,880,000 | 5/1/2017 | $ 172,046 |
| 3931 N Claremont | Chicago | $655,000 | $580,000 | $ 46,223 | $ 1,350,130 | $1,390,024 | $2,212 | $5,476 | $7,637 | 5 | $38,186.20 | -$96,000 | $1,600,000 | $1,504,000 | 10/29/2016 | $ (45,935) |
| 2124 W. Shakespeare | Chicago | $655,000 | $530,000 | $ 13,915 | $ 703,086 | $715,822 | $1,139 | $2,708 | $3,847 | 7 | $26,931.74 | | $0 | | 2/1/2017 | $ 20,250 |
| 3541 N. Claremont | Chicago | $600,000 | $1,686 | $ 27,199 | $ 645,817 | $651,826 | $1,038 | $2,478 | $3,516 | 7 | $24,615.83 | | $0 | | 2/1/2017 | $ 16,214 |
| 1506 W. School St. | Chicago | $755,000 | $505,000 | $ 45,906 | $ 1,373,254 | $1,415,946 | $2,252 | $5,762 | $8,014 | 9 | $69,816.62 | -$126,000 | $2,100,000 | $1,974,000 | 1/27/2017 | $ 87,008 |
| 2013 W Melrose | Chicago | $755,000 | $929,000 | $ 60,599 | $ 1,306,010 | $1,346,638 | $2,143 | $5,148 | $7,291 | 9 | $66,338.90 | -$126,000 | $2,100,000 | $1,974,000 | 4/1/2017 | $ 154,296 |
| 916 W. Willow | Chicago | $1,105,000 | $320,396 | $ 46,850 | $ 1,230,934 | $1,265,918 | $2,010 | $4,784 | $6,794 | 12 | $81,529.15 | -$159,000 | $2,650,000 | $2,491,000 | 5/1/2017 | $ 29,750 |
| 2431 W. Belle Plaine | Chicago | $450,000 | $425,000 | $ 29,909 | $ 525,699 | $525,699 | $837 | $2,042 | $2,878 | 10 | $28,776.18 | | $0 | $0 | | $ (43,414) |
| 1835 W. School | Chicago | $599,000 | $635,000 | $ 25,645 | $ 848,516 | $875,006 | $1,392 | $3,340 | $4,732 | 7 | $33,126.27 | -$87,000 | $1,450,000 | $1,363,000 | 2/14/2017 | $ 127,801 |
| 2318 W. Dickens | Chicago | $715,000 | $1,030,000 | $ 7,651 | $ 749,298 | $772,430 | $1,229 | $3,090 | $4,319 | 7 | | | $794,020 | | | $ (21,990) |
| 2453 W. Belle Plaine | Chicago | $460,000 | $425,000 | $ 17,035 | $ 500,921 | $516,385 | $822 | $2,016 | $2,838 | 7 | $19,863.96 | | $532,088 | $532,088 | | $ 15,703 |

| | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2446 W. Belle Plaine | Chicago | $475,000 | $550,000 | $ 12,600 | $ 519,582 | $535,621 | $852 | $2,112 | $2,965 | 12 | $35,575.09 | -$72,000 | $1,200,000 | $1,128,000 | 6/1/2017 | $ 31,382 |
| 3250 N. Hoyne | Chicago | $525,000 | $595,000 | $ 10,673 | $ 589,638 | $607,841 | $967 | $2,412 | $3,379 | 10 | $33,794.24 | -$85,500 | $1,425,000 | $1,339,500 | 3/21/2017 | $ 147,445 |
| 1824 W Albany | Chicago | $525,000 | $110,000 | $ 9,735 | $ 648,814 | $668,843 | $1,064 | $2,663 | $3,727 | 5 | $18,634.77 | -$45,900 | $765,000 | $719,100 | Listed | $ 26,922 |
| 841 N Euclid | Oak Park | $319,000 | $425,000 | $ 5,309 | $ 326,627 | $336,710 | $536 | $1,339 | $1,875 | 10 | $18,745.24 | -$60,000 | $1,000,000 | $940,000 | 5/1/2017 | $ 160,315 |
| 4022 N Campbell | Chicago | $380,000 | $375 | $ 6,292 | $ 392,416 | $404,530 | $644 | $1,609 | $2,252 | 1 | | $0 | $414,529 | $414,529 | | $ 9,999 |
| 1227 W Wellington | Chicago | $675,000 | $780,000 | $ 10,271 | $ 711,578 | $733,545 | $1,167 | $2,922 | $4,089 | 12 | $49,070.09 | -$111,000 | $1,850,000 | $1,739,000 | 6/1/2017 | $ 197,178 |
| 5253 Mulford | Skokie | $205,000 | $94,000 | $ 1,963 | $ 223,673 | $223,673 | $367 | $924 | $1,291 | 7 | $9,034.47 | -$22,800 | $380,000 | $357,200 | 1/13/2017 | $ 40,512 |
| 943 Olive 4B | Homewood | $12,000 | $29,000 | $ 129 | $ 14,586 | $14,586 | $24 | $60 | $84 | 5 | $420.81 | -$3,600 | $60,000 | $56,400 | 10/28/2016 | $ 12,393 |
| 1371 Margret | Des Plaines | $167,000 | $84,000 | $ 1,257 | $ 223,047 | $223,047 | $366 | $924 | $1,290 | 5 | $6,449.72 | -$18,900 | $315,000 | $296,100 | 10/14/2016 | $ 38,287 |
| 511 S. Yale | Addison | $92,000 | $49,000 | $ 636 | $ 132,550 | $132,550 | $217 | $550 | $767 | 5 | $3,835.20 | -$11,940 | $199,000 | $187,060 | 10/14/2016 | $ 41,921 |
| 4 N324 Briar Pl. | Bensonville | $170,000 | $89,000 | $ 1,904 | $ 250,385 | $250,385 | $411 | $1,035 | $1,446 | 1 | $1,445.99 | -$20,940 | $349,000 | $328,060 | SOLD | $ 57,129 |
| 4026 S. Artesian | Chicago | $55,000 | $104,000 | $ 636 | $ 91,600 | $91,600 | $150 | $379 | $529 | 6 | $3,175.48 | -$12,600 | $210,000 | $197,400 | 12/16/2016 | $ 32,772 |
| 532 Waikiki Dr. | Des Plaines | $235,000 | $120,350 | $ 333 | $ 249,553 | $249,553 | $409 | $1,038 | $1,448 | 6 | $8,686.27 | -$26,100 | $435,000 | $408,900 | 12/24/2016 | $ 48,895 |
| 8305 S. Yates | Chicago | $42,735 | $74,000 | $ 100 | $ 63,764 | $63,764 | $105 | $265 | $370 | 5 | $1,849.22 | -$9,600 | $160,000 | $150,400 | 11/4/2016 | $ 31,172 |
| 7126 W. Armitage | Chicago | $117,000 | $89,000 | $ 272 | $ 119,560 | $119,560 | $196 | $497 | $693 | 6 | $4,158.74 | -$16,080 | $268,000 | $251,920 | 12/24/2016 | $ 39,202 |
| 5026 W. Cullom | Chicago | $180,000 | $212,000 | $ 112 | $ 192,619 | $192,619 | $316 | $802 | $1,118 | 10 | $11,180.29 | -$30,000 | $500,000 | $470,000 | 5/1/2017 | $ 67,700 |
| 4748 Avon | Jacksonville | $220,000 | $132,000 | $ 19,393 | $ 405,372 | $405,372 | $665 | $1,608 | $2,273 | 3 | $6,819.30 | -$21,000 | $350,000 | $329,000 | Listed | $ (78,381) |
| 1371 Windsor Harbor Dr. | Jacksonville | $583,000 | $202,000 | $ 33,484 | $ 850,235 | $850,235 | $1,394 | $3,403 | $4,798 | 3 | $14,392.81 | -$54,000 | $900,000 | $846,000 | Listed | $ (17,481) |
| 1827 Tierra Verde | Jacksonville | $386,000 | $178,000 | $ 21,926 | $ 647,650 | $647,650 | $1,062 | $2,607 | $3,669 | 3 | $11,008.20 | -$39,000 | $650,000 | $611,000 | Listed | $ (14,162) |
| 4919 S Lotus Ave | Chicago | $90,000 | $131,619 | $ 19,151 | $ 268,683 | $272,205 | $452 | $1,040 | $1,492 | 0.5 | $745.84 | -$17,940 | $299,000 | $281,060 | SOLD | $ 3,337 |
| 408 S. Wille St. | Mount Prospect | $205,000 | $134,000 | $ 26,956 | $ 397,536 | $397,536 | $0 | $1,544 | $1,544 | 1 | $1,544.08 | -$24,600 | $410,000 | $385,400 | SOLD | $ (26,543) |
| 9527 S. Claremont | Chicago | $147,000 | $104,000 | $ 1,405 | $ 201,173 | $201,173 | $330 | $832 | $1,162 | 6 | $6,973.86 | -$20,400 | $340,000 | $319,600 | 11/25/2016 | $ 57,453 |
| | | $52,438,635 | $50,301,068 | $5,398,933 | $94,744,935 | $97,483,245 | $154,751 | $372,275 | $527,026 | $618 | $3,258,817 | ($6,946,470) | $120,742,494 | $113,768,024 | $2,863,141 | ($4,383,399) |

# EXHIBIT 6

FILED DATE: 7/31/2019 4:27 PM   2019L008483

EIN: 27-1778301

## SECOND AMENDED AND RESTATED
## OPERATING AGREEMENT
### *of*
## BCL-HOME REHAB LLC

THIS AGREEMENT is made and entered into on January 1, 2017, by the following persons ("Members"):

### BCL-FAMILY LLC
### ("BCL-Family")

### ELAN PERETZ, NOT INDIVIDUALLY, BUT AS TRUSTEE OF THE ELAN PERETZ TRUST
### (the "Peretz Trust")

### DANIEL SHACHTMAN, NOT INDIVIDUALLY, BUT AS TRUSTEE OF THE DANIEL
### SHACHTMAN TRUST DATED OCTOBER 14, 2008
### (the "Shachtman Trust")

### KENNETH FIXLER
### ("Kenneth")

### JONATHON FIXLER
### ("Jonathon")

### PRELIMINARY STATEMENTS:

A.      The Company was established on January 21, 2010, under and pursuant to the Act, and governed by that certain Operating Agreement (the "Initial Operating Agreement") dated January 21, 2010, by and between Kenneth and BCL-Business Holdings LLC.

B.      The Initial Operating Agreement was amended and restated by that certain Amended and Restated Operating Agreement (the "Amended Operating Agreement") dated October 19, 2012, by Kenneth and BCL-Business Holdings LLC.

C.      As of the date hereof, BCL-Business Holdings LLC has distributed its interest in the Company to the members of BCL-Business Holdings LLC.

D.      The parties hereto are desirous of continuing to operate the Company under the laws of the State.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein and other good and valuable consideration, the receipt, adequacy and sufficiency of which are hereby acknowledged by the parties, the parties agree to amend and restate the Amended Operating Agreement as follows:

### Article 1
### Select Definitions

"Act" means the Limited Liability Company Act from time to time in force in the State.

FILED DATE: 7/31/2019 4:27 PM   2019L008483

"Agreement" means this Second Amended and Restated Operating Agreement, as originally executed and as amended, modified, supplemented or restated from time to time.

"Charter" means the articles of organization, certificate of formation or similar instrument, as amended from time to time, issued by the State evidencing the formation of the Company. The Charter was issued on January 21, 2010, and bears State File No. 03220982.

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Company" means the limited liability company formed upon the filing of the Charter and whose affairs are governed by this Agreement.

"Determination Portfolio" means the investment portfolio of the Company (including its subsidiaries, including, without limitation, BCL-Jacksonville LLC, FB Realty, LLC and BCL-Home Lending Parent LLC), as such portfolio existed at 11:59 p.m. Central Standard Time on December 31, 2016.

"First Determination Date" means the date on which the last house in the Determination Portfolio has been sold to a third party.

"Member" means the person or persons identified as such in this Agreement, including persons subsequently admitted to the Company as Members in accordance with Article 10.

"Pay In Amount" means the amount, as calculated by BCL-Family in its reasonable discretion following the First Determination Date, of the net loss from the operation of the Company's business with respect to the Determination Portfolio, *less* the amount the Members contributed to the Company in 2016 in respect of such net loss.

"Profit Percentages" shall be as set forth below and as may be adjusted from time to time in accordance with this Agreement:

| Member | Prior to the First Determination Date | Following the First Determination Date | Following the Second Determination Date |
|---|---|---|---|
| BCL-Family | 56% | 62% | 56% |
| Peretz Trust | 12% | 12% | 12% |
| Shachtman Trust | 12% | 0% | 0% |
| Kenneth | 20% | 20% | 20% |
| Jonathon | 0% | 6% | 12% |

"Second Determination Date" means the date upon which 9.68% of the aggregate amount distributed pursuant to Section 6.2 to BCL-Family following the First Determination Date is equal to 12% of the Pay In Amount.

"State" means the State of Illinois, which has issued the Company's Charter.

FILED DATE: 7/31/2019 4:27 PM   2019L008483

## Article 2
## Organizational Matters

2.1     Formation and Statutory Authority.

(a)     *Formation*.  The Company was formed upon the issuance of the Charter by the State. The Members hereby ratify and adopt the acts and conduct of the Company's organizer in connection with the filing of the Charter as acts and conduct by and on behalf of the Company.  The organizer is hereby released and indemnified by the Company from any liability on account of its actions in connection with the formation of the Company.

(b)     *Statutory Authority*.  The Company shall continue to operate as a limited liability company in accordance with this Agreement and the Act. The rights and obligations of the Members among themselves and in relation to the Company shall be determined in accordance with this Agreement and the Act.  To the extent that anything contained in this Agreement conflicts with the Act, or modifies, supplements or otherwise affects any rights or obligations under the Act, this Agreement shall supersede the Act, except to the extent expressly restricted by the Act.

2.2     Filings.  The Members shall make such filings and do or cause to be done such other acts and things as shall be required to continue the existence of the Company in the State and shall cause the Company to be qualified or registered under assumed or fictitious names statutes or similar laws in any jurisdiction in which the Company owns property or transacts business to the extent the same is necessary or, in the judgment of the Members, advisable in order to protect the limited liability of the Members or to permit the Company to lawfully own property or transact business.  The Members shall, to the extent the same is necessary or, in the judgment of the Members, advisable, execute, file and publish all such certificates, notices, statements or other instruments necessary to permit the Company lawfully to own property and conduct business as a limited liability company in all jurisdictions where the Company elects to own property or transact business and to maintain the limited liability of the Members.

2.3     Principal Office of the Company.  The principal office of the Company shall be located at such place within or outside the State as the Members may from time to time designate.  The Company may have secondary offices at such other place or places as the Members may from time to time designate.

2.4     Records to be Maintained.  The Company shall at all times during the continuance of the Company keep at the Company's principal office such records and information as the Company may be required to maintain in accordance with the Act.

2.5     Registered Office and Registered Agent.  The Members shall designate a registered office and a registered agent in accordance with the Act.  The Members have the right to change the Company's registered office and/or registered agent from time to time in accordance with the Act.  The Members shall select and designate a registered office and registered agent for the Company in each other state in which the Company is required to maintain or appoint one.

## Article 3
## Purpose of the Company

The purpose of the Company is to engage in any and all lawful businesses, make any and all lawful investments and undertake such other activities related or incidental thereto as the Members may determine is in the interests of the Company.

3

FILED DATE: 7/31/2019 4:27 PM   2019L008483

### Article 4
### Duration of the Company

4.1     Duration of the Company.   The Company shall continue in perpetuity unless sooner dissolved in accordance with the other provisions of this Article.

4.2     Winding-Up.  The Company shall commence a winding-up of its affairs upon the earliest of:

(a)     *Decision of the Members*.  The decision of the Members to do so.  A decision of the Members under this paragraph shall require the approval of Members holding at least a majority of the Profit Percentages as of the date such decision is made.

(b)     *Judicial Dissolution*.  Upon the entry of a judicial decree of dissolution of the Company in accordance with the Act.

The winding-up of the Company shall be conducted in accordance with this Agreement generally and Article 12 in particular.

4.3     Continuation of Company Upon Certain Events.  The death, disability, court declaration of incompetence, bankruptcy, dissolution, liquidation or other dissociation of a Member shall not dissolve the Company, but it shall be continued with the successor or legal representative of such Member; such successor or legal representative shall, to the extent of the interest acquired, be entitled only to the predecessor Member's rights, if any, in the distributions of the Company, and no such person shall have any right to participate in the management of the affairs of the Company or vote on any Company matter without the written consent of the Members holding at least a majority of the Profit Percentages at such time.  See Article 10 for additional provisions applicable to any such successor or legal representative.

### Article 5
### Capital Contributions to the Company

5.1     Capital Contributions.   Each Member (or its predecessors, if any) has made such contributions to the capital of the Company as are reflected in the books and records of the Company.

5.2     Additional Capital Contributions.  Except as set forth in this Agreement or as required by the Act, no Member shall be assessed for additional capital contributions.

(a)     *By Agreement of Members*.  The Members may, by unanimous agreement, at any time or from time to time, make additional capital contributions to the Company.

(b)     *By Action of BCL-Family*.  If BCL-Family determines that it is necessary or desirable for the Company to obtain additional funds in the form of additional capital contributions, then:

> (i)     BCL-Family shall send to each Member (other than the Shachtman Trust) a notice (the "First Requirement Notice"), which shall advise Members as to the total amount of capital required by the Company (the "Requirement Amount"), the portion of the Requirement Amount which may be contributed by each Member (determined pro rata according to the Members' Profit Percentages at the time such First Requirement Notice is delivered; provided, that if such First Requirement Notice is delivered on or prior to the Second Determination Date, then the portion of the Requirement Amount which may be contributed by each

4

FILED DATE: 7/31/2019 4:27 PM   2019L008483

Member shall be determined pro rata according to the Members' Profit Percentages as of the day before the Second Determination Date) and the date on which such capital is required to be contributed to the Company (the "Requirement Date"). The Requirement Date shall be not less than five days after the date of the First Requirement Notice.

(ii)     Should any Member not exercise its option and contribute its capital within the period provided in clause (i), BCL-Family may (but shall not be obligated to) send to each Member who made contributions pursuant to clause (i) a notice (the "Second Requirement Notice") of the uncontributed portion of the Requirement Amount, each of whom may elect to make a further additional capital contribution to the Company by delivering to BCL-Family, within five days of the date of the Second Requirement Notice, written notice of the same, which notice shall include a statement of the maximum amount of the uncontributed Requirement Amount such Member would be willing to contribute. The portion of the uncontributed Requirement Amount that may be contributed by each Member shall be determined by BCL-Family ratably according to the relative maximum amounts that the Members propose to contribute in their notices to BCL-Family or otherwise as BCL-Family shall determine, and shall be paid by the Member to the Company immediately upon demand therefor. No Member, however, shall be required to pay more than the maximum amount it proposed to contribute to the Company.

(iii)    *Additional capital contributions under this Section are voluntary*, but once a Member has agreed to make an additional capital contribution hereunder, the Company shall have all of the rights and remedies at law, in equity and as set forth in this Agreement resulting from the failure of the Member to make such capital contribution.

(iv)     In the event that the entire Requirement Amount is not contributed by all Members in proportion to their Profit Percentages in effect immediately prior to the First Requirement Notice, the Profit Percentages of the Members shall be adjusted with prospective effect to take account of the additional capital contributions made by the contributing Members in relation to the sum of (A) those additional capital contributions and (B) in BCL-Family's discretion, either (i) the aggregate amount of the capital contributions (whether or not returned) of the Members immediately prior to the additional capital contributions or (ii) the net fair market value of the Company's assets at such time (as determined by BCL-Family). Notwithstanding the foregoing, prior to the First Determination Date, no adjustment shall be made to the Profit Percentage of the Shachtman Trust.

(c)     *Pay In Amount.*   Upon determination of the Pay In Amount, each Member shall contribute to the capital of the Company an amount equal to such Member's pro rata portion of the Pay In Amount (determined in accordance with the Profit Percentages of the Members prior to the First Determination Date), and the Company shall pay the Pay In Amount to BCL-Operations LLC.

5.3     Guaranty Capital Contributions.     The Members hereby acknowledge that BCL-Operations LLC ("BCL-Operations") has prior to the date of this Agreement and may subsequent to the date of this Agreement make loans to the Company. Each of the Members hereby acknowledges that such Member agreed to reimburse an amount equal to its portion of such loans to the extent that upon the

5

FILED DATE: 7/31/2019 4:27 PM   2019L008483

conclusion of the activities of the Company, the Company is not able to pay to BCL-Operations all of the outstanding principal and accrued but unpaid interest under such loans, as determined by the Members holding a majority of the Profit Percentages at such time, which amount shall be known herein as the "Guaranteed Amount." To the extent that BCL-Operations is required to pay any amount to another third party in respect of a loan from such other third party to the Company that BCL-Operations guaranteed, such amount shall increase the amount of the Guaranteed Amount accordingly. Upon determination by the Members holding a majority of the Profit Percentages at such time that the activities of the Company have concluded, a final calculation shall be performed by the Company to determine the amount of the Guaranteed Amount. Within 10 days of such determination (or later upon determination by the Members holding a majority of the Profit Percentages at such time), the Members shall contribute to the Company an amount equal to the Guaranteed Amount multiplied by such Member's Profit Percentage, which amounts the Company shall pay to BCL-Operations. For the avoidance of doubt, and notwithstanding the foregoing, the Guaranteed Amount shall not include, and no Member shall be required to contribute pursuant to this Section, any amount in duplication of amounts paid by such Members in respect of the Pay In Amount.

      5.4    Defaulting Members. The Company, acting at the sole direction of BCL-Family, shall be entitled to enforce the obligations of each Member to make the contributions and other payments due to the Company that are provided in this Article and elsewhere in this Agreement, and the Company shall have all remedies available at law or in equity in the event any such contribution or payment is not so made. The Company, acting at the sole direction of BCL-Family, shall be entitled to recover the reasonable attorney's fees and other costs of enforcing the Members' contribution and payment obligations under this Agreement, and shall also be entitled to recover interest on any unpaid amount, from the due date of such payment to the date of payment at 500 basis points over the prime rate of interest from time to time in effect at large US money center banks most recently published in The Wall Street Journal (US Edition) or similar publication if The Wall Street Journal (US Edition) is not available.

Article 6
Distributions by the Company

      6.1    Definitions. The following terms shall have the following meanings:

      (a)    "*Available Cash*" shall consist of all cash on hand of the Company irrespective of its source, excluding, however, such reserves as Members holding at least a majority of the Profit Percentages as of the date of the determination of such reserves may establish.

      (b)    "*Unreturned Capital*" consists of so much of a Member's capital contributions to the Company that have not been returned to such Member by way of distributions made under this Article that are identified (in the distribution provisions of this Article) as distributions of Unreturned Capital. If a person acquires all or a portion of another Member's interest in the Company, the transferee shall succeed to the corresponding proportion of the transferor Member's Unreturned Capital at the time of the transfer.

      6.2    Distributions of Available Cash. Available Cash shall be distributed to the Members in such amounts and at such times as Members holding at least a majority of the Profit Percentages as of the date such distributions are made shall determine in the following rank and order:

      (a)    Among the Members in proportion to, and to the extent of, their Unreturned Capital.

      (b)    The remainder, if any, among the Members according to their Profit Percentages during the period in which such distributions are made.

6.3     Priorities. Except as may be expressly provided in this Agreement, no Member shall have a priority right over any other Member as to distributions.

6.4     Interest on Capital Contributions. Except as may be expressly provided in this Agreement, no interest shall be allowed to any Member upon the amount of its capital contributions.

6.5     Set-Off Rights. The Company shall be entitled to set-off against any distributions or other amounts that may be or become due to a Member from the Company any amounts that may be due from such Member to the Company or another Member.

6.6     Restrictions on Distributions. No distributions may be made to the Members if, after giving effect to such distributions, either the Company would be unable to pay its debts as they become due in the usual course of business or the net assets of the Company would be less than zero.

### Article 7
### Accounting and Tax Matters

7.1     Books of Account. The Members shall cause proper and true books of account to be maintained for the Company in conformity with sound accounting principles consistently applied. There shall be recorded in the Company's books of account the particulars of all monies, goods or effects belonging to or owing to or by the Company, or paid, received, sold or purchased in the course of the Company's activities and all of such other transactions, matters and things relating to the Company as are usually entered in books of account kept by companies engaged in activities of a like kind and character.

7.2     Method of Accounting and Fiscal Year. The Company's books of account shall be maintained on the cash or accrual basis, as determined by Members holding at least a majority of the Profit Percentages as of the date such determination is made. The Company's fiscal year shall be the calendar year unless determined otherwise by Members holding at least a majority of the Profit Percentages as of the date such determination is made.

7.3     Reports and Returns. As soon as practicable after the close of each fiscal year the Company shall provide each Member with such statements as shall be necessary to advise the Members properly about their investment in the Company for income tax reporting purposes. The Company shall engage an accountant to prepare and to see to the filing of all Federal, state and local tax returns on behalf of the Company. Members acknowledge that the Company may not be able to provide all information required for income tax reporting purposes on a timely basis and that they should expect to extend the time for filing their income tax returns. Each Member does hereby consent to the electronic furnishing of Schedule K-1 information.

7.4     Capital Accounts. As part of the Company's books of account, an individual "Capital Account" shall be maintained for each Member at all times in accordance with sound accounting principles consistently applied.

7.5     Financial (Book) Allocations. The net profit or net loss of the Company, determined on an annual basis in accordance with sound accounting principles, shall, in the discretion of Members holding at least a majority of the Profit Percentages at such time, be allocated among the Members in accordance with any reasonable method selected by such Members that takes due account of the Members' economic interests in the Company and risk of loss as reflected by their capital contributions, rights to distributions and liability (direct and indirect) for the Company's debts and other obligations.

7

FILED DATE: 7/31/2019 4:27 PM   2019L008483

FILED DATE: 7/31/2019 4:27 PM   2019L008483

7.6     Tax Allocations. Except as provided herein, or as otherwise required by the Code or Treasury Regulations promulgated thereunder (including, without limitation, Treasury Regulations Section 1.704-1 and 1.704-2), Company income, gain, loss, deduction, credit and other partnership items, as computed for Federal income tax purposes, shall be allocated among the Members in the same manner as the corresponding book items are allocated pursuant to Section 7.5.

7.7     Tax Elections. Members holding at least a majority of the Profit Percentages at any given time shall have the right to make (and revoke) any and all tax elections for the Company, including, without limitation, an election to adjust the tax basis of Company assets under Code Section 754.

7.8     Administration of Tax Proceedings. The Members holding at least a majority of the Profit Percentages at any given time shall appoint, remove and replace the Company's "Tax Matters Partner" as defined in Code Section 6231(a)(7) (referred to herein as the "Tax Matters Member"). The Tax Matters Member shall have the right to resign by giving 30 days written notice to the Members. Upon the resignation of the Tax Matters Member, a successor Tax Matters Member shall be selected by the Members. The Members hereby appoint BCL-Family as the initial Tax Matters Member.

Article 8
Management of the Company

8.1     Management by Members. Except as otherwise provided in this Agreement, the affairs of the Company shall be managed and controlled by the Members (other than the Shachtman Trust) in accordance with this Agreement generally and this Article in particular. Except as otherwise provided in this Agreement, any action, decision or exercise of discretion by the Members in the name of the Company shall require the approval of any one of the Members (other than the Shachtman Trust).

8.2     Authority of Members.

(a)     *Power and Authority*. Without limiting the generality of the foregoing, and consistent with the purposes of the Company, each Member (other than the Shachtman Trust) acting alone on behalf of the Company shall have the right, power and authority to acquire assets; purchase goods and services; sell, exchange, lease, license or otherwise deal in or with any and all assets of the Company; open and maintain one or more bank accounts; borrow funds to finance the Company's activities and in connection with such borrowing, mortgage, hypothecate, pledge, lien or otherwise encumber the revenues and assets of the Company; guaranty the debts of affiliates and others when such Member believes it will benefit the Company to do so; confess, settle, compromise or otherwise satisfy debts, claims, judgments and other obligations, including by way of a deed in lieu of foreclosure or similar transaction; enter into any contract or agreement or amend or cancel the same; and invest and reinvest any funds or other assets of the Company – all as incident to or necessary for the operations of the Company.

(b)     *No Duty to Inquire*. Nothing herein contained shall impose any obligation on any person or firm doing business with the Company to inquire as to whether or not a Member has exceeded its power and authority in executing any agreement, contract, lease, mortgage, security agreement, deed or other instrument on behalf of the Company, and any such third person shall be fully protected in relying upon such authority.

(c)     *Major Action Approval Rights*. Notwithstanding any other provisions of this Agreement, a Member shall not be authorized to take, and shall not take, any of the actions that are set out below without the prior written consent of Members holding at least a majority of the Profit Percentages for the period in which such action is taken:

FILED DATE: 7/31/2019 4:27 PM   2019L008483

(i)     Making an assignment for the benefit of creditors or admitting in writing the inability of the Company to pay its debts generally as they become due or petitioning or applying to any tribunal for the appointment of a custodian, trustee, receiver or liquidator for the Company or of any substantial part of the assets, or commencing of any proceeding relating to the Company under any bankruptcy, reorganization, arrangement insolvency, readjustment of debt, dissolution or liquidation law of any jurisdiction.

(ii)    Hiring, firing, materially changing the responsibilities or duties, or altering the compensation (including salary, bonus or other benefits) of any employee.

(iii)   Determining the compensation, if any, of any Member or its affiliates in respect of such Member's or its affiliate's services to the Company.

(d)    *Subsidiaries.*   The provisions of this Agreement regarding the management and governance of the Company shall apply as well to the management and governance of the Company's subsidiaries, whether the subsidiaries are managed or controlled directly or indirectly by the Company, as a member, manager, partner, stockholder or otherwise. Any action to be taken by any such subsidiary shall be construed as an action taken by the Company and shall be subject to the same rights and limitations granted and imposed on the Members under this Agreement.

8.3    Members' Time Commitment. Each Member shall cause so much time to be devoted to the business of the Company as, in its judgment, the conduct of the Company's business shall reasonably require.

8.4    Reimbursement of Members. The Company shall reimburse the Members for any costs that may be properly expended on behalf of the Company made out of funds other than those of the Company.

8.5    Related Business Partners. The Company may employ, contract for services with, acquire or sell goods, property and materials from or to, borrow money from and otherwise deal with any Member or any affiliate of a Member on any basis which is customary and competitive, or otherwise fair and reasonable.

8.6    Liability of Member. A Member shall not be liable to another Member or the Company for honest mistakes of judgment, or for action or inaction, taken reasonably and in good faith for a purpose that was reasonably believed to be in the best interests of the Company, or for losses due to such mistakes, action or inaction, or for the negligence, dishonesty or bad faith of any employee, broker or other agent of the Company, but only if such employee, broker or agent was selected, engaged or retained and supervised with reasonable care. The Members may consult with counsel and accountants in respect of Company affairs and be fully protected and justified in any action or inaction that is taken in accordance with the advice or opinion of such counsel or accountants if, and only if, they shall have been selected with reasonable care. The Members shall look solely to the assets of the Company for the return of their capital and, if the assets of the Company remaining after payment or discharge of the debts and liabilities of the Company are insufficient to return such capital, they shall have no recourse against the Members for such purpose. Notwithstanding any of the foregoing to the contrary, the provisions of this Section shall not be construed to relieve (or attempt to relieve) any person of any liability by reason of gross negligence, recklessness or intentional wrongdoing or to the extent (but only to the extent) that such liability may not be waived, modified or limited under applicable law, but shall be construed so as to effectuate the provisions of this Section to the fullest extent permitted by law. This Section shall also

9

FILED DATE: 7/31/2019 4:27 PM   2019L008483

apply to the officers, directors, shareholders, partners, members, managers, employees, trustees, agents and other representatives of any entity that is a Member.

8.7     Indemnification. The Company shall indemnify any person who was or is a party, or is threatened to be made a party, to any threatened, pending or completed action, suit or proceeding (other than an action by or in the right of the Company), whether civil, criminal, administrative or investigative, by reason of the fact that the person is or was a member, manager, officer, employee, agent or other representative of the Company, or is or was serving at the request of the Company as a director, manager, officer, employee or agent of another limited liability company, corporation, partnership, joint venture, trust or other enterprise, against expenses (including attorney's fees and costs), judgments, fines and amounts paid in settlement actually and reasonably incurred by the person in connection with the action, suit or proceeding, if the person acted in good faith and in a manner the person reasonably believed to be in, or not opposed to, the best interests of the Company or, with respect to any criminal action or proceeding, had no reasonable cause to believe the person's conduct was unlawful. The termination of any action, suit or proceeding by judgment, order, settlement, conviction or upon a plea of *nolo contendere* or its equivalent shall not, of itself, create a presumption that the person did not act in good faith and in a manner that the person reasonably believed to be in, or not opposed to, the best interests of the Company or, with respect to any criminal action or proceeding, that the person had reasonable cause to believe that the person's conduct was unlawful. This Section shall also apply to the officers, directors, shareholders, partners, members, managers, employees, trustees, agents and other representatives of any entity that is a Member.

8.8     Authorized Signatories and Officers of the Company. The Members holding a majority of the Profit Percentages at any given time may from time to time appoint one or more persons to act as authorized signatories to execute agreements, contracts, documents (including promissory notes, mortgages, security agreements and other loan documents) and other instruments (including deeds) on behalf of the Company. The Members holding a majority of the Profit Percentages at any given time may also from time to time appoint one or more persons to serve as officers of the Company, in such capacities and with such delegated rights and powers as the Members may approve. No such authorized signatory or officer shall have any different or greater rights and powers than the Members have under this Agreement. Authorized signatories and officers appointed by the Members shall be entitled to be indemnified by the Company in accordance with Section 8.7.

Article 9
Membership in the Company

9.1     Rights and Obligations of the Members. Unless admitted to the Company as a Member in accordance with Article 10, no person who is not a signatory to this Agreement shall be considered a Member. The Company need deal only with persons as Members that are so admitted and shall not be required to deal with any other person (other than with respect to distributions to assignees pursuant to assignments in compliance with Article 10) merely because of an assignment or transfer of an interest to such person or by reason of the incapacity of a Member. Any distribution made in accordance with this Agreement by the Company to the person shown on the Company records as a Member or to its legal representatives, or to the assignee of the right to receive Company distributions as provided herein, shall acquit the Company with respect to such distribution of all liability to any other person that may have an interest in or claim to such distribution by reason of any other assignment by the Member with respect to such distribution or by reason of such Member's incapacity, or for any other reason.

9.2     Liability. No Member shall be personally liable for any of the debts of the Company or any of the losses thereof beyond the amount contributed or required to be contributed by it to the Company under this Agreement and as otherwise specified in this Agreement or in the Act.

10

FILED DATE: 7/31/2019 4:27 PM   2019L008483

9.3     No Partition. No Member shall have the right to partition any property of the Company during the term of this Agreement, or while such assets are held in trust pursuant to Section 12.4, nor shall any Member make application to any court of authority having jurisdiction in the matter or commence or prosecute any action or proceeding for such partition and the sale thereof, and upon any breach of the provisions of this Section by any Member, the other Members, in addition to all of the rights and remedies in law and in equity that they may have, shall be entitled to a decree or order restraining and enjoining such application, action or proceeding.  To the extent not prohibited by law, the Shachtman Trust specifically renounces, waives and forfeits all rights, whether arising under contract or statute or by operation of law, to seek, bring or maintain any action in any court of law or equity for an accounting.

9.4     Withdrawals and Resignations. No Member shall be entitled to withdraw, resign or voluntarily dissociate from the Company, except pursuant to the terms of this Agreement.  No Member shall be entitled to receive any money or property from the Company except (a) by way of distributions as provided pursuant to Article 6, (b) by way of distributions upon the winding-up of the Company pursuant to Article 12, (c) in respect of any loans to the Company then due and owing to such Member and (d) as expressly provided elsewhere in this Agreement.

9.5     Uncertificated or Certificated Securities. Unless the Members decide otherwise, the interests of the Members in the Company shall not be certificated.

9.6     Trustee Liability.

(a)     *Actions as Trustees*. When this Agreement is executed by the trustee of any trust, such execution is by the trustee, not individually, but solely as trustee in the exercise and under the power of authority conferred upon and vested in such trustee, and nothing herein contained shall be construed as creating any liability on the part of any such trustee personally to pay any amounts required to be paid hereunder, or to perform any covenant, either express or implied, contained herein, all such liability, if any, being expressly waived by the parties hereto by their execution hereof.  Any liability of any Member which is a trust to the Company or to any third person shall be only that of such trust to the full extent of its trust estate and shall not be a personal liability of any trustee, grantor or beneficiary thereof.

(b)     *Successor Trustee*. Any successor trustee or trustees of any trust which is a Member herein shall be entitled to exercise the same rights and privileges and be subject to the same duties and obligations as its predecessor trustee.  As used in this Agreement, the term "trustee" shall include any or all such successor trustees.

(c)     *Termination of Trust*. The termination of any trust which is a Member shall not terminate the Company.  Upon the allocation or distribution of all or any portion of the Company interest of a trust which is a Member pursuant to the exercise of any power of appointment, or otherwise, to a beneficiary of such trust or to another person or persons or to another trust or trusts, whether or not such distribution shall terminate such distributing trust, each such distributee shall be entitled to be admitted to the Company as a Member to the extent of the proportionate share of the Company interest distributed to it, subject to the terms of this Agreement, including, without limitation, the restrictions contained in Article 10.

9.7     Right of Reimbursement. In the event any Member guarantees any indebtedness or other obligation of the Company, then the Company shall promptly reimburse the guarantor for any and all payments made by the guarantor for such indebtedness or other obligation.  The Company shall not be obligated to reimburse the guarantor for any obligation under the guaranty that arises by reason of the gross negligence, willful misconduct or fraud of the guarantor or its affiliate.  This Section shall also

FILED DATE: 7/31/2019 4:27 PM   2019L008483

apply to any guaranty of any indebtedness or other obligation of the Company given by, and this Section shall then so benefit, any affiliate of a Member.

9.8     Competitive Undertakings. Any Member may engage in business ventures of any nature and description independently or with others, and neither the Company nor any of the Members shall have any rights in or to such independent ventures or the income or profits derived therefrom.

## Article 10
### Transfers and Rights Offerings; Bring-Along Rights; Purchase of Interests

10.1     Transfers by Members. No Member shall sell, exchange, pledge, mortgage, hypothecate or otherwise transfer or encumber its interest in the Company without the prior written consent of Members holding at least a majority of the Profit Percentages at such time. Any such transfer or encumbrance shall be void from inception and of no force or effect whatsoever. Direct or indirect transfers of interests in entities that are Members shall also be subject to the limitations of this Section.

10.2     Additional Membership Interests. The Members may issue additional membership interests in the Company (including so-called carried interests), or options, warrants or other rights to acquire membership interests in the Company, to new or existing Members on such terms as Members holding at least a majority of the Profit Percentages at any given time may determine is fair and reasonable. Upon the issuance of additional membership interests to new or existing Members, Members holding at least a majority of the Profit Percentages at such time are authorized to adjust the Profit Percentages, Capital Account balances, Unreturned Capital balances and other attributes of the membership interests of the existing Members to take due account of the additional membership interests issued by the Company.

10.3     General Provisions. The following rules shall apply to transfers of Company interests and the admission of additional persons to the Company:

(a)     *Procedure for Admission.* No person shall be admitted as a transferee or additional Member hereunder unless and until (i) in the case of an assignment of an interest in the Company permitted hereby, the assignment is made in writing, signed by the assignor and accepted in writing by the assignee, and a duplicate original of the assignment is delivered to and accepted by the Company, and (ii) the prospective admittee executes and delivers to the Company a written agreement, in form and substance satisfactory to the Company, pursuant to which said person agrees to be bound by this Agreement.

(b)     *Binding Effect.* Any person acquiring or claiming an interest in the Company, in any manner whatsoever, shall be subject to and bound by all terms, conditions and obligations of this Agreement to which its predecessor in interest, if any, was subject or bound, without regard to whether such person has executed a counterpart hereof or any other document contemplated hereby. No person, including the legal representatives, heirs or legatees of a deceased Member, shall have any rights or obligations greater than those set forth herein and no person shall acquire an interest in the Company or become a Member except as permitted hereby.

(c)     *Actions Prior to Acceptance of Assignment.* Notwithstanding that a person acquiring or claiming an interest in the Company is bound by all terms, conditions and obligations of this Agreement to which its predecessor in interest, if any, was subject or bound, the Company shall be entitled to treat the assignor of the assigned interest as the absolute owner thereof in all respects and shall incur no liability for distributions made in good faith to such assignor prior to such time as the documents specified in this Section have been delivered to and accepted by the Company. Any person to whom an

FILED DATE: 7/31/2019 4:27 PM   2019L008483

interest in the Company is attempted to be transferred in violation of this Article or any other provision of this Agreement shall not have any of the rights of a Member of the Company otherwise provided under this Agreement or the Act, including, but not limited to, the right (i) to receive distributions from the Company, (ii) to vote on any matter, (iii) to participate in the management of the Company, (iv) to act as an agent of the Company, (v) to obtain any information or accounting of the affairs of the Company or (vi) to inspect the books or records of the Company. If, however, by law, the Company is required to recognize the purported transfer of a Member's interest in the Company, the purported transferee's rights shall be strictly an economic interest in the Company limited solely to distributions (and accompanying allocations of accounting and tax items) as provided by this Agreement with respect to such economic interest, and the Member whose interest in the Company has purportedly been transferred shall have no right to any distributions with respect to such interest in the Company. Any distributions to such purported transferee may be applied (without limiting any other legal or equitable rights of the Company) to satisfy any debts, obligations or liabilities that the transferor or transferee may have to the Company (including for damages). A Member attempting to engage in any purported transfer that has not been approved in writing by Members holding at least a majority of the Profit Percentages shall be liable to indemnify and hold harmless the Company and the other Members from all costs, liability and damages that they may incur (including, but not limited to, incremental tax liability and attorney's fees and expenses) as a result of such purported transfer; any purported transferee shall be jointly and severally liable to do the same, including by way of set-off as provided in Section 6.5. For purposes of this paragraph, an economic interest in the Company shall mean a person's rights to distributions (and accompanying accounting and tax allocations), but excluding the right to vote, approve or disapprove, or otherwise to participate in, the management and control of the affairs of the Company.

(d)      *Costs.*  The costs incurred by the Company in processing an assignment (including attorney's fees and costs) shall be borne by the assignee, and shall be payable prior to and as a condition of admission to the Company.

10.4      Bring-Along Rights.  In the event that BCL-Family proposes to enter into one or more agreements to sell to any person or persons (referred to herein collectively as the "purchaser") all or substantially all of the membership interests in the Company in a single transaction or related series of transactions in lieu of a sale of all or a substantial part of the assets of the Company, all of the Members hereby agree to sell their respective interests in the Company to the purchaser on the terms set forth in such agreements. The agreements shall provide for the payment to the Members for their interests in the Company amounts equal to the amounts that they would have received had the Company (a) sold all of its assets at the price implicit in the price to be paid by the purchaser for the membership interests in the Company, (b) satisfied all of its obligations and (c) made liquidating distributions to the Members in accordance with Article 16. The costs associated with the sale shall, in general, be borne by the Members in the same proportion as they shared the considerations received in accordance with the preceding sentence. BCL-Family may reallocate among the Members so much of the considerations that a Member would be entitled to receive as equals the amounts which such Member then owes to the Company or to another Member. BCL-Family is hereby granted by each Member a power of attorney, coupled with an interest, to execute in the name of the Member any and all agreements, contracts, documents and other instruments (including instruments of assignment) that BCL-Family deems necessary or useful in order to consummate these transactions. These instruments shall be deemed to have been executed on behalf of the Members as if signed by the Members themselves.

10.5      Purchase of Interests.

(a)      *Membership Interests Subject to Purchase.*  The interests of any Member in the Company (which for purposes of this Section shall include any other person possessing an economic interest in the Company) shall be subject to purchase by BCL-Family as provided in this Section.

FILED DATE: 7/31/2019 4:27 PM   2019L008483

(b)     *Election to Purchase Made by BCL-Family.*  The decision to purchase a Member's interest in the Company in accordance with this Section shall be made by BCL-Family in its sole discretion and for any reason, including, without limitation, for "Cause" (as defined herein):

     (i)     As used in this Section, "Cause" means:

        (A)   A material breach by the Member of any of the terms, conditions or obligations of the Member contained in (1) this Agreement, including, without limitation, transferring (voluntarily, by operation of law or otherwise) an interest in the Company without the requisite approval of the Members in accordance with Section 10.1, or (2) any other operating agreement or governing document with respect to the Company.

        (B)   Fraud, dishonesty or willful and serious misconduct by the Member with respect to the business or affairs of the Company.

        (C)   Fraud, dishonesty or serious misconduct by the Member, other than with respect to the business or affairs of the Company, which involves an act of moral turpitude or could adversely affect the business, affairs or reputation of the Company.

        (D)   Interference with the orderly conduct of the Company's affairs that is demonstrably and materially injurious to the Company, monetarily or otherwise.

        (E)   The Member becoming a disreputable person.

        (F)   A Member who is an employee or otherwise engaged to provide services to the Company (in each case, an "employee") is separated from service for good cause (as defined below).  As used in this clause, "good cause" with respect to an employee means any one or more of the following:

            (I)    Employee's material breach of any employment, services or restrictive covenant agreement between employee and the Company.

            (II)   Employee's continued failure to perform his duties and responsibilities to the Company in a competent and professional manner for a period of 10 days following written notice by the Company to employee of such failure.

            (III)  Employee's willful failure to adhere to the Company's codes, policies or procedures (as in effect or as amended from time to time).

            (IV)   Employee's breach of any statutory or common law fiduciary duty (including the duty of loyalty) to the Company.

            (V)    Employee's admission or conviction of, or plea of guilt or *nolo contendere* with respect to, a felony crime or any other crime involving moral turpitude.

FILED DATE: 7/31/2019 4:27 PM   2019L008483

(VI)    Employee's abuse of illegal drugs or other controlled substances or his habitual intoxication.

(VII)   Any act described in the other clauses of this clause (i).

For the avoidance of doubt, "good cause" with respect to any employee does not mean retiring (in accordance with the retirement policies of the Company) or voluntarily resigning from service to the Company at a time when the Company would not otherwise have the right to terminate employee for good cause.

(ii)    For purposes of clauses (i) and (ii), the term "Company" shall include the Company and any of its subsidiaries or other affiliates. For the avoidance of doubt, any entity owned directly or indirectly by Joel Barnett, Nancy Barnett, Sam Barnett, Lindsey Barnett or any of their respective relatives or any trusts established for the benefit of any of the foregoing shall be deemed affiliates of the Company.

(iii)   For purposes of clauses (i) and (ii), the term "Member" shall include the Member and any of his or its affiliates or family members. For illustrative purposes only, Elan Peretz, Daniel Shachtman, their respective spouses and any trust established for the benefit of their respective spouses shall be deemed "Members" for purposes of clauses (i) and (ii).

(iv)   The purchase of a Member's interest for Cause shall not be considered a remedy for breach and shall not limit or in any way diminish any right or remedy the Company may have on account of an act constituting Cause.

(v)   The interests of all transferees, successors or assignees of a Member also be subject to purchase under this Section if any transferee, successor or assignee has engaged in any of the acts described in clauses (i) or (ii), or if the assigning or another predecessor Member of the transferee, successor or assignee (whether or not a Member) engaged in any of the acts described in such clauses.

(c)    *Purchase Notice*. If BCL-Family decides to purchase a Member's interest in the Company in accordance with this Section, BCL-Family shall send such Member (the "Subject Member") written notice (the "Purchased Notice") of its decision. The Purchase Notice shall specify the date on which the purchase sha ll close (the "Purchase Clo sing Date"); the Purchase Closi ng Date shall be established in accordance with paragraph (f).

(d)    *Purchase Price*. The purchase price (the "Purchase Price") of a Subject Member's interest shall equal:

(i)    The amount that the Subject Member would have received had the Company (A) terminated on the date the Purchase Notice was given, (B) sold all of its assets at their fair market values (as determined by BCL-Family in its sole discretion) on the date the Purchase Notice was given (net of BCL-Family's estimate of the costs and expenses of such sale), (C) satisfied all of its debts and obligations and (D) made distributions to the Members in accordance with Section 12.2, *less* any distributions made to the Subject Member after the date the Purchase Notice is given to Purchase Closing Date, *multiplied by*

15

FILED DATE: 7/31/2019 4:27 PM     2019L008483

(ii)     a percentage discount determined by BCL-Family in its sole discretion based on a decrease in value by reason of minority discount, lack of marketability or similar theory and such other factors determined by BCL-Family in its sole discretion.

Notwithstanding anything to the contrary contained in this Agreement, in the case of a purchase for Cause, (I) the Purchase Price shall not exceed $100.00 and (II) the Purchase Price shall be reduced by all of the Company's costs and expenses associated with the redemption, including without limitation attorney's and other professional fees, filing fees and transfer taxes.

(e)     *Payment of Purchase Price*.  The Purchase Price shall be paid in immediately available funds on the Purchase Closing Date.

(f)     *Purchase Closing Date and Closing Deliveries*.  The Purchase Closing Date shall be on a date and at the time specified by BCL-Family in the Purchase Notice but not later than the 30th day following the date the Purchase Notice is given.  Closing shall occur at the Company's principal office or at such other place specified by BCL-Family in the Purchase Notice.  At the closing, the Company shall tender the Purchase Price (as provided in paragraph (e)) to the Subject Member and the Subject Member shall accept the same and execute such documents of transfer as BCL-Family may request.  If the Subject Member shall not accept the tender of the Purchase Price or execute said documents, BCL-Family shall be entitled to execute the documents of transfer for and on behalf of the Subject Member, with the same effect as if the Subject Member had done so itself, and the contemplated transfer shall be deemed closed once Management has deposited the Purchase Price (i) as an interpleader in any court of competent jurisdiction (the Subject Member hereby irrevocably consents to such interpleader) or (ii) with any bank, trust company, escrow company or law firm under instructions that the same may be withdrawn by the Subject Member upon demand.  The closing of a redemption as contemplated in this paragraph shall not prejudice a Subject Member's right to contest the calculation of the Purchase Price but a Subject Member shall not be permitted to contest the effectiveness of the closing as contemplated by this paragraph.

(g)     *Assignment of Right of Purchase*.  BCL-Family shall have the right to assign BCL-Family's right to acquire the Subject Member's interest in the Company to any one or more Members or affiliates of any of the foregoing, and the provisions of this Section shall be construed accordingly.

## Article 11
## Amendments to the Agreement

11.1     Amendments.

(a)     *In General*.  This Agreement may be modified or amended at any time and from time to time upon the written consent of BCL-Family.

(b)     *Limitations on Authority to Amend*.  In no event shall any modification or amendment to this Agreement made pursuant to clause (a) above (i) disproportionately decrease the right of any Member to distributions in relation to Members similarly situated; or (ii) cause any Member to incur any additional personal liability with respect to the Company – unless in each case the Members adversely affected thereby consent in writing to such modification or amendment.

11.2     Power of Attorney.  Each Member hereby appoints BCL-Family (and each of its managers) as its true and lawful attorney, coupled with an interest in its name, place and stead, to sign, execute, acknowledge, swear to and file any and all documents which in the discretion of such attorney are required to be signed, executed, acknowledged, sworn to or filed by the Member to discharge the

FILED DATE: 7/31/2019 4:27 PM   2019L008483

purposes of the Company as hereinabove stated or the provisions of this Agreement. Without limitation, among the documents BCL-Family (and each of its managers) may execute on behalf of each Member shall be the following:

(a)     Any amendments to this Agreement, when this Agreement is amended in accordance with Section 11.1.

(b)     The Charter and any other instrument which may be required of the Company pursuant to the Act or the laws of any other jurisdiction and any amendments thereto that are not prohibited by Section 11.1.

The grant of authority set forth in this Section is a special power of attorney coupled with an interest, is irrevocable and shall survive the death, incapacity, insolvency, bankruptcy, liquidation or dissolution of a Member; may be exercised by BCL-Family (or any of its managers) for a Member by a facsimile signature or by listing the names of all of the Members executing any instrument with the signature of BCL-Family (or any of its managers), as attorney in fact for all of them; and shall survive the delivery of an assignment by a Member of all or any portion of its interest, except that where the assignee has been approved for admission to the Company as a substituted Member by the requisite consent of the Members in accordance with the provisions of Article 10, the power of attorney shall survive the delivery of such assignment for the sole purpose of enabling BCL-Family (and each of its managers) to execute, acknowledge and file any instrument necessary to effect such substitution, and the grant of authority set forth in this Section shall be deemed to have been made by such substitute Member.

Article 12
Winding-Up and Dissolution of the Company

12.1     Winding-Up and Dissolution Procedures. Upon an event described in Section 4.2, the affairs of the Company shall be wound-up and the Company shall be dissolved. A Member (the "Winding-Up Member") appointed by Members holding at least a majority of the Profit Percentages shall preside over the winding-up and dissolution of the Company or may appoint one or more agents to do so. The Winding-Up Member shall make such filings in the State and in such other states in which the activities of the Company make it necessary or desirable to do so and do or cause to be done such other acts and things as shall be required to dissolve the Company.

12.2     Distributions Upon Winding-Up. Except as otherwise provided in this Article, the winding-up and dissolution of the Company shall involve:

(a)     The orderly sale or other disposition of the Company's non-cash assets within a commercially reasonable time.

(b)     The payment or settlement of (and where appropriate, the establishment of reasonable reserves for) the Company's debts and other obligations, including to Members who are creditors, in the order of priority and to the extent provided by law.

(c)     The distribution of any remaining sums among the Members in accordance with Section 6.2.

12.3     Distributions In Kind. In the event that the Winding-Up Member determines that it is necessary or desirable to make a distribution of Company assets in kind, such assets shall be transferred and conveyed either to (a) the Members as tenants in common so as to vest in them undivided interests in the whole of such assets in proportion to their respective rights to share in the proceeds of the sale of such

FILED DATE: 7/31/2019 4:27 PM   2019L008483

assets in accordance with the provisions of Section 12.2(c); or (b) any one or more of the Members either as tenants in common (so as to vest in them undivided interests in the whole of such assets, in the proportions reasonably determined by the Winding-Up Member) or otherwise, on the condition that each such distributee receives aggregate value (whether in kind, cash or both) in accordance with the provisions of Section 12.2(c). All such Company assets shall be valued at fair market value as determined by the Winding-Up Member and shall be subject to such reasonable conditions and restrictions as are necessary or desirable in order to preserve the value of the assets distributed or for legal reasons.

12.4    Liquidating Trust. In the discretion of the Winding-Up Member, all or any portion of the distributions that would otherwise be made to the Members pursuant to Section 12.2(c) may be distributed to a trust established for the benefit of the Members for the purposes of liquidating Company assets, collecting amounts owed to the Company and paying any debts or other obligations of the Company arising out of or in connection with the Company. The Winding-Up Member shall appoint one or more persons as liquidating trustee. The assets of any such trust shall be distributed to the Members from time to time in the discretion of the Liquidating Trustee in the same proportions as the amount distributed to such trust by the Company would otherwise have been distributed to the Members pursuant to this Agreement.

12.5    Final Accounting. As part of the winding-up of the Company, a final accounting shall be made of the activities of the Company from the date of the last previous accounting to the date of dissolution. If a Member has a deficit in its Capital Account, such Member shall not be obligated to contribute any amount of that deficit to the Company; any such deficit shall not be considered an asset of the Company.

Article 13

General Provisions

13.1    Notices. All notices, demands, offers or other communications required or permitted to be given pursuant to this Agreement shall be in writing and shall be transmitted by courier, recognized overnight delivery service (such as FedEx) or first class (postage prepaid) certified U.S. mail. Any notice, demand, offer or other communication shall be effective on the date of receipt at the address of the addressee. Notices, demands, offers or other communications to a Member shall be addressed to the Member at the address beneath the Member's name on the signature page of this Agreement or, if applicable, in such Member's joinder to this Agreement or other instrument admitting the Member to the Company. Any Member may change its address for all future notices, demands, offers or other communications by giving notice to all of the other Members stating its new address.

13.2    Successors. This Agreement and all the terms and provisions hereof shall be binding upon the parties hereto and their respective legal representatives, heirs, successors and assigns, except as expressly herein otherwise provided.

13.3    Third Party Benefits. Without limiting Section 13.2, the provisions of this Agreement are intended solely to benefit the Company and the parties hereto and, to the fullest extent permitted by applicable law, shall not be construed as conferring any benefit upon any other person, including without limitation any creditor of the Company (and no such creditor or other person shall be a third party beneficiary of this Agreement), and except as required by the Act, the Members shall have no duty or obligation to any such creditor or other person to make any contributions or return any money or other property to the Company.

FILED DATE: 7/31/2019 4:27 PM   2019L008483

13.4     Governing Law.  This Agreement shall be construed in conformity with the domestic laws of the State, as applied to agreements whose only parties are residents of the State and which are to be performed entirely within the State.

13.5     Severability.  If any provision of this Agreement, or the application of such provision to any person or circumstance, shall be held invalid by a court of competent jurisdiction, the remainder of this Agreement, or the application of such provision to persons or circumstances other than those to which it is held invalid by such court, shall not be affected thereby.

13.6     Other Rules of Construction.  Every provision of this Agreement shall be construed simply according to its fair meaning and not strictly for or against any Member (notwithstanding any rule of law requiring an Agreement to be construed against the drafting party).  The following additional rules of construction shall apply to this Agreement:

(a)     All pronouns shall include the masculine, feminine or neuter thereof, wherever the context and facts require such construction.

(b)     The term "person" refers to an individual, corporation, partnership, joint venture, limited liability company, limited liability partnership, a cell of a series organization, association, joint stock company, statutory trust, common-law trust, unincorporated organization, government authority or any other organization whether or not a legal entity.

(c)     The term "party" means a signatory to this Agreement, including a Member and any successor to any Member, whether or not such successor has executed or otherwise joined in this Agreement.  The fact that a successor is a party shall not give that person any greater rights than it has under the express terms of this Agreement.  By way of illustration, a successor who has not been admitted to the Company in accordance with Article 10 is a party to this Agreement for purposes of the dispute resolution procedures in Section 13.8, but despite being a party is still subject to the limitations of Section 10.3(c).

(d)     The term "affiliate" is to have a meaning reasonably appropriate to its context; without limiting the generality of the foregoing, when used in connection with conduct that by the terms of this Agreement is to be circumscribed, the term shall be interpreted broadly. Without limiting the generality of the foregoing, an "affiliate" of a specified person, or a person "affiliated" with a specified person, is a person that directly, or indirectly through one or more intermediaries, controls, is controlled by or is under common control with the specified person.

(e)     All terms defined in this Agreement in the singular have the same meanings when used in the plural and vice versa.

(f)     The use of the word "including" herein shall not be considered to limit the provisions which it modifies but instead shall mean "including without limitation" u nless the provision states otherwise.

(g)     An "Article" of this Agreement is typically identified with a number (*e.g.*, "Article 13"). A "Section" of this Agreement corresponds to an Article and is typically identified with a number that includes a decimal (*e.g.*, "Section 13.6"). A "paragraph" of this Agreement corresponds to a Section and is typically identified by a lower case letter (*e.g.*, paragraph "(g)"). A "clause" of this Agreement corresponds to a paragraph and is typically identified with a roman numeral or an upper case letter (*e.g.*, "(i)," "(I)" or "(A)").

FILED DATE: 7/31/2019 4:27 PM   2019L008483

(h)     Headings, titles and subtitles are inserted for convenience of reference only and are to be ignored in any construction of the provisions hereof.

(i)     In the interpretation of this Agreement, no inference shall be drawn from the fact that a provision not included in this Agreement was included and then deleted from a draft of this Agreement.

13.7    Members Not Agents.  Nothing contained herein shall be construed to constitute any Member the agent of another Member, except as specifically provided herein.

13.8    Dispute Resolution.

(a)     *Jurisdiction, Venue and Service of Process*.  The Company and the parties to this Agreement hereby irrevocably and unconditionally agree that any suit, action or proceeding arising out of or related to this Agreement or the Company shall be brought only in the United States District Court for the Northern District of Illinois or in the Circuit Court of Cook County, Chicago, Illinois, and the specific choice from among the foregoing shall be determined by the party initiating such suit, action or proceeding.  To the fullest extent permissible by law, the Company and the parties to this Agreement hereby consent to the personal jurisdiction, venue and forum of such courts and hereby irrevocably and unconditionally waive any claim or objection that it is not subject to the jurisdiction of such courts, that the venue is improper, that the forum is inconvenient or any similar objection, claim or argument.  Service of process on any of the parties hereto with regard to any such action may be made and is considered legally proper by mailing the process to such person by certified mail to the address of such person as provided in Section 13.1 or to any subsequent address to which notices shall be sent.

(b)     *Waiver of Trial by Jury*.  Each party acknowledges and agrees that any controversy which may arise under this Agreement is likely to involve complicated and difficult issues, and therefore each such party hereby irrevocably and unconditionally waives any right such party may have to a trial by jury with respect to any litigation directly or indirectly arising out of or relating to this Agreement.  Each party understands and has considered the implications of this waiver. Each party makes this waiver voluntarily.

(c)     *Attorney's Fees*.  If the Company or any Member obtains a judgment in connection with a dispute arising under or in connection with any this Agreement, such party shall be entitled to recover from the non-prevailing party its court costs, and reasonable attorney's fees and disbursements incurred in connection therewith and in any appeal or enforcement proceeding thereafter, in addition to all other recoverable costs.

13.9    Remedies.  Subject to any express provisions of this Agreement, no remedy conferred upon the Company or any Member is intended to be exclusive of any other remedy herein or by law provided or permitted, but each shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law, in equity or by statute.

13.10   Waiver.  No waiver by the Company or any Member of any breach of this Agreement shall be deemed to be a waiver of any other breach of any kind or nature, and no acceptance of payment or performance by the Company or any Member after any such breach shall be deemed to be a waiver of any breach of this Agreement, whether or not the Company or any Member knows of such breach at the time it accepts such payment or performance.  No failure or delay on the part of the Company or any Member to exercise any right it may have shall prevent the exercise thereof by the Company or any Member at any time such other may continue to be so in default, and no such failure or delay shall operate as a waiver of any default.

FILED DATE: 7/31/2019 4:27 PM   2019L008483

13.11   Entire Understanding.   This Agreement constitutes the entire understanding among the Members and supersedes any prior understanding and/or written or oral agreements among them with respect to the Company. In the event of any conflict between this Agreement and any other written or oral communications among the Members, this Agreement shall control and take precedence.

13.12   Further Assurances.   Each of the parties hereto shall hereafter execute and deliver such further instruments and do such further acts and things as may be required or useful to carry out the intent and purpose of this Agreement and as are not inconsistent with the terms hereof.

13.13   Counterparts.   This Agreement may be executed in counterparts, each of which shall be an original, but all of which shall constitute one and the same instrument.

13.14   Electronic Transmission.   Signatures to this Agreement that are transmitted electronically (*i.e.*, via e-mail or facsimile) shall be binding.

13.15   Counsel.   Joel Barnett and BCL-Family (collectively, the "Directing Party") have selected Levenfeld Pearlstein, LLC ("LP") to prepare this Agreement. LP is counsel to Directing Party. Each party to this Agreement acknowledges that LP (a) does not represent the interests of any party other than Directing Party and (b) that LP shall owe no duties to the Company or any other party other than Directing Party. In the event any dispute or controversy arises between the Company or a party, on the one hand, and Directing Party, on the other hand, each party agrees that LP may represent Directing Party in any such dispute or controversy. To the extent that Directing Party requests that LP do so, LP may represent the Company in any dispute with any party other than Directing Party. The Company and each party consent to such representation. Each party further acknowledges that, whether or not LP has in the past represented or is currently representing such party with respect to other matters, LP has not represented the interest of any party other than Directing Party in the preparation or negotiation of this Agreement.

*[Signatures begin on the next page]*

21

*[Signature Page to Second Amended and Restated Operating Agreement]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed.

FILED DATE: 7/31/2019 4:27 PM   2019L008483

BCL-FAMILY LLC

By: _____
Joel A. Barnett, Manager

450 Skokie Boulevard
Suite 604
Northbrook, Illinois  60062

_____
Elan Peretz, not individually, but as
Trustee of the Elan Peretz Trust

450 Skokie Boulevard
Suite 604
Northbrook, Illinois  60062

_____
Daniel Shachtman, not individually,
but as Trustee of the Daniel
Shachtman Trust Dated October 14,
2008

450 Skokie Boulevard
Suite 604
Northbrook, Illinois  60062

_____
Kenneth Fixler

450 Skokie Boulevard
Suite 604
Northbrook, Illinois  60062

_____
Jonathon Fixler

450 Skokie Boulevard
Suite 604
Northbrook, Illinois  60062

# Exhibit 7

Home Rehab P&L
2014 - 2021

| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | TOTAL |
|---|---|---|---|---|---|---|---|---|---|
| **INCOME** | | | | | | | | | |
| GROSS INCOME FROM HOME SALES | $ 12,890,602.32 | $ 40,944,765.93 | $ 26,758,862.16 | $ 59,717,469.08 | $ 40,205,314.99 | $ 22,404,109.83 | $ 8,320,172.50 | 4,835.00 | $ 211,246,131.81 |
| LESS COMMISSIONS | $ (720,050.50) | $ (507,653.00) | $ (678,071.50) | $ (2,605,937.80) | $ (1,890,514.40) | $ (1,104,993.82) | $ (307,815.00) | - | $ (7,815,036.02) |
| LESS CLOSING COSTS AND CREDITS | $ (553,230.47) | $ (448,874.29) | $ (361,783.19) | $ (594,413.06) | $ (385,767.74) | $ (216,302.21) | $ (83,091.89) | (475.00) | $ (2,643,937.85) |
| EQUALS NET INCOME FROM HOME SALES | $ 11,617,321.35 | $ 39,988,238.64 | $ 25,719,007.47 | $ 56,517,118.22 | $ 37,929,032.85 | $ 21,082,813.80 | $ 7,929,265.61 | 4,360.00 | $ 200,787,157.94 |
| | | | | | | | | | |
| **EXPENSES** | | | | | | | | | |
| TOTAL COGS | $ 9,410,812.76 | $ 39,263,266.32 | $ 23,676,975.61 | $ 62,046,200.38 | $ 41,166,596.17 | $ 23,830,431.80 | $ 8,685,705.05 | 36,262.42 | $ 208,116,250.51 |
| GROSS MARGIN | $ 2,206,508.59 | $ 724,972.32 | $ 2,042,031.86 | $ (5,529,082.16) | $ (3,237,563.32) | $ (2,747,618.00) | $ (756,439.44) | (31,902.42) | $ (7,329,092.57) |
| TOTAL SGA | $ 229,466.53 | $ 1,008,733.73 | $ 1,868,118.99 | $ 1,995,236.72 | $ 981,052.63 | $ 548,632.06 | $ 461,168.71 | 200,914.83 | $ 7,293,324.20 |
| TOTAL INTEREST EXPENSE (BANK & PREFERRED) | $ 862,288.79 | $ 1,686,209.40 | $ 3,829,434.58 | $ 4,476,022.88 | $ 3,239,503.40 | $ 1,805,655.04 | $ 389,039.55 | 37,151.19 | $ 16,325,304.83 |
| NET INCOME | **1,114,753.27** | **-1,969,970.81** | **-3,655,521.71** | **-12,000,341.76** | **-7,458,119.35** | **-5,101,905.10** | **-1,606,647.70** | **-269,968.44** | **-30,947,721.60** |